UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>STEPHEN JOHNSON,<br><br>Defendant. | Case No. 22-CR-176 (CJN) |

## UNITED STATES OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

The United States of America, by and through its undersigned counsel, opposes the defendant's Motion to Suppress Statements, ECF No. 85, filed on November 22, 2023. Here all of defendant Stephen Johnson's statements to law enforcement are admissible at trial where he was arrested pursuant to a valid warrant, his pre-*Miranda* statements to officers were in response to "routine booking" questions, and where his post-*Miranda* statements were made after a knowing, voluntary, and intelligent waiver of his right to remain silent. At no time during his conversation with law enforcement did Johnson unambiguously assert his right to counsel or to remain silent and, instead, only asked law enforcement for clarification as to his rights. For these reasons, and any other reasons raised at a hearing, the defendant's motion to suppress his voluntary statements to law enforcement should be denied.

## FACTUAL BACKGROUND

The defendant, Stephen Johnson, came to the attention of law enforcement when Google reported to the National Center for Missing and Exploited Children (NCMEC)[1] that Google user

---

[1] The National Center for Missing and Exploited Children is a non-profit 501(c)(3) organization that serves as a national clearinghouse and resource center for families, victims, private organizations, law enforcement, and the public on missing and sexually exploited child issues.

stephenjohnson1197@gmail.com had uploaded numerous media files to Google Drive between the dates of September 21, 2020, and October 1, 2020.  Between October 3 and October 5, 2020, Google submitted 19 related CyberTip reports concerning the Google account stephenjohnson1197@gmail.com—an account that was later determined to belong to the defendant, Stephen Johnson.  Google reported that the user of this account had provided a name of "Stephen Johnson," along with a verified phone number and a backup email account.

As described in further detail below, Google identifies and reports child sexual abuse imagery in accordance with the federal definition of child pornography as codified in 18 U.S.C. § 2256.  When a Google employee or contractor reviews a file and determines that it is apparent child pornography, the file's "hash" (or digital fingerprint) is added to a repository of known child pornography.  When Google submits a CyberTip, the contents of the files reported have been viewed by a Google employee or contractor—the contents of the file are either reviewed by a person immediately before sending the CyberTip, or historically a person had reviewed a file whose hash matched the hash of the reported image and had determined it was apparent child pornography.

The CyberTip reports that Google submitted in this case corresponded to 220 files that were hash matches to files that a Google employee or contractor had identified as child pornography.  The reports were referred to the Northern Virginia–Washington, D.C. Internet Crimes Against Children Task Force and, after initial investigation by the Virginia State Police,

---

NCMEC operates a CyberTipline and Child Victim Identification Program.  Through the CyberTipline, Internet and Electronic Service Providers, and individual persons, may notify NCMEC of online child sexual abuse images.  NCMEC makes information submitted to the CyberTipline and Child Victim Identification Program available to law enforcement agencies.

were assigned to Metropolitan Police Department Detective Thomas Sullivan—a member of the task force—in December 2020.

Detective Sullivan reviewed the files submitted with CyberTip reports and observed child pornography. Out of an abundance of caution, the government initially applied for a search warrant to view the CyberTip files. After extensive litigation, Magistrate Judge Zia Faruqui found that the application established probable cause but ultimately denied it as unnecessary. *See In re the Search of Encrypted Data Provided by the National Center for Missing and Exploited Children for Nineteen Related Cyber Tipline Reports*, No. 20-SW-321 (ZMF), 2021 WL 2100997, at *1 (D.D.C. May 22, 2021); (ECF No. 4, Case No. 2021-SW-321 (ZMF) (D.D.C. May 22, 2021)).

