**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 22-CR-176 (CJN)** |
| **STEPHEN JOHNSON,** | |
| **Defendant.** | |

**GOVERNMENT'S CONSOLIDATED MEMORANDUM IN OPPOSITION TO DEFENDANT STEPHEN JOHNSON'S MOTIONS TO SUPPRESS EVIDENCE FROM GOOGLE ACCOUNT, SEIZED FROM RESIDENCE, AND FROM ELECTRONIC AND STORAGE DEVICES**

The United States of America, by and through its undersigned counsel, respectfully submits this Consolidated Memorandum of Law in Opposition to Defendant Stephen Johnson's Motions to Suppress Evidence **(i)** from Google Account (ECF No. 82), **(ii)** Seized from Residence (ECF No. 83), and **(iii)** from Electronic and Storage Devices (ECF No. 84). For reasons that follow, this Court should deny all three suppression motions without a hearing.

**FACTUAL BACKGROUND**

The National Center for Missing and Exploited Children is a non-profit 501(c)(3) organization that serves as a national clearinghouse and resource center for families, victims, private organizations, law enforcement, and the public on missing and sexually exploited child issues. NCMEC operates a CyberTipline and Child Victim Identification Program. Through the CyberTipline, Internet and Electronic Service Providers, and individual persons, may notify NCMEC of online child sexual abuse images. NCMEC makes information submitted to the CyberTipline and Child Victim Identification Program available to law enforcement agencies.

Between October 3 and October 5, 2020, Google submitted 19 related CyberTip reports concerning the Google account stephenjohnson1197@gmail.com—an account that was later

determined to belong to the defendant, Stephen Johnson.  Google reported that the user of this account had provided a name of "Stephen Johnson," along with a verified phone number and a backup email account.

As described in further detail below, Google identifies and reports child sexual abuse imagery in accordance with the federal definition of child pornography as codified in 18 U.S.C. § 2256.  When a Google employee or contractor reviews a file and determines that it is apparent child pornography, the file's "hash" (or digital fingerprint) is added to a repository of known child pornography.  When Google submits a CyberTip, the files reported have been viewed by a human reviewer before the report's submission—the contents of the file are either reviewed by a person immediately before sending the CyberTip, or historically a person had reviewed a file whose hash matched the hash of the reported image and had determined it was apparent child pornography.

The CyberTip reports that Google submitted in this case corresponded to 220 files that were hash matches to files that a Google content reviewer had identified as child pornography. The reports were referred to the Northern Virginia–Washington, D.C. Internet Crimes Against Children Task Force and, after initial investigation by the Virginia State Police, were assigned to Metropolitan Police Department Detective Thomas Sullivan—a member of the task force—in December 2020.

Detective Sullivan reviewed the files submitted with CyberTip reports and observed child pornography.  Then, on December 28, 2020, out of an abundance of caution, the government applied for a warrant to view the images in the CyberTip.[1]  (*See* ECF No. 1, Case No. 20-SW-321

---

[1] The issue had not previously been addressed in this Circuit.  The Sixth Circuit field its opinion in *United States v. Miller,* 982 F.3d 412 (6th Cir. 2020)—in which it held that **(i)** Google's identification of child pornography on its platform did not implicate the Fourth Amendment and **(ii)** a detective's review of CyberTip files was not a search under the private-search doctrine—just 25 days before the government first submitted its warrant application.  After considering *Miller*

(ZMF) (D.D.C.)).  The application did not rely on any information Detective Sullivan obtained from his review of the files.  It was referred to the Honorable Zia M. Faruqui, who raised questions about Google's hash matching system and deferred consideration of the warrant.  Following a March 18, 2021, status conference at which counsel for Google was present, the government filed its warrant application on March 23, 2021.  (*See* ECF No. 1, Case No. 20-SW-321 (ZMF) (D.D.C. Mar. 23, 2021), attached as **Exhibit A**).  That same day, Judge Faruqui determined that the warrant application "established probable cause to view all images, videos, and files in question," but denied it without prejudice.  (*See* Minute Order, case number 20-SW-321 (ZMF) (D.D.C. Mar. 23, 2021)).  Google then submitted a declaration explaining its hash matching technologies, (*see* ECF No. 2, Case No. 20-SW-321 (ZMF) (D.D.C. Apr. 21, 2021), attached as **Exhibit B**), and the government submitted supplemental briefing in which it argued that the issuance of a search warrant was unnecessary.  On May 22, 2021, Judge Faruqui issued a written opinion denying the warrant as unnecessary because the government's review of the reported files would not exceed the scope of Google's private search.  *See In re the Search of Encrypted Data Provided by the National Center for Missing and Exploited Children for Nineteen Related Cyber Tipline Reports*, No. 20-SW-321 (ZMF), 2021 WL 2100997, at *1 (D.D.C. May 22, 2021); (ECF No. 4, Case No. 2021-SW-321 (ZMF) (D.D.C. May 22, 2021), attached as **Exhibit C**).

On March 30, 2021, Judge Faruqui issued a search warrant for the defendant's Google account, stephenjohnson1197@gmail.com.  (*See* Case. No. 20-SC-3303 (ZMF) (D.D.C.), attached as **Exhibit D**).  In the supporting affidavit, Detective Sullivan detailed his review of certain files from the CyberTip reports, which had been uploaded to the defendant's Google Drive from an IP

---

and the record developed in the magistrate court, the government ultimately took the position that its warrant application had been unnecessary.

address associated with the defendant's Comcast Internet service, including but not limited to:

1. **lil black girl fucked by BBC.mp4** – Uploaded on September 21, 2020: This video is forty-five seconds long and shows a prepubescent African American female having her buttocks and genitals rubbed and penetrated by an adult male's erect penis.  The child is faced away from the camera watching television, and she is nude from the waist down.  The child does not appear to have any indication of pubic hair.

2. **black Shayla BACK IT UP 2.mp4** – Uploaded on September 21, 2020: This video is one minute and twenty-six seconds long and shows a prepubescent African American female completely nude laying on a bed.  The child is holding an electric toothbrush which she places on and inside her genitals.  An unknown person eventually takes the toothbrush out of the child's hand and places it on and inside the child's genitals.  The prepubescent girl has no breast development or indication of any pubic hair.