On March 30, 2021, Judge Faruqui issued a search warrant for the defendant's Google account, stephenjohnson1197@gmail.com. (*See* Case. No. 20-SC-3303 (ZMF) (D.D.C.)). In the supporting affidavit, Detective Sullivan detailed his review of certain files from the CyberTip reports, which had been uploaded to the defendant's Google Drive from an IP address associated with the defendant's Comcast Internet service, including but not limited to:

   a. **lil black girl fucked by BBC.mp4** – Uploaded on September 21, 2020: This video is forty-five seconds long and shows a prepubescent African American female having her buttocks and genitals rubbed and penetrated by an adult male's erect penis. The child is faced away from the camera watching television, and she is nude from the waist down. The child does not appear to have any indication of pubic hair.

   b. **black Shayla BACK IT UP 2.mp4** – Uploaded on September 21, 2020: This video is one minute and twenty-six seconds long and shows a prepubescent African American female completely nude laying on a bed. The child is holding an electric toothbrush which she places on and inside her genitals. An unknown person eventually takes the toothbrush out of the child's hand and places it on and inside the child's genitals. The prepubescent girl has no breast development or indication of any pubic hair.

In July 2021, law enforcement reviewed the contents of the defendant's Google account pursuant to the warrant. Law enforcement searched the production for child pornography and

3

located a folder within the account's Google Drive labeled "Haute Gurls." This folder contained several subfolders which included the following folders: "2020 PYT PACK," "blkkid 2," Brand new pyts 2," "ebonypyt," "Exclusive PYT's," "new stuff," and "pyt trade." Some of these folders contained additional child pornography that Google had not reported in the CyberTips. In addition, the Google production also included, among other things, the defendant's Google Chrome web browser history between April 8, 2020, and October 2, 2020. The browser history shows that, on multiple occasions, the defendant visited Dropbox folders with names including "Black teens and underage thots," "blkkidd 2," "PYT Pack," "2020 PYT PACK," and "Brand new pyts 2." Some of these folder names—such as "blkkidd 2," "2020 PYT PACK," and "Brand new pyts 2"—are identical to folder names that were found in the file structure of the defendant's Google Drive; these three Google Drive folders were among those that contained apparent child pornography.

On September 9, 2021, Judge Faruqui signed a search warrant authorizing the government to obtain historical and prospective cell site location data for the cellular phone associated with the defendant's Google account. (*See* Case No. 21-SC-2953 (ZMF) (D.D.C.)). That data corroborated other information obtained by law enforcement indicating that the defendant resided in an apartment on H Street Northeast in Washington, D.C.

On October 5, 2021, Judge Faruqui issued a criminal complaint and arrest warrant charging the defendant with one count of Transportation of Child Pornography, in violation of 18 U.S.C. § 2252(a)(1). (*See* ECF No. 1).

On October 7, 2021, members of the FBI Child Exploitation and Human Trafficking Task Force (CEHTTF) executed a residential search warrant for the defendant's residence. Pursuant to the search warrant, law enforcement seized digital devices belonging to the defendant, including his laptop computers and cellular telephones. The defendant was home at the time the search

warrant was executed and taken into custody pursuant to the arrest warrant.

Following his arrest, the defendant was taken to the FBI's Washington Field Office, where he waived his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 479 (1966), and agreed to be interviewed by CEHTTF members. Prior to receiving his *Miranda* warnings, law enforcement asked the defendant a series of administrate questions, including his full name, date of birth, phone number, and other details that were administratively necessary for either the booking process or for concluding the residential search that had been executed that same day. Law enforcement then reviewed the defendant's *Miranda* rights, which he voluntarily waived, agreeing to speak with law enforcement without an attorney present. During the interview, defendant Johnson made a number of admissions related to the case, which he now seeks to suppress.

On May 20, 2022, the Grand Jury returned a single-count indictment charging defendant Johnson with one count of Transportation of Child Pornography, in violation of 18 U.S.C. § 2252(a)(1). Trial is currently scheduled to begin on January 29, 2023.