In July 2021, Google produced the contents of the defendant's Google account in response to the warrant.  Law enforcement searched the production for child pornography and located a folder within the account's Google Drive labeled "Haute Gurls."  This folder contained several subfolders which included the following folders: "2020 PYT PACK," "blkkid 2," Brand new pyts 2," "ebonypyt," "Exclusive PYT's," "new stuff," and "pyt trade."  Some of these folders contained additional child pornography that Google had not reported in the CyberTips.  In addition, the Google production included, among other things, the defendant's Google Chrome web browser history between April 8, 2020, and October 2, 2020.  The browser history shows that, on multiple occasions, the defendant visited Dropbox folders with names including "Black teens and underage thots," "blkkidd 2," "PYT  Pack," "2020 PYT PACK," and "Brand new pyts 2."  Some of these folder names—such as "blkkidd 2," "2020 PYT PACK," and "Brand new pyts 2"—are identical to folder names that were found in the file structure of the defendant's Google Drive; these three Google Drive folders were among those that contained apparent child pornography.

On September 9, 2021, Judge Faruqui signed a search warrant authorizing the government to obtain historical and prospective cell site location data for the cellular phone associated with the

defendant's Google account.  (*See* Case No. 21-SC-2953 (ZMF) (D.D.C.)).  That data corroborated other information obtained by law enforcement indicating that the defendant resided in an apartment on H Street Northeast in Washington, D.C.

On October 5, 2021, the Honorable G. Michael Harvey issued a search warrant for the defendant's residence, which also authorized the seizure and search of his digital devices.  (*See* Case No. 21-SW-334 (GMH) (D.D.C.), attached as **Exhibit E**).  The same day, Judge Faruqui issued a criminal complaint and arrest warrant charging him with one count of transportation of child pornography, in violation of 18 U.S.C. §  2252(a)(1).  (*See* ECF No. 1).

On October 7, 2021, members of the FBI Child Exploitation and Human Trafficking Task Force (CEHTTF) executed the residential search warrant.  Pursuant to the search warrant, law enforcement seized digital devices belonging to the defendant, including his laptop computers and cellular telephones.  The defendant was home at the time the search warrant was executed and taken into custody pursuant to the arrest warrant.

The defendant was taken to the FBI's Washington Field Office, where he waived his *Miranda* rights and agreed to be interviewed by CEHTTF members.  During the interview, he made several admissions related to the case, including that he was the user of the Google account.

## BACKGROUND ON GOOGLE'S EFFORTS TO COMBAT CHILD PORNOGRAPHY

In considering whether it was necessary to issue a search warrant for law enforcement to view the files associated with Google's CyberTips in this case, Judge Faruqui ordered Google to "submit a written declaration regarding identifying and reporting apparent violations of the federal child pornography statutes."  (*See* Minute Order, Case No. 20-SW-321 (ZMF) (D.D.C. Apr. 20, 2021)).  Google submitted that declaration on April 21, 2021, attaching its Terms of Service and Privacy Policy as exhibits.  (*See* ECF No. 2, Case No. 20-SW-321 (ZMF) (D.D.C. Apr. 21, 2021),

attached as **Exhibit B**).  The below background information is drawn from that declaration.

Google provides Internet-based services, and its Terms of Service—which users must accept to register a Google account—prohibit the use of its services to violate the law.  *See* **Exhibit B** ¶ 2.  In its Terms of Service, Google reserves the right to take down illegal and harmful content and lists "child pornography" as the first example of such content.  *Id.*  Google's Privacy Policy also informs users that it may "analyze [their] content to help [Google] detect abuse such as spam, malware, and illegal content."  *Id.* ¶ 3.  Google asserts a "strong business interest" in enforcing its Terms and ensuring that its services are free of child sexual abuse material, which it considers harmful to its users, product, brand, and business interests.  *Id.* ¶ 4.  Accordingly, "Google has undertaken voluntary efforts to remove and report CSAM on a large scale."  *Id.* ¶ 5.  In the year 2020—the year in which Google submitted the 19 CyberTip reports concerning the defendant's account—it submitted a total of 547,875 CyberTip reports to NCMEC and over 4.4 million pieces of content.  *Id.*

Among Google's voluntary efforts to identify child pornography, Google employs a proprietary "hashing" technology to tag apparent child sexual abuse images.  *Id.* ¶ 6.  Google's employees and contractors are trained on the federal statutory definition of child pornography as codified in 18 U.S.C. § 2256.  *Id.*  An image that appears to be child pornography is viewed by a Google content reviewer and given a "hash" (i.e., a digital fingerprint) that Google's computers can automatically recognize.  *Id.*  That hash is then added to a repository of hashes of apparent child pornography; Google does not add an image hash to its repository unless one of its reviewers has viewed the corresponding image and confirmed that contains apparent child pornography.  *Id.*  Google can compare these hashes to hashes of content uploaded to its services and identify "exact or very similar" images of apparent child pornography.  *Id.*  When Google detects a hash match to

a known child sexual abuse image, Google either **(i)** automatically reports the offending image to NCMEC without re-reviewing the image or **(ii)** undertakes a manual review before reporting the offending image to confirm that it contains apparent child pornography. *See id* ¶ 7.  As mentioned above, each image associated with a hash was viewed by a Google content reviewer and confirmed to contain apparent child pornography before the hash was added to Google's repository. *See id.*

For video files, Google uses a proprietary technology called "CSAI Match." *Id.* ¶ 8. Google also maintains a repository of hashes that correspond to apparent child pornography it has identified in videos, which it uses it to detect known content in other videos. *See id.*  When Google becomes aware of a video containing apparent child pornography, a reviewer visually confirms the content, and Google calculates the hash of the portion of the video that contains the offending content (and possibly some portion of the video before and after). *See id.* ¶ 9.  This hash is then added to the repository. *See id.*  Google's technology allows it to detect identified child pornography contained within other videos, and "uses fingerprints that are resistant to manipulation and obfuscation, allowing Google to detect exact matches, matches intermingled with non-offending content, and slightly modified versions of the previously fingerprinted video." *Id.* ¶ 10.  As with images, in some cases when Google's systems detect a video whose hash matches a hash in its repository of known apparent child pornography, Google may automatically report the offending video to NCMEC without conducting a manual review. *See id.*  ¶11.  In those cases, a Google content reviewer had previously viewed a file whose hash matched that of the reported file. *See id.*  The reviewers view video files only to the extent necessary to confirm they contain apparent child pornography. *See id.*

## RELEVANT PROCEDURAL HISTORY

On May 20, 2022, a federal grand jury returned an indictment charging the defendant with

one count of transportation of child pornography, in violation of 18 U.S.C. § 2252(a)(1).  (ECF No. 43).  A jury trial is scheduled for January 29, 2024.