## LEGAL STANDARDS

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. To safeguard that right, the police must warn a suspect who is going to be questioned while in custody that he "has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). These rights need not be word for word from the *Miranda* ruling. Substance, not form, is the test. See, e.g., *Florida v. Powell*, 559 U.S. 50, 64, (2010) ("We decline to declare its precise formulation necessary to meet *Miranda*'s requirements. Different words were used in the advice [the

5

defendant] received, but they communicated the same essential message."); *Duckworth v. Eagan*, 492 U.S. 195, 202 (1989) ("We have never insisted that Miranda warnings be given in the exact form described in that decision."); *California v. Prysock*, 453 U.S. 355, 359, (1981)("*Miranda* itself indicated that no talismanic incantation was required to satisfy its strictures.").

While *Miranda* warnings are generally required, there are exceptions to the general rule. One notable exception is the "routine booking" exception which permits officers to ask "routine booking and processing questions regarding biographical data necessary to complete booking or pretrial services" prior to giving *Miranda* warnings. *United States v. Savoy*, 889 F. Supp. 2d 78, 108–09 (D.D.C. 2012) (internal citations omitted), citing *Pennsylvania v. Muniz,* 496 U.S. 582, 601–02, 110 (1990). The reasoning underlying this exception is that "officers asking routine booking questions 'reasonably related to the police's administrative concerns' are not engaged in interrogation within Miranda's meaning and therefore do not have to give *Miranda* warnings." *United States v. Gaston*, 357 F.3d 77, 82 (D.C. Cir. 2004), citing *Muniz,* 496 U.S. at 601-02.

Once *Miranda* warnings have been administered, however, a suspect who wishes to invoke his rights must do so unambiguously. *See Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010) ("There is good reason to require an accused who wants to invoke his or her right to remain silent to do so unambiguously."); *Davis v. United States*, 512 U.S. 452, 461-62 (1994) ("If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him."). This requirement "results in an objective inquiry that avoids difficulties of proof and provides guidance to officers on how to proceed in the face of ambiguity." *Berghuis*, 560 U.S. at 381 (cleaned up). Statements that merely convey that a suspect "might" exercise their rights to request counsel or terminate are insufficient. United States v. Abu Khatallah, 275 F. Supp. 3d 32, 69 (D.D.C. 2017) (Cooper, J.) (citing cases). Moreover, the Court

must consider the relied-upon invocation within the context of the surrounding conversation. In other words, the Court must ask, "Under the totality of the circumstances, what was the message that [the Defendant] wished to convey?" *United States v. Mills*, 122 F.3d 346, 350 (7th Cir. 1997). Where a suspect says something ambiguous or equivocal, it is not only permissible but often "good police practice" to clarify whether he wants to invoke his rights. *Davis*, 512 U.S. at 461; *accord Berghuis*, 560 U.S. at 381. Where the suspect decides to talk, his statements may be admitted without violating the Fifth Amendment if the government shows by a preponderance of evidence that he knowingly, intelligently, and voluntarily waived his rights. *See Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986).

The Supreme Court has indicated that the inquiry into whether a statement is obtained voluntarily should be determined with reference to the totality of the circumstances. In determining whether a defendant's will was overborne in a particular case, the Court has "assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Bustamonte*, 412 U.S. at 226. The ultimate question is whether the suspect's "will [has been] overborne" by "coercive police activity." *Colorado v. Connelly*, 479 U.S. 157, 167, 178 n.2 (1986). If there is no coercive police activity, a statement is considered voluntary. *Connelly*, 479 U.S. at 167; *Baird v. United States*, 851 F.2d 376, 382 (D.C. Cir. 1988). *Compare United States v. Hallford*, 816 F.3d 850, 856 (D.C. Cir. 2016) (no coercive police conduct where defendant agreed to an interview with agents, agents asked "straightforward" questions in "conversational tones"; defendant was not restrained; interview lasted less than an hour; defendant questioned in a hospital and not in a police-dominated atmosphere; defendant was not tricked into answer questions; defendant's refusal to consent to a search of his vehicle showed his will was not overborne), *with Little v. United States*, 125 A.3d 1119, 1133 (D.C. 2015) (defendant chained to

7

the ground and chair, denied counsel when requested, threatened that he would be raped if he went to jail, and accused of crimes officers knew he did not commit, was coerced into confessing).