On November 22, 2023, the defendant filed, among other motions, a Motion to Suppress Evidence from Google Account (ECF No. 82), a Motion to Suppress Evidence Seized from Residence (ECF No. 83), and a Motion to Suppress Evidence from Electronic and Storage Devices (ECF No. 84).  Because the arguments that the defendant raises in these three motions substantially overlap, the government respectfully submits this consolidated memorandum in opposition.

## LEGAL STANDARD

The Fourth Amendment proscribes "unreasonable searches and seizures," and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.

A showing of probable cause "is not a high bar."  *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)).  In the search warrant context, a showing of probable cause requires only a "fair probability that . . . evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  An application for a search warrant "must demonstrate cause to believe that 'evidence is likely to be found at the place to be searched.'"  *United States v. Griffith*, 867 F.3d 1265, 1271 (D.C. Cir. 2017) (quoting *Groh v. Ramirez*, 540 U.S. 551, 568 (2004)).  In addition, there must be "a nexus . . . between the item to be seized and criminal behavior."  *Id.* (quoting *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 307 (1967)).

When a search warrant is challenged, "the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis . . . for conclud[ing]' that probable cause existed."

*Gates*, 462 U.S. at 238–39 (omission and alteration in original) (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).  Affidavits in support of search warrants have "a presumption of validity," *Franks v. Delaware*, 438 U.S. 154, 171 (1978), and the Supreme Court has "repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review," because "[a] magistrate's 'determination of probable cause should be paid great deference by reviewing courts,'" *Gates*, 462 U.S. at 236 (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)).

## ARGUMENT

I.    **THIS COURT SHOULD DENY THE DEFENDANT'S SUPPRESSION MOTIONS BECAUSE ALL THE CHALLENGED SEARCH WARRANTS WERE PROPERLY ISSUED AND EXECUTED.**

The defendant has filed three separate suppression motions in which he challenges the search warrants for his Google account and residence.  He argues that the warrants were tainted because their applications reference Detective Sullivan's warrantless review of the files that Google excised from the defendant's account and submitted with its CyberTips.  This argument fails because no search warrant was required.  In any event, the government had sought a warrant out of an abundance of caution, and Judge Faruqui ruled that, while the application established probable cause, no warrant was necessary.  Google conducted a voluntary and independent private search, the scope of which Detective Sullivan's review did not impermissibly exceed.

The defendant also argues that the warrants were stale, premised on unreliable information, lacked sufficient nexus to the items to be searched and seized, and did not authorize the search of his electronic devices.  These arguments are unsupported by the record and meritless.

Finally, the defendant asserts that the evidence should be suppressed unless the government can demonstrate that it did not exceed the scope of the Google search warrant and that certain

technical violations did not occur (such as a violation of 18 U.S.C. § 3109's "knock and announce" requirement during the execution of the residential search warrant and of Federal Rule of Criminal Procedure 4.1's protocols during the magistrate court's telephonic swearing of warrants).   The government did not exceed the Google warrant, and the defendant does not assert otherwise.   Nor does the defendant put forth any evidence suggesting that Section 3109 or Rule 4.1 were violated, and the government is aware of none.   The defendant also fails to establish that, even if such violations did occur, suppression would be an available or appropriate remedy.

Because the challenged search warrants were properly issued and executed, this Court should deny the motions without a hearing.

### A. The Search Warrants Were Not Tainted as No Search Warrant Was Needed to Review the Files Google Submitted as Part of the CyberTips in this Case.

The defendant argues that **(i)** Google's identification of apparent child pornography on his account and **(ii)** Detective Sullivan's subsequent review of the files that Google submitted with its CyberTip reports constituted warrantless searches of his Google account, tainting the subsequent warrants authorizing searches of his Google account, residence, and electronic devices.   (*See* ECF No. 82 at 4–6, 9–10; ECF No. 83 at 5–6; ECF No. 84 at 7).   This argument is meritless.

### 1. The Fourth Amendment does not apply to voluntary and independent efforts by Google—a private entity that acts of its own accord and in furtherance of its legitimate business interests—to identify and report apparent child pornography on its servers.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause."   U.S. Const. amend. IV.   It has been long established that, like other constitutional rights, the Fourth Amendment regulates only government actors.   *See United States v. Miller*, 982 F.3d 412, 421 (6th Cir. 2020) (citing *United*

*States v. Jacobsen*, 466 U.S. 109, 113 (1984)); *Burdeau v. McDowell*, 256 U.S. 465, 475 (1921). The Fourth Amendment does not apply "to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the government or with the participation or knowledge of any government official." *Jacobsen*, 466 U.S. at 113.

"Google is a private entity," *Miller*, 982 F.3d at 421, that is a "provider" of electronic communication and remote computing services, 18 U.S.C. § 2258E(6).  While providers have no affirmative obligation to monitor their platforms for child pornography, *see* 18 U.S.C. § 2258A(f), they *are* obligated to report any child pornography they do discover to NCMEC's CyberTipline, *see* 18 U.S.C. § 2258A(a)(1)(B).  As part of the report, providers are authorized to include, in their "sole discretion," identifying information of any individual who appears to have violated the federal child pornography laws and visual depictions of apparent child pornography.  18 U.S.C. § 2258A(b).  NCMEC must send any such report to law enforcement.  *See* 18 U.S.C. § 2258A(c).