## ARGUMENT

All of the statements made by defendant Johnson to law enforcement following his arrest are admissible at trial. Here, the defendant was arrested pursuant to a valid warrant, his pre-*Miranda* statements to officers were in response to "routine booking" questions, and his post-*Miranda* statements were made after a knowing, voluntary, and intelligent waiver of his right to remain silent. At no time during his conversation with law enforcement did Johnson unambiguously assert his right to counsel or to remain silent and, instead, only asked law enforcement for clarification as to his rights. Thus, the defendant's motion should be denied.

I. **Defendant Johnson Was Lawfully Arrested Prior to his Custodial Interview**

As described above, defendant Johnson was arrested on October 7, 2021, following the search of his residence at 600 H Street Northeast, Apartment XXX. He was then transported to the FBI's Washington Field Office, where he was interviewed by CEHTTF members. Prior to his arrest, Magistrate Judge Zia Faruqi issued an arrest warrant based upon probable cause, 21-mj-626, charging the defendant with one count of Transportation of Child Pornography. For reasons addressed in the "Government's Consolidated Memorandum In Opposition to Defendant Stephen Johnson's Motions to Suppress Evidence From Google Account, Seized from Residence, and From Electronic and Storage Devices," the arrest warrant was valid. Thus, the statements made by the defendant during his custodial interview do not constitute "tainted fruit" to be suppressed.

II. **Defendant Johnson's Pre-*Miranda* Responses to Routine Booking Questions Are Admissible**

While many statements made by a defendant are only admissible after a defendant has been provided with his *Miranda* warnings, there is an exception for routine booking questions. Such

questions are admissible even if asked, as here, prior to the defendant receiving *Miranda* warnings. After arrest, and upon arriving at the FBI Washington Field Office, defendant Johnson was placed in a room alone. He was not handcuffed or shackled and sat on a seat in the corner of the room. A video camera recorded the defendant's arrival and his entire interaction with law enforcement.[2]

After sitting in the room alone for approximately five minutes, two law enforcement officers entered the room: FBI Special Agent Laura Calvillo and MPD Detective Thomas Sullivan, both dressed in plain clothes. Upon entering the room, SA Calvillo sat down across from the defendant and said, "before we get started, I need to make sure that we have all of your information correctly…name, date of birth, social security, that sort of stuff." She then proceeded to ask for that information, including the defendant's full name, including middle name, location of birth, address and residence, his phone number, and questions about his vehicle. Johnson responded to each of those question providing, among other things, his full name, phone number, residence and other details. While the United States agrees that the defendant was in custody at this time, the questions posed to the defendant pre-*Miranda* were all "reasonably related to the police's administrative concerns" and, therefore, did not constitute interrogation. *United States v. Gaston*, 357 F.3d 77, 82 (D.C. Cir. 2004), citing *Muniz,* 496 U.S. at 601-02. Thus, Johnsons' pre-*Miranda* statements fall within the "routine booking exception to the *Miranda* rule and are admissible at trial.

---

[2] The United States intends to submit the entire video-recorded interaction between defendant Johnson and law enforcement on October 7, 2021, as an exhibit to this opposition. The video is approximately 90 minutes long and undersigned counsel will coordinate with Chambers to provide the video.

### III.     The Defendant's *Miranda* Waiver was Knowing, Intelligent, and Voluntary

After spending roughly three and a half minutes discussing routine administrative matters, law enforcement informed the defendant of his rights pursuant to *Miranda*. SA Calvillo specifically advised the defendant that: (1) he had a right to remain silent; (2) anything he said could be used against him in court; (3) he had a right to speak with a lawyer prior to questioning; (4) he had a right to have a lawyer during questioning; (5) if he decided to answer any questions without a lawyer, he then had a right to stop answering questions at any time. Defendant Johnson affirmatively indicated that he understood each right.