The defendant makes the unsupported assertion that Google "acted as [a] government agent[] when searching his Google account."  (ECF No. 82 at 6).  The D.C. Circuit has not addressed what transforms a private entity into a government agent for Fourth Amendment purposes, but those Circuits that have confronted the issue essentially examine **(i)** the government's role in the private entity's search and **(ii)** whether the private entity was seeking to serve primarily the government's interests or its own legitimate interests.  *See In re the Search of Encrypted Data Provided by the National Center for Missing and Exploited Children for Nineteen Related Cyber Tipline Reports*, 2021 WL 2100997, at *5 & n.5 (comparing the factors examined by the First, Sixth, Eighth, and Ninth Circuits).

Here, the government played no role in Google's voluntary and independent identification of apparent child pornography in the defendant's account.  Federal law does not require Google to

monitor its platform for violations of the federal child pornography laws. *See* 18 U.S.C.
§ 2258A(f). The fact that it requires Google to report any child pornography it identifies as the
result of its voluntary efforts does not turn it into a government agent. *See United States v.
Stephenson*, 727 F.3d 826, 830 (8th Cir. 2013) ("A reporting requirement, standing alone, does not
transform an Internet service provider into a government agent whenever it chooses to scan files
on its network for child pornography."); *United States v. Cameron*, 699 F.3d 621, 637–38 (1st Cir.
2012) ("Yahoo! employees conducted the search pursuant to Yahoo!'s own internal policy.
Furthermore, there is no evidence that the Government compelled Yahoo! in any way to maintain
such a policy. Cameron points to the fact that Yahoo[!] had a duty under federal law to report
child pornography to NCMEC . . . . However, the statute did not impose any obligation to *search*
for child pornography, merely an obligation to *report* child pornography of which Yahoo! became
aware."); *United States v. Richardson*, 607 F.3d 357, 363–67 (4th Cir. 2010) (holding that the
mandatory reporting requirement did not turn AOL into a government agent). As a private entity,
Google did not violate the Fourth Amendment when it identified apparent child pornography that
the defendant had uploaded to his Google account—an action that was in furtherance of its
legitimate business interests and consistent with its Terms of Service and Privacy Policy.

    And while "it is certainly the case that combating child pornography is a government
interest," "this does not mean that [Google] cannot voluntarily choose to have the same interest,"
and the defendant identifies "no evidence that the government instigated the search, participated
in the search, or coerced [Google] to conduct the search." *Cameron*, 699 F.3d at 638; *United States
v. Crawford*, No. 18-CR-345, 2019 WL 3207854 at *2 (N.D. Oh. July 16, 2019) (holding that
Google "monitor[s] [its] platform[] not to assist the government but to further [its] legitimate
business interest in ridding its platform of abusive content" and that its "business interest in

clearing [its] platform[] of abusive material is independent of the government's interest in investigation and prosecution," even if "these interests might overlap").   Google undertakes voluntary efforts to identify and report apparent child pornography of its own accord because it makes good business sense for it to do so.   As a Google product manager declared in connection with the CyberTip reports in this case:

> Google has a strong business interest in enforcing our Terms of Service and ensuring that our products are free of illegal content, and in particular, CSAM. Accordingly, we independently and voluntarily take steps to monitor and safeguard our platform.   If our products or services were to become associated with being a haven for abusive content and conduct, including CSAM, users will stop using our services.   Ridding our products and services of CSAM is critically important to protecting our users, our product, our brand, and our business interests.

**Exhibit B ¶** 4.

Because "Google conducts child pornography searches at its own instigation to advance its 'strong business interest[s]'" and "retains total control over how it conducts these searches without any input or oversight from the government," Judge Faruqui concluded that it acts not as a government agent but rather as a private entity whose efforts to identify child pornography are independent and voluntary.   *In re the Search of Encrypted Data Provided by the National Center for Missing and Exploited Children for Nineteen Related Cyber Tipline Reports*, 2021 WL 2100997, at *5.   The defendant cites no contrary authority.[2]

---

[2] The defendant cites *United States v. Ackerman*, 831 F.3d 1292 (10th Cir. 2016), for the proposition that NCMEC is a government entity for Fourth Amendment purposes.   That issue is irrelevant here, where Google—a private entity—independently and voluntarily identified apparent child pornography in the defendant's Google account.   While NCMEC received Google's CyberTip reports, nothing in the record suggests it was in any way involved in Google's private search of the defendant's account.

> **2.    The Fourth Amendment did not require the government to obtain a search warrant to view files that were within the scope of Google's private search.**

Where a private entity conducts a search, its "actions to not violate the Fourth Amendment because of their private character." *Jacobsen*, 466 U.S. at 115. "Once frustration of the original expectation of privacy occurs, the Fourth Amendment does not prohibit governmental use of the now-nonprivate information." *Id.* at 117. The Fourth Amendment is implicated only if the government exceeds the scope of the private search. *See id.* at 117–18. "In the classic case, the government does not perform a search if its examination of the evidence is 'coextensive with the scope' of the antecedent private search and, viewed objectively, 'there is "a virtual certainty that nothing else of significance" could be revealed' through its actions." *United States v. Rivera-Morales*, 961 F.3d 1, 10 (1st Cir. 2020) (quoting *United States v. Powell*, 925 F.3d 1, 5 (1st Cir. 2018) (quoting in turn *Jacobsen*, 466 U.S. at 119)); *accord United States v. Runyan*, 275 F.3d 449, 463 (5th Cir. 2001) ("In the context of a search involving a number of closed containers, this suggests that opening a container that was not opened by private searchers would not necessarily be problematic if the police knew with substantial certainty, based on the statements of the private searchers, their replication of the private search, and their expertise, what they would find inside. Such an 'expansion' of the private search provides the police with no additional knowledge that they did not already obtain from the underlying private search and frustrates no expectation of privacy that has not already been frustrated.").