Special Agent Calvillo then asked the defendant to "read this consent portion out loud" and handed him a piece of paper with his rights printed on it. Defendant Johnson began reading: "I have read this statement of my rights and understand what my rights are. At this time I am willing to answer any questions without a lawyer." The defendant then paused reading and said "Okay can I have a lawyer" to which SA Calvillo responded, "That is your right, but what I am asking you is are you willing to initiate a conversation now, without a lawyer present and then if you want to at anytime we can stop and you can either ask for whatever. It's up to you." After a brief additional conversation, the defendant waived his *Miranda* rights and signed the consent form to speak with law enforcement without a lawyer presents. The conversation with law enforcement lasted for over an hour and at no time during that conversation did the defendant request to end the interview or to have a lawyer present.

The United States contends that the defendant's question to SA Cavillo asking "Okay can I have a lawyer," was not an unequivocal request for a lawyer but was, instead, a request for clarification of his rights while he was reading the rights card out loud. It was *not* the unambiguous

10

invocation of his rights required by *Berghuis*.  *See Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010) ("There is good reason to require an accused who wants to invoke his or her right to remain silent to do so unambiguously."); *Davis v. United States*, 512 U.S. 452, 461-62 (1994) ("If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him.").  SA Calvillo clarified for the defendant that having a lawyer present "is your right" and emphasized that the decision was up to him and that, even if he decided to proceed without a lawyer, he could end the conversation at any time.  Given the totality of the circumstances, specifically the context in which defendant Johnson posed the question "Okay can I have a lawyer," while in the middle of reading his rights out loud, this request for clarification did not require law enforcement to end the interview at that time.

After having his rights read to him by SA Calvillo, and then reading the consent form out loud, defendant Johnson then knowingly, voluntarily, and intelligently waived his *Miranda* rights and spoke with law enforcement for over an hour about the substance of his case.  Based upon these facts, and other facts to be elicited at a hearing on this motion, the defendant's motion to suppress statements should be denied.

**IV.     The Defendant is Not Entitled to a Hearing on this Matter**

For more than 50 years, the law in this Circuit has been that "[a] defendant is entitled to an evidentiary hearing on his motion to suppress 'only upon factual allegations which, if established, would warrant relief.'"  *United States v. Law*, 528 F.3d 888, 903–04 (D.C. Cir. 2008) (quoting *United States v. Thornton*, 454 F.2d 957, 967 n.65 (D.C. Cir. 1971) (emphasis added)).  In his motion, the defendant has not raised any genuine dispute of material fact that requires an evidentiary hearing. *See Law*, 528 F.3d at 904 ("[T]he right to an evidentiary hearing . . . turns on whether the district court needed to resolve any disputes of material fact to decide [defendant's]

11

suppression motion."); *United States v. Harris*, No. 19-CR-358 (RC), 2021 WL 1167263, at *4 (D.D.C. Mar. 26, 2021) (Contreras, J.) (denying evidentiary hearing where video evidence had been submitted to the Court and the defendant had "not alleged any egregious activity on the part of the interviewing officers sufficient to warrant further review into whether his statements were in fact voluntary, and . . . ha[d] not raised any facts suggesting that his waiver was uninformed."). Accordingly, this Court can deny his suppression motion without an evidentiary hearing.

## CONCLUSION

For the reasons addressed above, the court should deny the defendant's Motion to Suppress Statements.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:  /s/ Jocelyn Bond
Jocelyn Bond
D.C. Bar No. 1008904
Paul V. Courtney
D.C. Bar No. 1034252 / N.Y. Bar No. 5392337
Assistant United States Attorneys
601 D Street, N.W.
Washington, D.C. 20530
(202) 809-0793 (Bond)
(202) 252-1719 (Courtney)
Jocelyn.Bond@usdoj.gov
Paul.Courtney@usdoj.gov