Here, where all the files that Google submitted with the CyberTip reports were hash matches to apparent child pornography that had been viewed at least once by a Google content reviewer, Detective Sullivan's review of the files fell within the scope of Google's private search and so did not implicate the Fourth Amendment. As Judge Faruqui held with respect to the

CyberTip reports in this case, there was a substantial certainty—if not a virtual certainty—that all the hash matched files reported by Google would contain apparent child pornography.  *See In re the Search of Encrypted Data Provided by the National Center for Missing and Exploited Children for Nineteen Related Cyber Tipline Reports*, 2021 WL 2100997, at *6 ("Indeed, the 'hash-value match's near-perfect accuracy' moves beyond a 'substantial certainty' to a 'virtual certainty' that the videos the government will review in this CyberTipline report are child pornography within the scope of the private search." (quoting *Miller*, 982 F.3d at 418)); *Miller*, 982 F.3d at 418 ("Critically, Miller does not dispute the district court's finding about a hash-value match's near-perfect accuracy:  It created a 'virtual certainty' that the files in the Gmail account were the known child-pornography files that a Google employee had viewed."); *United States v. Reddick*, 900 F.3d 636, 639 (5th Cir. 2018) (holding that, where detective viewed files Microsoft had hash matched to known child pornography, "there was no 'significant expansion of the search that had been conducted previously by a private party' sufficient to constitute 'a separate search.'" (quoting *Walter v. United States*, 447 U.S. 649, 657 (1980))).

Judge Faruqui also addressed the fact that, unlike with image files, Google reports some video files that have not been viewed in their entirety by a Google reviewer at any point.  *See In re the Search of Encrypted Data Provided by the National Center for Missing and Exploited Children for Nineteen Related Cyber Tipline Reports*, 2021 WL 2100997, at *6.  Relying on the Fifth Circuit's decision in *Runyan*, Judge Faruqui held that the government would not exceed the scope of Google's prior, private search by viewing the entirety of a reported video file.  *See id.*  In *Runyan*, the defendant's estranged wife and her friend took various computer disks from the defendant's ranch and examined some of their contents; after determining they contained child pornography, they turned them over to the various law enforcement agencies.  *See Runyan*, 275

F.3d at 453.  The defendant argued that the "police exceeded the scope of the private search because they examined more files on each of the disks than did the private searchers." *Id.* at 464. The Fifth Circuit noted that there was a factual dispute on this issue but found it unnecessary to resolve because, even if true, the police's conduct would not have violated the Fourth Amendment. *See id.*  The court held that by viewing certain files on a disk, the private searchers had compromised the defendant's expectation of privacy in that disk; "the police do not exceed the scope of a prior private search when they examine the same materials that were examined by the private searchers, but they examine these materials more thoroughly than did the private parties." *Id.* at 464 (citing *United States v. Simpson*, 904 F.2d 607, 610 (11th Cir. 1990)); *accord Rann v. Atchison*, 689 F.3d 832, 838 (7th Cir. 2012) ("[E]ven if the police more thoroughly searched the digital media devices than S.R. and her mother did and viewed images that S.R. or her mother had not viewed, per the holding in *Runyan*, the police search did not exceed or expand the scope of the initial private searches.  Because S.R. and her mother knew the contents of the digital media devices when they delivered them to the police, the police were 'substantially certain' the devices contained child pornography.").  Accordingly, Judge Faruqui reasoned that "[t]he government's review of the full video file from the CyberTipline is akin to examining 'more items' on a disk or examining the disk more 'thoroughly' than Google did." *In re the Search of Encrypted Data Provided by the National Center for Missing and Exploited Children for Nineteen Related Cyber Tipline Reports*, 2021 WL 2100997, at *6 (quoting *Runyan*, 275 F.3d at 464)).

The basis for law enforcement to review the entirety of the video files in this case is even stronger than the situations presented in *Runyan* and *Rann*—because "[t]his is not a case in which

law enforcement opened files with no hash match to suspected child pornography." [3]  *Id.*  Every video file that Google submitted contains content that a human reviewer at some point reviewed and determined to be apparent child pornography. The fact that a Google content reviewer watched the video only to the extent necessary to confirm that it contained apparent child pornography,[4] or that a video file may have been later modified to evade detection, does not matter.  Google's private search determined that each reported file contains apparent child pornography, and viewing the entire video "provides the police with no additional knowledge that they did not already obtain from the underlying private search and frustrates no expectation of privacy that has not already been frustrated."  *In re the Search of Encrypted Data Provided by the National Center for Missing and Exploited Children for Nineteen Related Cyber Tipline Reports*, 2021 WL 2100997, at *6 (quoting *Runyan*, 275 F.3d at 463)).  In any event, the defendant can claim "no legitimate

---

[3] For this reason, as Judge Faruqui observed, the instant case is readily distinguishable from *United States v. Ackerman*, 831 F.3d 1292 (10th Cir. 2016).  *See In re the Search of Encrypted Data Provided by the National Center for Missing and Exploited Children for Nineteen Related Cyber Tipline Reports*, 2021 WL 2100997, at *6 n.7.  In *Ackerman*, AOL submitted an email and its four attachments—only one of which was a hash match to apparent child pornography—and the government agent reviewed all four attachments.  *Id.* (citing *Ackerman*, 831 F.3d at 1294).  The government agent's review of the additional files that were not hash matches to child pornography was thus held to exceed the scope of AOL's private search.  *Id.* (citing 831 F.3d at 1305–06).  In *Miller*, the Sixth Circuit observed that "*Ackerman* reserved whether its holding would change if the analyst had viewed *only* the one image."  *Id.* (quoting 982 F.3d at 429).  The Sixth Circuit distinguished *Miller* from *Ackerman* "by finding the government agent in *Miller* 'viewed only files with hash-value matches.'"  *Id.* (quoting 982 F.3d at 429).  The same is true in this case—"Google only sent video files with hash matches to the CyberTipline."  *Id.*

[4] Because viewing such content can cause severe emotional distress, it would be perverse to require content moderators to watch the entirety of a video file where it is readily apparent from a shorter review that the file contains child pornography.  *See, e.g.*, Katherine Houreld, *Kenyan court says Meta can be sued for psychological distress*, Wash. Post (Feb. 6, 2023, 12:46 p.m.), https://www.washingtonpost.com/world/2023/02/06/kenya-facebook-meta-lawsuit/;      Bobby Allyn, *Former TikTok moderators sue over emotional toll of 'extremely disturbing' videos*, NPR (Mar. 24, 2022, 5:38 p.m.), https://www.npr.org/2022/03/24/1088343332/tiktok-lawsuit-content-moderators.

expectation of privacy in illegal contraband like child pornography." *Miller*, 982 F.3d at 431.

Because Detective Sullivan's review of the files Google submitted with its CyberTip reports did not exceed the scope of Google's private search, the Fourth Amendment was not implicated, and no search warrant was required.[5]

### B.     The Search Warrants Were Not Stale.

The defendant asserts that the warrants were stale because he is alleged to have uploaded child pornography to Google in October 2020, and the government sought the search warrant for his Google account six months later and for his residence and devices a year later.  (*See* ECF No. 82 at 7–8; ECF No. 83 at 4–5; ECF No. 84 at 6–7).  The defendant's argument is premised solely on the passage of time.  Because staleness involves a context-specific inquiry and is not determined by the application of any bright-line temporal rules, the defendant's argument fails.

The D.C. Circuit "has emphasized that 'the facts supporting a warrant must be "so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time."'" *United States v. Jenkins*, 984 F.3d 1038, 1044 (D.C. Cir. 2021) (quoting *United States v. Webb*, 255 F.3d 890, 904 (D.C. Cir. 2001) (quoting in turn *Sgro v. United States*, 287 U.S. 206, 210 (1932))).  "But it is not simply a matter of counting days; a wide range of factual circumstances may be relevant to the inquiry."  *Id.*  The D.C. Circuit has provided the following guidance:

> The likelihood that the evidence sought is still in place is a function not simply of watch and calendar but of variables that do not punch a clock: the character of the crime (chance encounter in the night or regenerating conspiracy?), of the criminal (nomadic or entrenched?), of the thing to be seized (perishable and easily

---

[5] As stated above, Judge Faruqui determined that the government's warrant application established probable cause to view the CyberTip files.  *See In re the Search of Encrypted Data Provided by the National Center for Missing and Exploited Children for Nineteen Related Cyber Tipline Reports*, 2021 WL 2100997, at *3 (citing March 23, 2021, Minute Order).  But pointing to the fact that, "[i]n 2020, NCMEC reported receiving 21.4 million CyberTip reports," the Court concluded that "the harm to judicial economy far outweighed any hardship to the government, [and that] the Court was authorized to reject the unnecessary warrant application."  *Id.* at *4.

transferable or of enduring utility to its holder?), of the place to be searched (mere criminal forum of convenience or secure operational base?), etc.

*Id.* (quoting *United States v. Matthews*, 753 F.3d 1321, 1325 (D.C. Cir. 2014) (quoting in turn *United States v. Bruner*, 657 F.2d 1278, 1298 (D.C. Cir. 1981))).

All of these considerations weigh heavily against a finding of staleness in this case.

### 1.     The character of child pornography offenses weighs against a finding of staleness.

"[C]hild pornography is not a fleeting crime." *United States v. Frechette*, 583 F.3d 374, 378 (6th Cir. 2009).   "When a defendant is suspected of possessing child pornography, the staleness determination is unique because it is well known that images of child pornography are likely to be hoarded by persons interested in those materials in the privacy of their homes." *United States v. Irving*, 452 F.3d 110, 125 (2d Cir. 2005) (cleaned up).   "[B]ecause the crime is generally carried out in the secrecy of the home and over a long period, the same time limitations that have been applied to more fleeting crimes do not control the staleness inquiry for child pornography." *United States v. Paull*, 551 F.3d 516, 522 (6th Cir. 2009) (rejecting staleness challenge to residential search warrant that had issued 13 months after defendant was alleged to have last subscribed to a child pornography website); *accord, e.g.*, *United States v. Contreras*, 905 F.3d 853, 858–89 (5th Cir. 2018) (holding where, as here, affiant attested that collectors of child pornography often keep such materials for years, search warrant issued over one year after the defendant uploaded child pornography to Kik was not stale); *United States v. Allen*, 625 F.3d 830, 842–43 (5th Cir. 2010) (holding that, based on nature of child pornography, search warrant was not stale where underlying facts were 18 months old); *United States v. Morales-Aldahondo*, 524 F.3d 115, 119 (1st Cir. 2008) (holding that, because "customers of child pornography sites do not quickly dispose of their cache," passage of more than three years from the acquisition of the evidence to the warrant application did not render the warrant stale."); *Irving*, 452 F.3d at 125 (holding that

magistrate was entitled to determine that the defendant was "likely to hoard pornographic images of children in his home for extended periods of time" and that warrant issued after two-year delay was not stale); *United States v. Riccardi*, 405 F.3d 852, 861 (10th Cir. 2005) (holding that, given nature of child pornography, computer search warrant premised in part on five-year-old Kinko's receipt was not stale).  This factor weighs heavily against staleness.

> **2.      The defendant was not nomadic, and law enforcement confirmed he resided at the address connected to the uploads during its investigation.**

The defendant was not nomadic.  The warrant application clearly detailed law enforcement's efforts to confirm that the defendant resided at the address associated with an IP address from which he uploaded child pornography to his Google Drive.  There is no dispute that the defendant resided at this apartment at all times relevant to the investigation.  This factor also weighs against staleness.

> **3.      Child pornography has an infinite life span and can be kept indefinitely.**

"Unlike cases involving narcotics that are bought, sold, or used, digital images of child pornography can be easily duplicated and kept indefinitely even if they are sold or traded.  In short, images of child pornography can have an infinite life span." *Frechette*, 583 F.3d at 379.  "[D]igital images of child pornography can be easily duplicated and kept indefinitely even if they are sold or traded." *Id.*  This factor, too, weighs against staleness.

> **4.      The places to be searched—the defendant's home, electronic devices, and Google account—are places where child pornography crimes primarily occur and where such material can be stored for indefinite periods of time.**

The challenged searches were of the places where child pornography crimes primarily occur and where child pornography can be stored for indefinite periods of time.  Here, it is alleged that the defendant uploaded digital files of child pornography to Google Drive—which necessarily

entailed the use of both digital devices and Google Drive—from an IP address associated with his home address.  The address searched was not a "mere criminal forum of convenience," but the defendant's primary residence.  Courts have recognized that child pornography crimes are "generally carried out in the secrecy of the home and over a long period."  *Paull*, 551 F.3d at 522; *accord Irving*, 452 F.3d at 125 ("[I]t is well known that images of child pornography are likely to be hoarded by persons interested in those materials in the privacy of their homes.").  In addition, the defendant's digital devices and cloud storage "were places where many files could be stored for indefinite periods of time."  *Crawford*, 2019 WL 3207854, at *7.  This factor also weighs against staleness.

*     *     *

In sum, every *Matthews* factor weighs against a finding that either warrant was stale.

## C.     The Search Warrant Applications Contained Reliable Information.

The government's warrants rely on the CyberTips submitted by Google to NCMEC.  The defendant raises the undeveloped argument that "it appears that the information the government received from outside sources was unreliable."  (ECF No. 82 at 11; ECF No. 83 at 7; ECF No. 84 at 8).  The defendant also wrongly asserts that the 220 files submitted with the CyberTip was a "gross overstatement" and that "the government now considers the number of child pornographic files associated with this case to be far less."  (ECF No. 82 at 11 n.7; ECF No. 83 at 7 n.1; ECF No. 84 at 8 n.3).  Warrant applications commonly rely on information provided by witnesses and other third parties, and the factual record developed by Judge Faruqui in connection with the CyberTips submitted by Google in this case establishes that the information is not only highly reliable but virtually certain.  *See In re the Search of Encrypted Data Provided by the National Center for Missing and Exploited Children for Nineteen Related Cyber Tipline Reports*, 2021 WL

2100997, at *6 ("The chances of Google's submission based on a hash match not being child pornography is 'astronomically small.'  Indeed, the 'hash-value match's near-perfect accuracy' moves beyond a 'substantial certainty' to a 'virtual certainty' that the videos the government will review in this CyberTipline report are child pornography within the scope of the private search." (quoting Richard P. Salgado, *Fourth Amendment Search and the Power of the Hash*, 119 Harv. L. Rev. Forum 38, 39 (2005), and *Miller*, 982 F.3d at 418).  Over 40 of the files submitted by Google have been determined to contain identified minor victims, and the government has not conceded that any of the files submitted by Google—some of which contain unidentified minor victims who are self-evidently children—is not apparent child pornography.  This argument is meritless.

> **D.     The Search Warrant Applications Established a Sufficient Nexus Between Child Pornography Offenses and The Things to Be Searched and Seized.**

The defendant argues that the warrant applications for his Google account, digital devices, residence, and digital devices failed to show a sufficient nexus between the things to be searched and seized and the child pornography offense he is alleged to have committed.  (*See* ECF No. 82 at 11; ECF No. 83 at 7; ECF No. 84 at 8–9).  This argument is meritless.  The defendant is alleged to have uploaded child pornography to his Google Drive from at least one IP address associated with his residence; the offense directly implicated the defendant's Google Drive, digital devices, and home internet service.  The nexus of his Google account, residence, and digital devices to the suspected offense was therefore obvious.  *See, e.g.*, *United States v. Elbe*, 774 F.3d 885, 890 (6th Cir. 2014) ("We have held in the context of child pornography that an affidavit including both information connecting the defendant to the offending username and information about where the defendant lived established probable cause to search the defendant's residence.  This inference is permitted in the child pornography context, we have explained, because these crimes are committed in a private place with high-speed internet." (citing *United States v. Lapsins*, 570 F.3d

758, 766 (6th Cir. 2009))); *United States v. Prideaux-Wentz*, 543 F.3d 954, 961 (7th Cir. 2008) (holding that there was sufficient nexus to search the defendant's residence 10 months after last Yahoo! CyberTip, even though defendant had since moved, based on alleged "computer usage and the fact that most child pornographers do not dispose of their collections"); *United States v. Richardson*, 607 F.3d 357, 371 (4th Cir. 2010) (holding that warrant established sufficient nexus to search apartment where email accounts used to distribute child pornography were linked to that address); *United States v. Smith*, No. 19-CR-324 (BAH), 2021 WL 2982144, at *10 (D.D.C. July 15, 2021) (Howell, J.) ("Broad offense-based searches may be excessive in murder investigations in which the cell phone is not used in carrying out the offense, but well-within Fourth Amendment bounds in the case of child sexual abuse, where the cell phone may be integral to the offense and the kinds of evidence and contraband likely to be stored on the phone are varied and well-known to law enforcement.").

E. **The Residential Search Warrant Authorized the Search of Electronic Devices.**

The defendant argues that the search of his digital devices was done without a warrant. (*See* ECF No. 84 at 3–6). This argument is baseless. Attachment B to the residential search warrant plainly authorized the government to seize and examine digital devices and their contents. *See* **Exhibit E** at 6–11 (Attachment B). The defendant also notes that the search warrant had to be executed by October 18, 2021, without asserting that the government violated this temporal limitation. (*See* ECF No. 84 at 5–6). The government's examination of the digital devices timely began on October 13, 2021. *See* **Exhibit F**. These arguments fail.

F. **The Defendant's Arguments Concerning the Scope of the Google Search Warrant, the Law Enforcement's Compliance with 18 U.S.C. § 3109, and the Magistrate Court's Compliance with Federal Rule of Criminal Procedure 4.1 Are All Meritless.**

Finally, the defendant's arguments that the government exceeded the permissible scope of

the Google search warrant, (*see* ECF No. 82 at 11–12), that the government has not demonstrated that the FBI agents who executed the residential search warrant complied with 18 U.S.C. § 3109 (*see* ECF No. 83 at 8), and that the government has also not demonstrated that the magistrate court complied with Federal Rule of Criminal Procedure 4.1 in swearing out the warrants telephonically, (*see* ECF No. 82 at 12–13; ECF No. 83 at 7–8), are all without factual foundation and meritless.

First, the Google search warrant authorized the government to search the defendant's Google account and to seize, in addition to evidence of criminal child exploitation, evidence of user attribution, including evidence showing "how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user." *See* **Exhibit D** at 10 (Attachment B p. 5). The government reviewed the information that Google produced and determined that it all fell within the scope of information to be seized as specified in the warrant. Because the government will have to prove that the defendant transported child pornography to, and possessed child pornography on, his Google Drive, any information indicating that the defendant owned and used the account is relevant evidence. The government disclosed the material it obtained from Google to the defendant in discovery (after excising apparent child pornography in compliance with its statutory obligation under 18 U.S.C. § 3509(m)), and yet the defendant does not identify any information that is beyond the scope of the warrant. This argument fails.

Second, the defendant argues that the government must demonstrate that the FBI agents who executed the warrant complied with the provisions of 18 U.S.C. § 3109, which allows law enforcement to forcibly enter a residence to execute a search warrant if, after giving notice of their authority and purpose, they are denied entry. The defendant was at home when the search warrant was executed, and yet he does not allege that the FBI violated 18 U.S.C. § 3109. The defendant

makes no factual allegations that would suggest the FBI's entry of his residence was contrary to law, and the government is aware of none. This argument is meritless.

Third, each warrant application, which states that it was attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone, was signed by a magistrate judge. *See* **Exhibit D** at 2; **Exhibit E** at 2. In addition, each magistrate signed the affidavit in support of the application, below text indicating the warrant was "[s]ubscribed and sworn pursuant to Fed. R. Crim P. 4.1 and 41(d)(3)." **Exhibit D** at 31 (affidavit p. 19); **Exhibit E** at 47 (affidavit p. 36). The defendant does not assert that the magistrate judges who signed the warrants failed to comply with Rule 4.1 but suggests, without citation to any authority, that the government must demonstrate their compliance. Once again, the defendant makes no factual allegations that would suggest noncompliance with Rule 4.1, and the government is aware of none. This argument is likewise meritless.

Moreover, even if the defendant could establish any of these alleged technical violations, he cites no authority for the proposition that suppression is an available or appropriate remedy.

## II.    EVEN IF THIS COURT WERE TO FIND THAT A SEARCH WARRANT WAS REQUIRED TO VIEW THE CYBERTIP IMAGES, OR THAT ANY SEARCH WARRANT DID NOT PROPERLY ISSUE, THE GOOD FAITH EXCEPTION TO THE EXCLUSIONARY RULE WOULD APPLY.

Even if this Court were to find that a warrant was required to view the CyberTip images, or that any of the warrants that subsequently issued was not sufficiently supported by probable cause, it should still deny the motions because the good faith exception to the exclusionary rule would apply. The defendant does not argue otherwise—indeed, he does not address the good faith exception at all. The exclusionary rule's "sole purpose . . . is to deter future Fourth Amendment violations. . . . Where suppression fails to yield appreciable deterrence, exclusion is clearly unwarranted." *Davis v. United States*, 564 U.S. 229, 236–37 (2011). "[T]he marginal or

nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *United States v. Leon*, 468 U.S. 897, 922 (1984).  Therefore, the exclusionary rule generally does not apply to evidence seized by "an officer acting with objective good faith [who] has obtained a search warrant from a judge or magistrate and acted within its scope."  *Id.* at 921.

"[T]he fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner, or, as [the Supreme Court] ha[s] sometimes put it, in 'objective good faith.'"  *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012).  To nevertheless justify suppression, the defendant must show that the warrant was "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."  *Leon*, 468 U.S. at 923.  Put another way, to conclude that the good faith doctrine does not apply requires a finding that the warrant judge made "not just a reasonable mistake, but an unacceptable error indicating gross incompetence or neglect of duty."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  Even if the affiant's belief that the warrant was supported by probable cause were somehow mistaken, in these circumstances it was not "plainly incompetent" such that the good faith doctrine should not apply.  *Id.* at 341.

Here, the government applied for a search warrant to view the CyberTip files out of an abundance of caution, and it did not submit any further warrant applications relying on the content of the CyberTip files until its CyberTip warrant application was resolved.  Judge Faruqui ultimately decided that, although the warrant application established probable cause to view all the CyberTip files, it was unnecessary for the Court to issue a search warrant.  Even if this Court were to disagree, the purpose of the exclusionary rule is to deter Fourth Amendment violations.  Here, the government sought a warrant and acted in objectively reasonable reliance on the magistrate

court's judgment that, although probable cause existed to view the files, no warrant was required. Nor can Judge Faruqi's decision be said to implicate "gross incompetence or neglect of duty." To the contrary, Judge Faruqui held hearings and sought to develop a factual record. Because the government's cautious approach is something to be encouraged rather than deterred, suppression would serve no legitimate Fourth Amendment interest here and is not an appropriate remedy. *See Davis*, 564 U.S. at 236–37. In addition, the warrants that the government subsequently applied for and obtained were not so lacking in probable cause such that belief in its validity would be unreasonable, and the defendant does not argue otherwise.

## III.     THE DEFENDANT IS NOT ENTITLED TO AN EVIDENTIARY HEARING.

For more than 50 years, the law in this Circuit has been that "[a] defendant is entitled to an evidentiary hearing on his motion to suppress 'only upon factual allegations which, if established, would warrant relief.'" *United States v. Law*, 528 F.3d 888, 903–04 (D.C. Cir. 2008) (quoting *United States v. Thornton*, 454 F.2d 957, 967 n.65 (D.C. Cir. 1971) (emphasis added)). The proponent of a motion to suppress first "has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *United States v. Jones*, 374 F. Supp. 2d 143, 147 (D.D.C. 2005) (quoting *Rakas v. Illinois*, 439 U.S. 128, 132 n.1 (1978)). Once the "defendant produces evidence that he was arrested or subjected to a search without a warrant," however, "the burden shifts to the government to justify the warrantless arrest or search." *Id.* (quoting *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977)). The defendant's arguments are largely conclusory and without factual foundation; none of his motions raises a material factual dispute necessitating an evidentiary hearing. *See Law*, 528 F.3d at 904 ("[T]he right to an evidentiary hearing . . . turns on whether the district court needed to resolve any disputes

of material fact to decide [defendant's] suppression motion.").  Accordingly, this Court can deny his suppression motions without an evidentiary hearing.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should deny the defendant's suppression motions without a hearing.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By: */s/ Paul V. Courtney*
Paul V. Courtney
D.C. Bar No. 1034252 / N.Y. Bar No. 5392337
Jocelyn Bond
D.C. Bar No. 1008904
Assistant United States Attorneys
United States Attorney's Office
for the District of Columbia
601 D Street NW
Washington, D.C. 20530
(202) 252-1719 (Courtney)
(202) 809-0793 (Bond)
Paul.Courtney@usdoj.gov
Jocelyn.Bond@usdoj.gov