```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA


    UNITED STATES OF AMERICA,      .
                                   .
              Plaintiff,           .  CR No. 22-0176 (CJN)
                                   .
         v.                        .
                                   .
    STEPHEN JOHNSON,               .  Washington, D.C.
                                   .  Thursday, March 21, 2024
                   Defendant.      .  10:10 a.m.
    . . . . . . . . . . . . . . .  .
```

```
                 TRANSCRIPT OF MOTION HEARING
              BEFORE THE HONORABLE CARL J. NICHOLS
                 UNITED STATES DISTRICT JUDGE
```

APPEARANCES:

```
For the Government:          PAUL V. COURTNEY, AUSA
                             RYAN LIPES, AUSA
                             U.S. Attorney's Office
                             601 D Street NW
                             Washington, DC 20530

For Defendant:               JONATHAN JEFFRESS, ESQ.
                             Kaiser Dillon PLLC
                             1099 14th Street
                             Suite 800 West
                             Washington, DC 20005


                             TONY W. MILES, ESQ.
                             Miles Law PLLC
                             1717 K Street, NW
                             Suite 900
                             Washington, DC 20006

Court Reporter:              BRYAN A. WAYNE, RPR, CRR
                             U.S. Courthouse, Room 4704-A
                             333 Constitution Avenue NW
                             Washington, DC 20001
```

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

<pre>
 1                       P R O C E E D I N G S
 2           THE DEPUTY CLERK:  Criminal case 22-176, the United
 3   States versus Stephen Johnson.  Counsel, would you please
 4   identify yourself for the record, starting with the government.
 5           MR. COURTNEY:  Good morning, Your Honor.  Paul
 6   Courtney for the United States.  I'm joined today by my
 7   colleague Ryan Lipes.  He's taking Ms. Bond's place on the case.
 8           THE COURT:  Good morning, counsel.  Welcome.
 9           MR. JEFFRESS:  Good morning, Your Honor.  Jon Jeffress
10   and Tony Miles on behalf of Mr. Johnson, who is present.
11           THE COURT:  Also good morning, counsel and
12   Mr. Johnson.
13       So here's why I wanted to hold this hearing today.  It
14   seems to me there are a number of motions that are now fully
15   briefed.  I know there are motions that are still being briefed.
16   In particular, I thought we could use this time with a few weeks
17   before trial to resolve -- to discuss and resolve the following
18   motions:
19       ECF 82, which is the motion to suppress evidence from the
20   Google account; ECF 83, which is motion to suppress evidence
21   from residence; ECF 84, motion to suppress evidence from
22   electronic and storage devices; ECF 85, motion to suppress
23   statements; and ECF 95, motion in limine to exclude
24   non-child-pornography evidence.
25       Mr. Jeffress, will you be taking the lead for Mr. Johnson
</pre>

1    or Mr. Miles?  Or are you going to split it up?

2          MR. JEFFRESS:  Split it up, Your Honor.  I was going

3    to handle the motion to suppress the Google drive, the

4    residence, and the electronic devices and the motion in limine.

5    Mr. Miles is handling the statements.

6          THE COURT:  Great.  Why don't we start there then.

7          MR. JEFFRESS:  I'm sorry.  Mr. Miles has that

8    particular motion in limine.

9          THE COURT:  Okay.

10          MR. JEFFRESS:  Your Honor, does the Court have a

11    preference among which of the motions to suppress --

12          THE COURT:  Why don't we start with the Google drive.

13          MR. JEFFRESS:  Well, the Google drive, Your Honor, I

14    think that's the most complicated one and the one that deals I

15    think with the more developing issues in the law on the Fourth

16    Amendment.  I filed last night, Your Honor, something just to

17    clarify the facts.

18          THE COURT:  I read it.

19          MR. JEFFRESS:  Okay.  And I don't understand the

20    government to disagree with all of those.  But basically there

21    are two alternative bases for exclusion of the evidence on that

22    one.  The first one is that the Google warrant is based on

23    Detective Sullivan's warrantless review of the material he

24    received from NCMEC -- actually not entirely -- yeah, from

25    NCMEC I think is the most accurate way to say that.

1     The government has said that they subsequently applied for
2     a warrant for Detective Sullivan to review that material, but
3     the fact is is Detective Sullivan reviewed that material prior
4     to the government ever applying for that warrant.  So there's
5     no question he did so just without any -- without having even
6     applied for a warrant.

7          THE COURT:  Wait.  Just be very clear about what --
8     because I had understood the facts to be somewhat different.
9     With respect to the materials that were sent by NCMEC to the
10    government, your understanding of the chronology is that all of
11    those files were reviewed by the detective before the warrant
12    application was made to Magistrate Judge Faruqui?

13         MR. JEFFRESS:  Yes, Your Honor.

14         THE COURT:  Okay.

15         MR. JEFFRESS:  Yes.  I think in an abundance of
16    caution, the government later decided let's apply for a warrant,
17    but Detective Sullivan had reviewed the files prior to that.
18    And Detective Sullivan's review of those files was of course the
19    basis for, or one basis, important basis for the warrant for the
20    Google drive.

21         So there are two different bases here for why that evidence
22    must be suppressed, for why Detective Sullivan, law enforcement,
23    undoubtedly a government agent, cannot review what NCMEC sent to
24    him without a warrant.

25         The first is is that no human -- you know, the government

1    will say, you know, we'll turn to the private search doctrine,

2    to *Jacobsen* and to the other cases and say, basically, look,

3    somebody from Google had already looked at this material prior

4    to Detective Sullivan's review and so the reasonable expectation

5    of privacy had already been compromised.

6          That I think isn't true just within the reasonable

7    expectation of privacy doctrine, but then there is the second

8    basis that I'll get to, which is the reasonable expectation of

9    privacy under *Katz* is not the only basis for suppressing

10   information under the Fourth Amendment anymore.

11         *Jones* has made clear that there is also a trespass theory

12   that applies also, and that the fact that someone else had

13   previously trespassed against the property does not mean that

14   the government can then freely do so again.

15         So on the first issue, Your Honor, just working within the

16   reasonable expectation of privacy issue, the case that we've

17   cited to Your Honor, *United States v. Wilson*, is factually

18   indistinguishable from this case.  And I think even the

19   government would have to --

20              THE COURT:  But also not binding.

21              MR. JEFFRESS:  Not binding.  Ninth Circuit case.

22   I think it's one of the main cases in this area, and I think

23   even the government would concede that if the Court were to

24   follow that decision, then that evidence must be suppressed.

25         It is the same as what happened here.  There was a Google

1    tip with respect to some attachments -- with respect to some

2    material --

3            THE COURT:  Do you concede that if Google had

4    identified an image through its process and had then disclosed

5    that to NCMEC and then that image -- actually, let me add one

6    additional fact.  Google's systems flagged an image, a Google

7    employee reviewed the image, the image was sent to NCMEC and

8    then to the government, that the private search doctrine would

9    mean as to that image no warrant was required?

10           MR. JEFFRESS:  No.  I'm sorry.  Can I clarify,

11   Your Honor.  In *Wilson* what was important to the court was

12   that no human reviewer had ever looked at Mr. Wilson's images.

13           THE COURT:  I'm talking about the image flagged by

14   Google, reviewed by a Google person, sent to NCMEC and then to

15   the government, and is then reviewed by the government.

16           MR. JEFFRESS:  So had a Google employee -- under Your

17   Honor's hypothetical --

18           THE COURT:  Yes.  Again, yes.  A Google employee

19   reviewed the very image that was sent to NCMEC and then to the

20   government.

21           MR. JEFFRESS:  That would distinguish it somewhat

22   from the facts in *Wilson* which are --

23           THE COURT:  But I'm trying to understand whether

24   the defendant concedes that that would mean that no warrant

25   was required in that circumstance.

MR. JEFFRESS:  I don't have any, you know, authority for the fact that -- that's different from *Wilson*, obviously, because in *Wilson* it was a historical review.  And -- as it is here.  It was a historical review.  No one looked at the images from Mr. Johnson's Google drive proper.  That I think is a fact that the government has stipulated to or admitted before the magistrate.

THE COURT:  Understand.  I'm just trying to understand the -- I get it.  Like an image is not a video, and it may or may not be the case that in particular circumstances Google employees review whatever the particular media is.  I'm just trying to understand whether you agree that the private search doctrine could mean that if a Google employee reviewed a particular image and that image was exactly what was sent to the government, that the government wouldn't need a warrant to then review that image.

MR. JEFFRESS:  I would say no also to that, Your Honor, for two reasons.  One is, you know, this issue has come up with the Google reviewer:  Who are these people?  What is their training on the federal statutory definition of child pornography?  Who is training them?

THE COURT:  Why does that matter?

MR. JEFFRESS:  Because it's the reliability of the initial identification.  The government likes to pretend like this is all computer-generated --

```
1              THE COURT:  What if Google is wrong?  Imagine
2    hypothetically Google looked at an image, and the image was of a
3    25-year-old person engaged in a sex act, and it sent that on to
4    the government.  And the Google reviewer thought it was child
5    porn.  Why would that mean that the government needed a warrant
6    to review that?
7              MR. JEFFRESS:  First of all, they would say the
8    criteria that Google is opining on is whether it's apparent
9    child pornography.
10             THE COURT:  But what if Google just happened upon
11   something and reviewed it, privately reviewed it in full and
12   then sent it to the government?
13             MR. JEFFRESS:  And got it wrong?
14             THE COURT:  Yeah.  The question is whether the
15   government then gets it wrong or why isn't it a jury question
16   about whether the image is or is not child pornography.
17             MR. JEFFRESS:  The analogy I think of is to the
18   drug-sniffing dogs.  What they have to do in the case of a
19   drug-sniffing dog -- what the government has to do under Supreme
20   Court precedent is show that the K9 is reliable, right?  And so
21   what they have to show here is not just that some Google
22   employee who has uncertain training, you know -- the incentive,
23   frankly, to identify the image as child pornography because if
24   they get it wrong, then who knows what would happen to their
25   employment.  And these are also -- I say Google employees, but
```

1    apparently they're also contractors.

2        But without any showing that they have reliably -- have

3    some degree of reliability in making that initial determination,

4    I don't believe that the government could rely on that in

5    conducting a warrantless search even under *Jacobsen*.

6        THE COURT:  Okay.  So now let's take this case.

7    Let's assume, hypothetically, there is maybe some circumstance

8    in which a properly trained Google employee reviewing an image

9    that is in all respects the very image that goes to the

10   government, that in some respects at least that could satisfy

11   the private search exception.  Here, of course, your point is

12   that's not this case.  You have -- first of all, you have no

13   present review, for lack of a better word.

14       MR. JEFFRESS:  Correct.

15       THE COURT:  And to the extent -- I think your argument

16   is to the extent that there are hashes that are applied to the

17   videos, that could be just as to a portion of the video, it's

18   historic.  And in this case I think your basic point is no one

19   at Google, or at least the record doesn't reflect that anyone at

20   Google affirmatively and contemporaneously reviewed the videos

21   before sending to the government.

22       MR. JEFFRESS:  The record states the opposite, yeah.

23       THE COURT:  And so why, then, was Magistrate Judge

24   Faruqui wrong to conclude that no warrant was required in those

25   circumstances?

MR. JEFFRESS:  Well, one, he was depending entirely on the -- there was a factual error and I think a legal error.  One is he was depending entirely on the hash matching, on the technology.  I don't doubt that a computer can say that a string of 16 alphanumeric characters matches another string of 16 alphanumeric characters and say these two are the same so these must be the same images.

But there is a human judgment underlying that which Judge Faruqui did not get into at all, which is what I just talked about, which is who is making this determination in the first place.  And that is a Google employee or contractor of uncertain training and uncertain reliability, and I don't think that that alone would supply a probable cause.  And I don't think the fact that --

THE COURT:  So your view is that Magistrate Judge Faruqui couldn't have even issued a warrant in this case.

MR. JEFFRESS:  I think not without getting more into what the initial decision was to classify this as child pornography --

THE COURT:  Because he seemed to have thought that he could issue a warrant, but didn't do so for judicial economy purposes.

MR. JEFFRESS:  Say a couple things about that opinion.  One is that it's like an advisory opinion, I don't exactly understand even what was going on down there, and ultimately

1    concludes that -- he follows a Fifth Circuit case, *Runyan*, which

2    is just wrong.  That decision is just wrong, which is that if

3    law enforcement is certain, has a degree of certainty that a

4    container that has never been opened by a private actor, has the

5    same thing as a container that has been opened by a private

6    actor, then they can go ahead and open it.  That is what the

7    Fifth Circuit said.  There is no grounding in the Supreme Court.

8    And that would just basically nullify the Fourth Amendment.

9        I mean, if what we're ultimately coming down to is whether

10   law enforcement thinks that something is going to reveal

11   criminal activity, then law enforcement always thinks that.

12   Or they can always say they think that.  So that is just wrong.

13   So I think he erred legally there.

14       But also, the opinion is so focused on the accuracy of the

15   hash matching technology and a computer's ability to do this.

16   And I understand that.  But what he's not getting into is that

17   there's a human judgment before that that's the key to all of

18   this, and that's what he really should have been examining.

19           THE COURT:  Let's assume a warrant was required.

20   Why doesn't the good faith -- or why does the exclusionary rule

21   apply, given that the government did at some point apply for a

22   warrant, asked Magistrate Judge Faruqui for a warrant, and he

23   concluded, of course, that in his view a warrant wasn't required

24   and he wasn't prepared to issue one for the reasons we've

25   discussed already?

1          MR. JEFFRESS:  Yeah.  I think because what he's saying

2     is is -- it's because of the sequence.  And on this maybe more

3     evidence would be useful, and I think we believe that an

4     evidentiary hearing, to the extent the government casts this

5     in any doubt, would be required -- that Detective Sullivan just

6     got it and reviewed it.  He thought he could open it without a

7     warrant.  He was wrong.  And he just did it.  And then the

8     government said whoa, whoa, whoa, whoa.

9          I mean, if anything, I think the government's subsequent

10    application for a warrant is an endorsement of our position,

11    because they're like you shouldn't have done that without a

12    warrant, we're going to try and fix it by going off and applying

13    for a warrant now.

14         On the second page of the government's opposition --

15         THE COURT:  Yes.  Detective Sullivan reviewed the

16    files submitted with cyber-tip reports and observed child

17    pornography.  Then, out of an abundance of caution, the

18    government applied for a warrant to view the images in the

19    cyber-tip.  The application did not rely on any information

20    Detective Sullivan obtained from his review of the files.

21         MR. JEFFRESS:  Yes.  That's true.  I looked at the

22    warrant.  That's true.  But that doesn't matter.  He had still

23    already done it.  The police can't go into a house without a

24    warrant and determine that oh, there's the gun that shot the

25    guy, and then leave the house, don't say anything about the fact

1    that they just made an unconstitutional intrusion into the house

2    and identified the gun, apply for a warrant based on all this

3    other information, and then that somehow justifies or validates

4    the initial warrantless intrusion into the house.

5              THE COURT:  Well, the question is whether to exclude

6    the information found by the government upon the warrant-based

7    search, which is not about saying we are going to allow the use

8    of information obtained through the pre-warrant search.  It's a

9    different question.

10          So what's the best case that you have for the proposition

11   that if in your circumstance the government had gone and gotten

12   a warrant -- not relying on the information obtained through the

13   pre-warrant search -- government gets a warrant, or is otherwise

14   justified in searching -- that the information gleaned as a

15   result of the post-warrant search is excluded?

16             MR. JEFFRESS:  Well, I mean, a warrant didn't

17   ultimately issue here.  So I think --

18             THE COURT:  Agree.

19             MR. JEFFRESS:  -- what you really have to look at is

20   that is --

21             THE COURT:  Let me ask you this question:  If the

22   government had applied for the warrant here before Detective

23   Sullivan had reviewed anything, and then everything that

24   happened here otherwise happened, that is to say, Magistrate

25   Judge Faruqui put the government through a lot of paces, and

1  Google too, to understand the technology and the search and the
2  like, and then issued the opinion that we all know he issued.
3  In those circumstances.  So again, I'm assuming hypothetically
4  no search by Sullivan pre this.  Magistrate Judge Faruqui says
5  no warrant for the reasons he said.

6      Would exclusion be required?

7      MR. JEFFRESS:  I think their good faith case would be
8  much stronger under the circumstances Your Honor just outlined.
9  I still don't think, because of this issue with the reliability
10 of the Google tip, the fact that Google is saying they're only
11 getting to an apparent child pornography standard, I think all
12 those things would have had to have been considered.  But their
13 good faith --

14     THE COURT:  Right.  If they applied for the warrant
15 before any review by the government, that is a stronger good
16 faith case in your view than when they do so after.

17     MR. JEFFRESS:  Oh, yeah.  If they applied for a
18 warrant and Judge Faruqui said what he said -- I still think
19 he's wrong on a number of things, but that would give them much
20 greater protection than here, where Sullivan just opened it up
21 and looked at it without any judicial authorization or even
22 discussion with the prosecutor, it looks like.

23     THE COURT:  Do we know that he reviewed all of the
24 relevant files?  I'll ask the government these questions of
25 course.

MR. JEFFRESS:  From what they indicate here, it looks like he did.

THE COURT:  All right.  I understand the arguments, obviously.  Let's turn to the next motion you're handling, Mr. Jeffress.

MR. JEFFRESS:  Your Honor, just on the *Jones* issue on this --

THE COURT:  Yeah, sure.

MR. JEFFRESS:  You know, their argument is that basically, okay, *Jones* is just talking about physical intrusions onto property and so forth.  I think that's just completely anachronistic.  In light of *Riley*, *Carpenter*, everything else, you know, electronic property is treated -- you know, I mean, what we're going through right now where people are just trying to adapt these doctrines and what this court is doing is trying to adapt these doctrines to the digital era and it doesn't make any sense to say *Jones* is just about physical trespass, it's not about trespass onto, you know, digital files. That is not a viable distinction.  And once you get rid of that distinction, then the *Jones* trespass theory also requires the suppression of the evidence from the Google drive.

THE COURT:  Okay.

MR. JEFFRESS:  Your Honor, the next one I'd like to take is just the digital devices.  Because on this, I think this is very clear.  This is not a case where the government issued

1       a -- you know, got a defective warrant and there's some good

2       faith argument or something like that.  This is not a case where

3       we're arguing some technicality.  We are arguing, and it's very

4       clear, and I think the government admits, there was no warrant

5       for the search of the electronic devices, just no warrant.

6       They just didn't get one.

7           They got a warrant for his apartment and they said they

8       could search his apartment.  We have problems with that too.

9       But with respect to, you know, the search of the digital

10      devices, there is no judicial officer who ever authorized a

11      search of the digital devices.  Just no warrant.

12          And, you know, I mean, it could not be more clear.  I mean,

13      all the Supreme Court cases, and most importantly *Riley*, says

14      you need a warrant before you search a cell phone.  It would

15      just be a complete abrogation of that decision to allow the

16      government to introduce the contents of a cell phone or a

17      computer or anything else where they didn't get a warrant to do

18      it.  You know, it couldn't be more clear from the warrant that

19      they did get that it did not apply to the electronic devices.

20      It just applied to the residence.

21          They were allowed to seize certain things, they were

22      allowed to search certain things.  They were not allowed to

23      search, under this warrant, the cell phone, the computers,

24      the thumb drives, any other of the evidence the government

25      now seeks to admit.

1          THE COURT:  Why would the warrant say that the

2     government could get Mr. Johnson's fingerprint if it wasn't

3     authorizing the search of his electronic devices?  It says,

4     "for the purpose of attempting to unlock devices in order to

5     search the contents as authorized by this warrant."

6          MR. JEFFRESS:  I mean, so the -- I'm sorry, Your

7     Honor.  What is Your Honor referring to in the warrant?

8          THE COURT:  The attachment to the warrant.

9          MR. JEFFRESS:  Attachment A?  Attachment A is property

10    to be searched.

11         THE COURT:  I'll pull it up right now.

12         MR. JEFFRESS:  The warrant itself, it says, "In the

13    matter of the search of 600 H Street, Apartment 749."  So, you

14    know, they're asking for a warrant to search the apartment.

15    Attachment A says things to be searched, and then it has the

16    apartment.  It doesn't say anything about the electronic devices.

17      I just don't see how any magistrate would believe, when

18    they say we want to search the apartment, and they have a

19    picture of the apartment, and they say absolutely nothing about

20    the devices, that he's authorizing a search -- and the warrant

21    says the same thing -- that the magistrate is in fact

22    authorizing a search of cell phone --

23         THE COURT:  It says, "During the execution of the

24    search of the premises described in Attachment A" --

25         MR. JEFFRESS:  Where --

1          THE COURT:  Page 9.  So this is --

2          MR. JEFFRESS:  Of the affidavit?

3          THE COURT:  This is Attachment B, property to be

4     seized.  It's -- the problem is it's not -- there are no page

5     numbers, but this is Attachment B, page 1, 2, 3 -- 4.

6          MR. JEFFRESS:  Attachment B, things to be seized?

7          THE COURT:  Yeah.  So then: During the execution of

8     the search of the premises described in Attachment A, law

9     enforcement personnel are also specifically authorized to obtain

10    from Stephen Johnson, but not any other individual... compel

11    display of any physical biometric characteristics... necessary

12    to unlock any devices requiring such biometric access subject to

13    seizure pursuant to this warrant for which law enforcement has

14    reasonable suspicion that the -- blah, blah, blah -- will be

15    unlocked.

16         MR. JEFFRESS:  You know, I mean, Your Honor, that

17    is things to be seized.  Okay.  So I think what Your Honor is

18    saying, well, if they're saying they can seize his thumb print

19    or something like that, that is somehow saying in fact they are

20    allowed to search his electronic devices.  That is far too thin

21    a read to justify that conclusion.

22         THE COURT:  So your view is --

23         MR. JEFFRESS:  The Supreme Court was very --

24         THE COURT:  Your view is they can search the

25    apartment, because that's what can be searched, they can seize

1    everything listed in Attachment B, to include his fingerprint,

2    and for the purpose of -- or the stated purpose of allowing the

3    unlocking of other property to be seized, but those two things

4    together do not authorize the search of electronic devices that

5    would thereby be unlocked.

6         MR. JEFFRESS:  Not when there's so much -- especially

7    not -- yes.  Now, I have other problems with the search of the

8    apartment.  But not when there's so much contrary information

9    indicating that all the magistrate was authorizing here was a

10   search of the apartment for these devices.

11        Anyone reading this would contemplate if the government --

12   would naturally contemplate, and especially any judicial

13   officer, that you could seize this stuff but if -- you're going

14   to want a search --

15        THE COURT:  So what about the language that says --

16   so same paragraph, it says, "for the purpose of attempting to

17   unlock the devices' security features in order to search the

18   contents as authorized by this warrant"?

19        MR. JEFFRESS:  It's wrong.  That's wrong.  This

20   warrant did not authorize it.  It's on the plain face of

21   the warrant.

22        THE COURT:  Well, but it says that.  This is the

23   warrant.

24        MR. JEFFRESS:  I mean, those are attachments to the

25   warrant application.  The warrant itself is actually not --

1    that's not what it is.  The warrant is --

2              THE COURT:  It incorporates Attachment B expressly.

3              MR. JEFFRESS:  I mean, these are attachments to the

4    affidavit.

5              THE COURT:  Fair enough.

6              MR. JEFFRESS:  You know, the affidavit is not the

7    warrant.  You need a warrant, you know -- and this is not a

8    small thing.  The Supreme Court in *Riley* was adamant and very

9    clear, and I believe unanimous, in saying that -- I might have

10   that wrong.  Well, anyway.  It was a very -- you know, it's a

11   landmark decision.

12        It says if you want to search someone's cell phone, that's

13   a very serious thing and you need to get a warrant.  This would

14   just toss that out the window.  I mean, they don't have a

15   warrant for his phone.  And, you know, if they wanted to do

16   that, they just missed a step here, and they went right to --

17   from seizing it to searching it.  That was not authorized under

18   this warrant.  It says right here on the face of the warrant

19   itself that, you know, all they're allowed to do is search the

20   apartment.

21        So the devices are just out here.  And, you know, the

22   government has not even in its own papers argued any -- they

23   have not made the argument that Your Honor just said.  They

24   have not argued any exception to the warrant requirement.

25   They've just said we're allowed to do it, you know, without

1   really providing any reasoning to the Court.

2       I think it is understood here that they missed a very

3   important step that is critical to the Fourth Amendment, which

4   is obtaining a warrant before you search an electronic device.

5               THE COURT:  Okay.  Next motion you're going to handle.

6               MR. JEFFRESS:  Yes, Your Honor.  Finally, on the

7   residence, the information that they had was stale.  You know,

8   basically, they had a tip from Google that some files had been

9   on a Google drive, you know, six months earlier.

10      You know, this case actually shows why they were wrong

11  about this.  The government is now saying that, I believe --

12  it's gone back and forth, but I think where we are now is that

13  there was no pornography recovered from the computers.  There

14  were artifacts, is what they say, and they're going to use that

15  as evidence to -- you know, at any trial of this matter, or they

16  want to.  But in fact, there was no pornography on the

17  computers.

18      And it's a perfect example of the fact that, you know,

19  something that they may think is on a computer at one time may

20  not be six months later when they finally get around to, you

21  know, applying for the warrant, and then they didn't conduct the

22  search until a year after Google had suspended Mr. Johnson's

23  account and provided the cyber-tips.

24      So on that, Your Honor, we believe the staleness argument

25  should have prevented them from even having a warrant to search

1  his residence.

2          THE COURT:  Thank you, Mr. Jeffress.

3      Mr. Miles.

4          MR. MILES:  Good morning, Your Honor.

5          THE COURT:  Good morning.

6          MR. MILES:  Since we're on motions to suppress, if

7  you don't mind, I'll start with the motion to suppress the

8  statement.

9          THE COURT:  You can take them in whatever order you'd

10 like.

11         MR. MILES:  Thank you.  I'm trying to narrow down

12 where I don't think there's a dispute.  I don't think there's

13 any dispute that there was custodial interrogation going on.

14 There are two sets of statements we're talking about.  One that

15 we characterize as the pre-Mirandized statements, and then we

16 have the post-Miranda.

17         THE COURT:  What's the standard I should apply in

18 deciding whether something constitutes a routine booking

19 question or statement?  D.C. Circuit's opinion has a couple

20 different, or at least arguably different tests.  What do you

21 think the relevant standard is?

22         MR. MILES:  Well, I think if it's necessary question

23 that's part of the administrative function such as booking --

24         THE COURT:  Okay.  So in your view what --

25         MR. MILES:  An example, a name, I think Social

Security number is probably fair.  Now, address is interesting.

I think there was a case the government cited -- if I look

through my notes carefully I'll find it, but I'll -- where there

was somebody that was on the roadside.  It was a DUI case if I

remember.  They were on the roadside, and one of the questions

asked was about their residence.  They didn't know what that

person's residence was, so I think that arguably would be okay.

Another case cited by the government where a person was

questioned about their residence was a case where they were

executing a search warrant in the residence and they needed to

comply with the Federal Rules of Criminal Procedure that

requires that you give a copy of what you seized and provide it

to the owner of the premises.

And so that case was based on that reasoning, that because

they needed to determine who the owner of the premises was in

order to comply with the rule, they needed to ask about their

residence.

Here, it's very different with regard to residence.  They

knew what his residence was.  They went to that residence and

they searched it.  And not only did they search the residence

and find Mr. Johnson present in it, they did all kinds of

investigation and research --

THE COURT:  What in your view is the purpose of an

appropriate booking question?

MR. MILES:  To gather information that would be

1    necessary to complete the booking, like name --

2         THE COURT:  That begs the question:  What information

3    is necessary to complete the booking --

4         MR. MILES:  Oh, I'm sorry.  So name --

5         THE COURT:  You want to make sure you have the right

6    person.  Name, Social Security, why not address?  Want to just

7    make sure it's the person we believe resides at that address.

8    We want to be comfortable that we've pulled the right person in

9    here.

10         MR. MILES:  And I would say address, like in the

11    example -- I think it's fact -- you know, depends on the

12    totality of the circumstances.  In this circumstance I think

13    address is not necessary.

14         THE COURT:  Probably not how far your Tesla can drive.

15         MR. MILES:  Probably not.  Exactly.  And that's a good

16    example, but that doesn't seem to be a matter of consequence.

17         THE COURT:  I don't think so either.

18         MR. MILES:  And that's why that didn't get --

19         THE COURT:  I don't know whether any of these are

20    matters of consequence, to be honest.

21         MR. MILES:  They may not be, Your Honor.  And they may

22    not be anything -- you know, but out of an abundance of caution,

23    we think they are --

24         THE COURT:  So what statements do you think are of

25    consequence that happened before the *Miranda* warning occurred?

1          MR. MILES:  Well, potentially, and that's the -- you

2    know, where this place -- and I don't -- the address, residence

3    is potential, and the phone number.  The phone number is perhaps

4    even more important, that -- as this case is developing in ways

5    that were unaware of us -- to us at the time the motion was

6    filed.  We are learning, you know, more recently that there's

7    evidence from this telephone that the government may seek to use

8    when previously it did not appear to be the case.  And so the

9    telephone number is tied to a particular telephone on which they

10   say there's evidence.  If Mr. Johnson says this is my telephone,

11   obviously that means that's his --

12         THE COURT:  So really what this question -- the

13   booking question issue is really about address and phone number.

14         MR. MILES:  Correct.

15         THE COURT:  Okay.  Got it.  Let's move on to the

16   question of the *Miranda* warning.

17         MR. MILES:  The post booking stuff.

18         THE COURT:  And I should note, obviously, I have the

19   video of the custodial interview.  I've reviewed it multiple

20   times, including in particular the first -- well, I've reviewed

21   the first 12 minutes or so multiple times.

22         MR. MILES:  Okay.  The -- our I think primary concern

23   there is that Mr. Johnson was not properly informed about what

24   his *Miranda* warnings were.  The purpose of *Miranda* is about

25   statements -- protecting the -- or letting the defendant be

1    aware that any statements that defendant makes could, you know,

2    could be used against him in court.  Before you make that

3    statement you have the right to counsel, you don't have to make

4    these statements to us, etc.  Not statements law enforcement may

5    make to the defendant about the case to let them know what's

6    going on.

7         And much of what was being told to Mr. Johnson about why

8    they have to give the *Miranda* warnings, and even after they were

9    given and he asks the question about counsel, is you -- this is

10   something we need to do so that we can tell you -- we can talk

11   to you about what's going on.  And our view is that was

12   misleading and that did not properly inform Mr. Johnson about

13   what *Miranda* is about, what the warnings are, what's being

14   protected and why they're given.

15        And therefore we argue that his -- well, there is no

16   waiver.  He was not -- it was not an intelligent waiver because

17   he was not properly informed about what --

18             THE COURT:  Let me just make sure I understand it.

19   Really the argument is because the interviewers said we want you

20   to do this or you need to sign this waiver so that we can tell

21   you what's going on --

22             MR. MILES:  Correct.

23             THE COURT:  -- that is an incorrect and misleading

24   statement, because, I guess what your point is, is they were

25   free to tell him whatever they wanted, because he wouldn't have

1    had to say anything in return.

2              MR. MILES:  Correct.

3              THE COURT:  It's only if he were to speak that the

4    waiver was necessary.

5              MR. MILES:  Yes.

6              THE COURT:  Okay.  I have it.

7              MR. MILES:  Any other argument with respect to that

8    motion?

9              THE COURT:  No.  I got it.  Thank you.

10             MR. MILES:  Okay.  I'll move on to the motion in

11   limine.  Court's indulgence.

12             THE COURT:  Yeah.

13             MR. COURTNEY:  Could I just briefly interrupt?  If

14   this is about the motion in limine for non-child pornography

15   evidence, we've prepared our exhibit list, and I don't think we

16   have any.  So it's moot.

17             THE COURT:  You know, I was looking back at my

18   scheduling orders in this case and I realized that I didn't

19   include a paragraph that I sometimes do which is that the

20   parties should meet and confer before filing any motion to see

21   if the issues in dispute can be narrowed.

22       It sounds like for present purposes the government may not

23   be intending to use any non-child pornography evidence of the

24   kind covered by ECF 95.  Correct?

25             MR. COURTNEY:  That's correct, Your Honor.

1        THE COURT:  Okay?

2        MR. MILES:  Okay.

3        THE COURT:  Why don't we table that, then, for now.

4        MR. MILES:  Okay.  Thank you.  So I think we're done

5   with...

6        THE COURT:  Let me just make sure.  Google...

7    Yes.  Great.  Let's hear from the government now.

8    Mr. Courtney, good morning.

9        MR. COURTNEY:  Good morning, Your Honor.

10   I'll start with the Google account.  And I just want to be

11   very clear on the timeline.

12       THE COURT:  Yes, please.

13       MR. COURTNEY:  The cyber-tips were submitted by Google

14   to NCMEC in early October of 2020.  At some point in the fall of

15   2020 Detective Sullivan reviewed those images to prepare a

16   warrant to Google for Mr. Johnson's Google account on the basis

17   of the cyber-tips.  That did not ultimately at that time happen.

18   In December of 2020 the Sixth Circuit issued its decision

19   in *Miller*.  At that point that was the only circuit authority

20   that was squarely on point with respect to Google cyber-tips,

21   and it held that a warrant wasn't required.

22   Nevertheless, there was no law in this circuit, and the

23   government decided that before any application was made to

24   Google for the contents of the Google account, there should be a

25   warrant application out of an abundance of caution, because this

issue is being litigated, to review the contents of the

cyber-tip.  And that application was submitted to Judge Faruqui

initially at the end of December in 2020.

On page 11 of the government's ultimate submission, it was

noted in footnote 3:  "The media files provided to NCMEC by

Google LLC have been reviewed by your affiant in preparation for

obtaining a search warrant to Google.  Your affiant did not

apply, however, for a Google search warrant related to this

cyber-tip.

"Instead, your affiant is now seeking this search warrant

out of an abundance of caution to view the materials provided by

Google because they were based solely on hash value matches and

were not reviewed by someone at Google.  Your affiant is not

relying on any information obtained from these media files to

form the basis of the probable cause in this search warrant."

THE COURT:  Okay.  So I think everyone agrees that the

following things are true:  Detective Sullivan reviewed all of

the files that were received from NCMEC -- Google files via

NCMEC.  He did so without a warrant.  There was then,

thereafter, a warrant application that did not -- or at least as

you just articulated, did not rely on any information that

Detective Sullivan gleaned from his review.

All of that is -- I think to some extent the defendant is

relying on that chronology to say well, yes, there was a warrant

application, but it postdated the detective's review of all the

files.

Obviously, thereafter, Magistrate Judge Faruqui asks for further briefing and more information from the government and Google about the process and the like, and ultimately says a warrant is not necessary and I don't think I should issue one for the reasons he articulated.

So obviously the government here, the principal argument is that no warrant is required.  But it has a fallback argument that an exception to the warrant requirement should apply because the government asked for a warrant and didn't get one, and it did all the things it should have, at least as of that point.

I want to focus on this question first, which is the good-faith exception, or just basically whether the exclusionary rule should preclude the use of these files, images, videos, in light of the process before Magistrate Judge Faruqui.

I will be very frank, that I had not realized before today that Detective Sullivan had reviewed all of the relevant files before the warrant application.  I'm not suggesting that you said to the contrary.  I was just sort of assuming he had done something, but then the warrant application was in a sense much broader.

MR. COURTNEY:  I don't have the information with certainty, but there are 220 files, and I find it hard to believe that he reviewed all of them.  I think it was -- I can

1    confirm for the court --

2          THE COURT:  Let's assume hypothetically for present

3    purposes that he did.

4          MR. COURTNEY:  I'm not sure.  And I think that's a

5    fair question, but I'm not sure it's really of consequence

6    either way.

7          THE COURT:  Well, I don't disagree with that

8    necessarily; I just want to assume for purposes of the next

9    question that he reviewed every single minute of every single

10   one of those 220 files.  And then the warrant application occurs

11   later.  And then Magistrate Judge Faruqui holds what he holds.

12       I think my first question is, would there have been any

13   problem, Fourth Amendment problem, if Magistrate Judge Faruqui

14   had issued a warrant at that time -- contrary to what he did --

15   but imagine we actually had a warrant and then the review or the

16   use of the files thereafter?

17         MR. MILES:  I don't believe so.  And I think what's

18   significant, and part of the reason why I read -- perhaps too

19   quickly -- the footnote that was in the application is that the

20   application did not, explicitly did not rely on any information

21   that was gleaned from that review, wasn't used for any other

22   purpose prior to the application, and that information was

23   provided to Judge Faruqui.  I mean, this isn't something that

24   the government has ever failed to disclose.  The government was

25   very clear that Detective Sullivan had looked at those images

1   and it didn't form any basis of the statement of probable cause.

2   I mean, maybe there's an inference that because he decided to

3   apply for the warrant that there's something there, but --

4           THE COURT:  Your view is a warrant would have been

5   wholly appropriate in this case based on the information

6   provided to the government from Google through NCMEC, even if

7   Detective Sullivan hadn't reviewed a single file, because of the

8   hashing process and the like.

9           MR. COURTNEY:  Correct.  And that is essentially what

10  Judge Faruqui decided.  I mean, he didn't issue the warrant, but

11  substantively there's not much difference between the order that

12  he issued and a warrant.  It's an explicit judicial finding of

13  probable cause signed by a judge to conduct a particular search.

14      You know, the -- granted, he said I'm not issuing the

15  warrant, but the Fourth Amendment doesn't spell out that a

16  warrant has to be on certain forms or templates.  I mean, it's

17  substantively authorizing the search.

18          THE COURT:  It is.  Without a warrant.

19          MR. COURTNEY:  Correct.

20          THE COURT:  Which isn't the same as saying I think a

21  warrant should issue, in substance.

22      But -- so the thing that I just want to make sure we focus

23  on is, so given all of that history, Magistrate Judge Faruqui

24  says you don't need a warrant and I will not issue one.  So of

25  course we are now proceeding in a warrantless environment.

1        MR. COURTNEY:  Correct.

2        THE COURT:  And so for purposes of the exclusionary

3   rule, assuming I think a warrant was required, we have to be

4   thinking about an exception.  It is the government's view that

5   the good-faith exception is equally applicable here whether or

6   not Sullivan reviewed the files before the warrant application.

7        MR. COURTNEY:  Yes.  And that's because that

8   information was not incorporated into the -- relied upon in the

9   application.  It was disclosed to the Court.  The government had

10  Detective Sullivan apply for the warrant.  You know, Judge

11  Faruqui did not just issue an order that was a rubber stamp.  I

12  mean, he conducted a series of hearings.  He requested briefing.

13  He ordered Google to appear through counsel.  He ordered Google

14  to submit a sworn declaration.  It was a process that lasted

15  several months.  And then issued a reasoned opinion that relied

16  on what was at the time the only circuit authority on Google

17  cyber-tips.  I mean, the decision that the Ninth Circuit issued

18  in *Wilson* came several months later in 2021.

19       And so, when you think about the purposes of the

20  exclusionary rule, you know, which is to deter misconduct, it's

21  hard to imagine why that should apply here, where Detective

22  Sullivan applies for the warrant, notes that he had looked at

23  the images but aren't relying on them, the court conducts

24  extensive proceedings that essentially involve fact-finding,

25  issues a written opinion --

1          THE COURT:  And as you've said, Magistrate Judge

2     Faruqui also knows at the time that Detective Sullivan had

3     reviewed the files --

4          MR. COURTNEY:  Correct.

5          THE COURT:  -- pre warrant application.

6          MR. COURTNEY:  Correct.  And the court issues an

7     opinion that is also consistent with the opinion of a court

8     of appeals, which at that point there's not a circuit split.

9       So there would be no reason for Detective Sullivan or the

10    government to think it couldn't rely on Judge Faruqui's decision

11    given that sequence of events, all of the information that was

12    provided to the court, and the way that the court responded --

13         THE COURT:  Does the government agree with Magistrate

14    Judge Faruqui that if the government satisfies all the

15    requirements for a warrant, that the magistrate judge can

16    decline to issue one for the reasons he gave?

17         MR. COURTNEY:  I honestly haven't thought about that

18    issue.

19         THE COURT:  Does the government --

20         MR. COURTNEY:  I -- not to speak over Your Honor --

21         THE COURT:  Please.

22         MR. COURTNEY:  I think, to the extent that the court

23    can decline to issue a warrant for reasons of judicial economy,

24    this is an area where it would make good sense.  I mean, there

25    are I think 80,000 cyber-tips submitted every day to NCMEC.  And

1  so --

2          THE COURT:  Is it the department's policy to now seek

3  warrants in all similar cases -- in all cases similar to this

4  one?

5          MR. COURTNEY:  So my understanding is that after Judge

6  Faruqui's decision we were not applying for warrants because

7  there was a decision in this jurisdiction that they were not

8  required.  I think now that there is a circuit split, we are

9  applying for warrants in circumstances where it's a Google

10  cyber-tip and Google has not done human review contemporaneous

11  with the submission of the report.

12          THE COURT:  Right.  So in the six months between

13  Magistrate Judge Faruqui's decision and the Ninth Circuit

14  decision, at least in this district perhaps the government

15  wasn't seeking warrants, but post the creation of the circuit

16  split, the government has been.

17          MR. COURTNEY:  Or at least --

18          THE COURT:  In certain circumstances.

19          MR. COURTNEY:  At least recently in certain

20  circumstances as a result of the --

21          THE COURT:  Do you happen to know how many warrant

22  applications that means in this district?

23          MR. COURTNEY:  I'm not sure that one has yet been

24  submitted.  I don't know.

25          THE COURT:  Okay.  Fair enough.

1      So, obviously, all of my questions have been about whether
2  and to what extent an exception or -- whether we want to call
3  it the good-faith exception or just whether the exclusionary
4  rule would prevent the use of the evidence here in the absence
5  of a warrant and assuming one was required.  The government's
6  lead argument of course is that no warrant was required, for the
7  reasons you've articulated in your brief.

8      Why isn't Judge Berzon's opinion right, at least in certain
9  circumstances, where -- I mean hypothetically, for example, I
10  can imagine at least a world where a hash is triggered as to a
11  video.  I'm using those words in like the least technical sense,
12  I get.  But that just means that in a particular file there is
13  something that might be child pornography, very likely is child
14  pornography, no doubt.  I don't think there's any question about
15  that.  But then no one at Google, at least hypothetically,
16  necessarily reviews the entire video file.  And so the first
17  review of the full video file is by the government.  At least
18  that can happen.

19      If that happens, why is it that the private search doctrine
20  applies to the entire video file?

21          MR. COURTNEY:  Well, I mean I think -- I think the
22  issue is that when you are essentially 99.9 percent certain that
23  the file contains contraband, child pornography, there's not a
24  legitimate privacy interest in that file.  And if you look --

25          THE COURT:  Because it's child pornography?

1          MR. COURTNEY:  Because it contains child pornography.

2     Or at least it's known to with relative certainty.  If you also

3     look to any other search in the private search context --

4          THE COURT:  But that means -- that at least could mean

5     that no human ever needed to have reviewed the file at all.

6          MR. COURTNEY:  Well, respectfully --

7          THE COURT:  If all -- it doesn't seem like it can be

8     enough that the mere mathematical certainty that there is child

9     pornography on a file means that there's no reasonable

10    expectation of privacy in that file.  For the private search

11    doctrine to have applied, doesn't some human have to have looked

12    at the file at some point?

13         MR. COURTNEY:  Well, some human has looked at at least

14    the portion of the file that is child pornography.

15         THE COURT:  Yes.  And so you have to have had some

16    quote-unquote private search at some point.

17         MR. COURTNEY:  Correct.

18         THE COURT:  But why does it follow that if there has

19    been that as to a portion of a file -- and again, I believe it's

20    true that once that has happened, given all the information in

21    the record, that makes it very, very, very likely that in the

22    next hashtagged or whatever file, that is also child

23    pornography.  But why does that mean there is no reasonable

24    expectation of privacy at least as to the portions of the video

25    that have not previously been viewed by a human?

1          MR. COURTNEY:  Well, it's kind of hard to imagine the

2     circumstance in which that exists.  What does a file look like

3     where there are portions that are not child pornography and then

4     child pornography?  I mean, probably something where there's an

5     attempt to conceal that the file is child pornography --

6          THE COURT:  Maybe, or somebody decided to make, like,

7     his or her own home movie of sorts, and added to a file

8     information that no human has ever seen.

9          MR. COURTNEY:  But the file itself contains child

10    pornography.  So I mean, it's hard to --

11         THE COURT:  Yes.  I'm assuming a world where at least

12    hypothetically you have a file that of course at some point in

13    the past a human has viewed, and as a result the most recent

14    file has at least some overlap with what a human has previously

15    viewed, but we don't know, based on the process that's been

16    described to me, whether there's a 100 percent overlap of the

17    private viewing with the file that we have, or if it's 5

18    percent, 50 percent, or 75 percent.

19         Because as I understand it, at least, the fact of the

20    hash is really just saying within this file there is child

21    pornography of a kind that has been viewed once before, but

22    it doesn't tell you whether it's 100 percent, 5 percent or

23    somewhere in between of what's previously been viewed by a

24    human.

25         MR. COURTNEY:  Sure.  And I think our position would

1    be that there's no expectation of privacy in the file because it

2    contains child pornography.  I mean, if it's one video file that

3    contains child pornography, the entire video file is contraband.

4        I also don't think in the private search context courts

5    have ever required a private party making a report to law

6    enforcement have 100 percent knowledge of everything the file

7    shows.  I mean, I think it's *Runyan*, the Fifth Circuit case

8    where the woman provided some disks to law enforcement and

9    said -- from her ex-husband or a man she was divorcing, and said

10   it contains child pornography.  I mean, it wasn't an issue in

11   that case, but I would very much doubt that she watched every

12   second of every video because it's something that most people

13   would find disturbing.

14          THE COURT:  If I found somebody's diary and I saw on

15   the first page that the person intended to, I don't know, do

16   something unlawful, and I read that page and I didn't read

17   anything else, and I turned it over to law enforcement, would

18   law enforcement be able to read the entire diary?

19          MR. COURTNEY:  I think that's --

20          THE COURT:  Absent a warrant?

21          MR. COURTNEY:  I think that's a different question.

22          THE COURT:  Why?

23          MR. COURTNEY:  Well, if we think --

24          THE COURT:  What if it was a diary on the first page,

25   it said I just viewed child pornography?  That's the first page.

And I read that, I turned it over to law enforcement.  Can law enforcement review the rest of the diary?

MR. COURTNEY:  I wouldn't think so, and I think what's distinguishable about a book from a video is that a book has many pages on which people can write and opine and memorialize many different things.  And when you're talking about a video file that has child pornography in it, it's hard to separate.  It's not something with different pages.  It's hard to separate it in that way.

THE COURT:  What if the video file is two hours long and for all we know the hash is tagging 15 seconds of the video?  I don't know, really, but still holds true that the hash -- I'm assuming -- and I realize that I am stating this in a very nontechnical way.  But, for example, a human could have reviewed a 15-minute clip -- well, sorry.

Call it a two-minute clip of child pornography a couple years ago, tagged that in all of the technically appropriate way, and then if a two-hour video file appears somewhere on Google's system, that would get flagged, disclosed to NCMEC and disclosed to law enforcement.  Assuming those are all true, the government's position is the government could review all two hours.

MR. COURTNEY:  If the file contains child pornography.

THE COURT:  If the file contains child pornography or at least is highly likely to, given the hash, even if it's hypothetically possible that only a small portion of that entire

1    video file has ever been viewed by a human.

2            MR. COURTNEY:  Yes.

3            THE COURT:  Okay.

4       Okay.  Let's move to the other motions, if we could.

5            MR. COURTNEY:  Sure.

6            THE COURT:  Take them up in whatever order you'd like.

7            MR. COURTNEY:  I would next like to address I guess

8    the electronic and storage devices.

9            THE COURT:  Yes.

10           MR. COURTNEY:  The warrant expressly, as the Court

11   I think has already noted, authorizes the search of digital

12   devices recovered from the residence.  The caption of the

13   warrant pertains to the residence itself.  Attachment A talks

14   about the residence.  Attachment B, which is also incorporated

15   into --

16           THE COURT:  But the warrant expressly incorporates

17   Attachment B.  And let me make sure I have it.  "I find that the

18   affidavit... established probable cause to search and seize the

19   person or property described above," which is Attachment A, "and

20   that search will reveal" Attachment B.

21      Okay.  So it isn't hyper express, you would concede, that

22   electronic devices may be searched.  It's at least not as hyper

23   express as the residence is.

24           MR. COURTNEY:  The residence is -- in these types of

25   cases, obviously, you don't know what devices are going to be in

the residence until you search it, but you know based on the

nature --

THE COURT:  Yes, but Attachment A could say "the

residence and all electronic devices found therein."  It didn't

say that.

MR. COURTNEY:  Correct.  But Attachment B, as Your

Honor noted, does expressly authorize the search.  On page 3 of

document 84-3, which is item No. 3 of Attachment B --

THE COURT:  Let me just catch up with you.  ECF 84-3?

MR. COURTNEY:  Yes.

THE COURT:  Okay.  Attachment B, yes.

MR. COURTNEY:  Number 3 on page 3, "for any digital

device which is capable of containing and reasonably could

contain fruits, evidence, information, contraband, or

instrumentalities as described in the search warrant affidavit

and above (hereinafter 'the devices')," and it lists the type of

information which can be seized from the devices, which is

information, correspondence, records and documents constituting

evidence of child pornography offenses.

And so I mean, I think the kind of legal argument here is

that the electronic devices are essentially containers, and the

warrant authorized them to be seized and that the data on them

that is evidence of child pornography offenses is established --

THE COURT:  To be seized --

MR. COURTNEY:  -- can be seized.

1          THE COURT:  And searched.

2          MR. COURTNEY:  And searched.

3          THE COURT:  I don't think there's any question from

4    the defense perspective that seizing them was appropriate under

5    the warrant.  The question I think is whether their search is

6    appropriate.  Your view is that --

7          MR. COURTNEY:  That's what the warrant contemplates.

8          THE COURT:  -- even though Attachment B says "property

9    to be seized," it really means property to be searched.

10         MR. COURTNEY:  Correct.  I mean, I think it's

11   functionally equivalent.  It's describing the seizure of digital

12   evidence from within the devices, which is tantamount to a

13   search.  I'm not sure that there's a huge distinction

14   substantively --

15         THE COURT:  Put differently, you can't seize the

16   electronic information on a device without quote-unquote

17   searching the device.

18         MR. COURTNEY:  Correct.

19         THE COURT:  Okay.

20         MR. COURTNEY:  And my understanding, you know, in some

21   cases in Attachment A you do sometimes see "and devices found

22   therein," but the way this warrant is formatted is how I believe

23   the department kind of handles these nationwide.  I'm not aware

24   of any authority that has ever invalidated -- I don't think

25   defense cites any -- search of digital devices where they're in

1    Attachment B.

2              THE COURT:  Okay.

3              MR. COURTNEY:  Next I guess, the residence.  I think

4    that defense's focus today was solely on staleness.  I would

5    rely on the authority that we cited in our papers about how

6    courts have addressed staleness in the context of these types of

7    offenses, which was addressed in the warrant affidavit.  People

8    tend to hold on, or there tends to be digital evidence of these

9    offenses for some time, certainly more than, you know, the

10   period here.  And indeed, the digital devices did contain

11   artifacts that are evidence of the crimes.

12        Based on the authority that we've cited in the papers, I

13   don't think there's really great authority for the staleness

14   argument.  The other argument that I note that the defense

15   raised was about knock and announce, and I had written in our

16   opposition that there was no authority cited for that.  I

17   subsequently learned that the Supreme Court expressly foreclosed

18   suppression for knock and announce violations in *Hudson v.*

19   *Michigan*, which is a 2006 decision.

20             THE COURT:  Let me ask you this question.  Going back

21   to the Google drive issue.  If I were to conclude that a warrant

22   was required but that an exception to the exclusionary rule

23   applies, or exclusion is not warranted, as to the information

24   procured without the warrant, the Google drive information.  So

25   in a way you can imagine that holding being something like there

was a warrantless search when there should have been a warrant,
but -- I mean, that's really therefore a Fourth Amendment
problem -- but no exclusion.  What does that mean for the other
steps the government took, relying on the information gleaned in
the absence of a warrant?  Does the same result flow?  That is
to say, if exclusion is not required, that means that that
information is usable for all purposes?

MR. COURTNEY:  Yes.  I would think so.  Because the
court would be holding in essence that the government was
entitled to use and rely on that information in good faith.
And if it's not being excluded substantively as trial evidence,
it certainly seems that it could be used to form the basis --

THE COURT:  As a future warrant application basis?

MR. COURTNEY:  For probable cause.  And I would note
that the warrant to Google was sought in March of 2021, which
was still months before the Ninth Circuit issued its ruling in
*Wilson*.  So there's really another layer of good faith that
applies because there's good faith for the Google warrant.
I mean, the government applied in March relying on information
that it was told it didn't need a warrant to make use of, and at
that time there was no contravening legal authority.

So it would seem that the government could also rely on
good faith with respect to the Google warrant if the court were
to find that the information from the cyber-tips was not
permitted to be used in a warrant.

1          THE COURT:  Okay.  Thank you.  So how about the

2    custodial interview?

3          MR. COURTNEY:  Yes.  I'll just be brief on that.

4    I know the Court has reviewed it several times.

5          THE COURT:  Does the government intend to use any of

6    the booking statements, so to speak?

7          MR. COURTNEY:  I would say -- we would like a ruling

8    because the government wants to reserve the right to use the

9    statement as the trial develops.

10         THE COURT:  Which statements?  Is it a routine booking

11   question to have a conversation about someone's car and whether

12   it can go 300 miles without a charge?  Probably not.

13         MR. COURTNEY:  Probably not, but I don't think it's of

14   consequence.

15         THE COURT:  That's why I wanted to know what if

16   anything -- which pre-*Miranda* statements the government wants

17   a ruling on for purposes of deciding what to use at trial.

18         MR. COURTNEY:  I think the ones are the ones that

19   would be standard booking questions about phone number and

20   address, although the government at this point doesn't intend to

21   rely on that evidence to establish the phone number or address.

22   I mean, that's covered through other evidence and the fact that

23   Mr. Johnson was arrested in the apartment.  There was

24   significant indicia that he lived there.

25         THE COURT:  So let me just make sure I have it.  The

1    government believes it can use, in the pre-*Miranda* context, his
2    statement of his name, address, phone number, Social Security.

3               MR. COURTNEY:  Yes.  Identifying information.

4               THE COURT:  But just those four?

5               MR. COURTNEY:  Correct.

6               THE COURT:  Anything else?

7               MR. COURTNEY:  No.

8               THE COURT:  Okay.  And then how about whether he was
9    properly Mirandized?

10              MR. COURTNEY:  I think the video speaks for itself,
11   which is that he was.  I mean, Special Agent Calvillo sat next
12   to him with the *Miranda* waiver form, read everything to him very
13   clearly.  The tone was not at all inappropriate.  She's a very
14   soft-spoken, gentle individual.  There were no threats made.
15   He indicated that he understood everything.  And I think it's --
16   the video is significant.  When you hear the intonation of his
17   question at the end, can I have a lawyer, it's not can I have a
18   lawyer, I want a lawyer, it's a clarifying question.  And --

19              THE COURT:  The defendant's argument has shifted a
20   little bit, maybe, or at least it seemed a little bit different
21   to me today.  Not suggesting it's not in the briefs this way
22   also, but it's by telling him he needed to waive his rights or
23   sign the form, the government said you need to do that in order
24   for us to tell you what's going on, which is misleading because
25   the government could make a series of representations to him

1    without his waiving any rights.  What's your response to that?

2               MR. COURTNEY:  I don't think that's quite --

3               THE COURT:  Is that a fair reading of the video?

4               MR. COURTNEY:  I don't think that's quite what she

5    said.  I mean, I think the reality of the situation is that if

6    he decides that he's going to invoke his right to counsel, which

7    they made clear to him multiple times he could do, and she told

8    him after that question, you can remain totally silent, it's

9    your choice, they weren't going to speak to him.

10        And so -- the Court may be pulling up the transcript.

11   I mean, the words she uses were never "in order to," and I

12   wouldn't interpret it as this is a necessary predicate so that

13   we are able to speak to you.  I would interpret it more as we're

14   not going to talk to you at all if you decide that you want to

15   be represented by a lawyer, which is accurate.  I mean, that's

16   what they're supposed to do.  They're not really supposed to be

17   engaging with somebody who wants a lawyer present.

18               THE COURT:  Okay.  Any -- on my list that is

19   everything.

20               MR. COURTNEY:  That's everything that the Court

21   addressed.

22               THE COURT:  Everything that I noted at the top,

23   because the government has said at least presently it's not

24   intending to put on its exhibit list the non-child pornography

25   evidence.  So we've tabled that question.

1          MR. COURTNEY:  Right.

2          THE COURT:  So why don't you raise other topics you'd

3    like to address.

4          MR. COURTNEY:  Briefly, I would just note simply for

5    housekeeping matters, motions 86 and 87, given the superseding

6    indictment, are now moot.

7          THE COURT:  That's why I didn't mention them.  And the

8    motions directed at the superseding indictment are not yet ripe

9    because I believe the reply briefs are due tomorrow.

10          MR. COURTNEY:  Correct.  And the government filed at

11    ECF No. 119 an unopposed motion for a protective order.  So we

12    would just ask the Court to enter that.

13          THE COURT:  Yes.  I will enter that today.

14          MR. COURTNEY:  And then as to our motion in limine

15    with respect to the defense expert, which also may not yet be

16    fully ripe, we've at least reached a tentative agreement with

17    counsel on that to receive or report any exhibits for that

18    expert by April 1.

19          THE COURT:  With some more granularity around the

20    opinions to be expressed, I assume?

21          MR. COURTNEY:  Yes.  I understand that she's currently

22    at the FBI's Washington field office and was there yesterday

23    continuing her review.  We've tried to assist, where she's had

24    questions about evidence, to expedite her review, and we're

25    understanding of the fact that she's going to need some time to

1    prepare a report and defense will need time to process it.

2         So we've agreed at this point, if it's acceptable to the

3    Court, that we would be willing to accept more particular expert

4    notice by April 1, and to -- that the defense should be

5    permitted to submit to us any exhibits for their expert witness

6    by April 1 as well.

7         We would ask of course that if anything raised by the

8    report or those exhibits causes us to alter our case-in-chief,

9    that we be permitted to supplement our exhibits at that time in

10   response.

11        THE COURT:  I'd certainly entertain that.  That seems

12   reasonable to me.

13        MR. COURTNEY:  Thank you, Your Honor.

14        THE COURT:  Thank you.  Mr. Jeffress, would you like a

15   brief reply on some of these topics?

16        MR. JEFFRESS:  Yes, Your Honor.  First on the warrant

17   for the Google drive information, you know, I think what *Wilson*

18   teaches and what is clear from the record is that there are two

19   things that change from Detective Sullivan's warrantless review,

20   and they really, they color, you know, all subsequent

21   proceedings in this case, including the proceedings in front of

22   Judge Faruqui.  And as the government pointed out, you know, the

23   warrantless search of the information is very prominently

24   featured in the actual warrant that was ultimately authorized to

25   get the Google drive information.  And I mean, it's extensive.

It, you know, includes exactly what Detective Sullivan saw, the images that he saw, and everything else.  It's a very prominent part of that warrant.

But two things that change basically and that make this -- take it outside of *Jacobsen* and outside the private search doctrine is that they go from, you know, apparent child pornography, which is all Google ever said, based on a historical review not of these actual images but of previous images that they believe match -- they said these are apparent child pornography -- to images that a law enforcement officer has reviewed and has himself confirmed are actual child pornography.  So that is a substantive difference that colors all subsequent proceedings.

And then the second thing is that, you know, it goes from, well, you know, Google reviewed these historically and there's a hash match and stuff like that to, no, I have reviewed these images, the ones from, you know, allegedly Mr. Johnson's Google drive account, and these images are child pornography.

So I mean, that's what *Wilson* instructs and I think that's very clear and that really takes this -- and what *Wilson* found is even if you accept the private search doctrine in *Katz* or all we're dealing with here -- and I don't believe that's right in light of *Jones* -- but even if you accept that that's all we're dealing with here, even within that paradigm, it's outside of that and it was an unconstitutional search.

1          THE COURT:  Can I just pause you there.  I just want

2     to make sure I understand your argument.

3          MR. JEFFRESS:  Sure.

4          THE COURT:  If we had a one-minute video and a Google

5     employee reviewed it two days before it was sent to NCMEC and

6     then to the government, and reviewed it in its entirety, and the

7     Google employee concluded the reason I'm sending it along is

8     this appears to contain child pornography:  I'm viewing it

9     myself, I'm a human, I've decided it likely contains child

10    pornography, sends it to Google -- sorry -- sends it to NCMEC,

11    sends it to the government, and then the government reviews it

12    without a warrant.  The problem -- the Fourth Amendment problem

13    from your perspective is?

14         MR. JEFFRESS:  One part of the Fourth Amendment

15    problem is is that now it's gone from some Google person who

16    -- of uncertain training, has said this is possible child

17    pornography, to I, Detective Sullivan, a detective who, as I

18    am telling you, have been a detective for 20 years, I've been

19    involved in countless child pornography investigations,

20    everything else that goes into the affidavit, I am saying this

21    is child pornography.  That is a substantive difference for

22    probable cause purposes.

23         THE COURT:  I'm asking about the search by the

24    detective, not an application for warrant purposes.  I'm just

25    asking about whether if, when Detective Sullivan or anyone

1    reviews that file, absent a warrant -- put aside any determination

2    he makes -- when he does that, what's the Fourth Amendment

3    problem?

4            MR. JEFFRESS:  Well, that's the second point.

5            THE COURT:  He reviews it and then he says I too

6    believe this is child pornography, and he begins an

7    investigation.

8            MR. JEFFRESS:  He says I believe this is actual child

9    pornography.  And then he -- right.

10           THE COURT:  Yes, he does.  Just like if I found some

11   white powder in my office -- I don't happen to know what cocaine

12   is.  I find it, I call the law enforcement, I've seen it.  The

13   fact that I don't have training in cocaine doesn't mean that

14   when the officer comes and looks at it, my having now seen it,

15   that that's a problem, is it?  Does Google need to know with

16   100 percent certainty before it sends along these videos that

17   they're child pornography?

18           MR. JEFFRESS:  This is different, though.  This would

19   be like if you saw it in somebody else's house.  Right?  This is

20   your property.  If you want to let law enforcement into your --

21           THE COURT:  Sure.  I understand.

22           MR. JEFFRESS:  If you saw it in somebody else's

23   house --

24           THE COURT:  Right.  My office is a bad example.  Yes.

25           MR. JEFFRESS:  And you said, hey, I don't know

anything about cocaine, but I saw something that looked like cocaine in my friend's house or whatever, and then law enforcement just barged right into that person --

THE COURT:  How about this:  I have the same degree of certainty that a Google employee has about whether it's child pornography.

MR. JEFFRESS:  Well, that's an unknown.  They haven't submitted anything that has anything about the training or anything like that.  It's changed from even when *Wilson* where they said these people were trained at least by counsel.  I don't know what kind of training they have, and the government hasn't submitted anything to validate that training.  So I don't think on the existing record that they have here, that would be enough for probable cause, and I disagree with Judge Faruqui on that.

THE COURT:  Fair enough.  Okay.

MR. JEFFRESS:  Now, I completely don't understand the argument that because this ultimately turns out -- because a container, I'm using that analogy on Google drive, ultimately turns out to have child pornography in it, that that somehow vitiates the privacy interest in the container to begin with. That just seems to me entirely backwards.  The government keeps saying well, you have no privacy interest in child pornography. You have privacy interests in the digital files.  You have privacy interest in your computer, in your telephone, and

everything else.  That's clear from what the Supreme Court has said.  The fact that ultimately it turned out to have some child pornography he either -- you know, we submit he did not know was on there, that is not pertinent to the Fourth Amendment analysis.  So I did not understand that point from the government.

Now, on the devices, Your Honor, I just want to say briefly this warrant is not built in any way for a search of the electronic devices.  It says exactly what Your Honor pointed out, which is that the property to be searched -- and it says this several times, it says it in the caption -- and the warrant itself is what's operative.  This is what's required under the Fourth Amendment.  The affidavit is not part of the warrant.  The government, if they had cases that said --

THE COURT:  The warrant itself expressly incorporates both Attachment A and Attachment B.

MR. JEFFRESS:  But how does it do that, Your Honor?

THE COURT:  By expressly incorporating it.

MR. JEFFRESS:  Well, it says I, a federal law enforcement officer, believe that on the person -- you know, following property -- and then it says identify the person or describe the property to be searched and give its location:  See Attachment A, incorporated by reference, yes.  And then it says located in the District of Columbia.  There is now concealed -- identify the person or describe the property to be seized:

1    Attachment B incorporated by reference.  So it does not

2    incorporate Attachment B into the property to be searched on the

3    plain face of the warrant.

4        And, you know, why are there two attachments?  If they were

5    allowed to search everything, then why are there two different

6    attachments?  Why doesn't it just say see Attachment A and

7    Attachment B and you can search it?  No judicial officer reading

8    this would believe he was authorizing a search of the electronic

9    devices based on --

10            THE COURT:  You don't really mean that.  No judicial

11   officer?  What's the standard I'm applying?  Am I --

12            MR. JEFFRESS:  A reasonable.

13            THE COURT:  A reasonable what?  This is a warrant.

14   Am I reading this like a statute?  Like is there any reasonable

15   interpretation of it that would authorize this?

16            MR. JEFFRESS:  I mean, you know, the Fourth Amendment

17   has a particularity requirement.  They have to designate what

18   things they want to search.  And here they did do that.  And

19   what they designated was the apartment, what was listed in

20   Attachment A.

21            THE COURT:  Okay.

22            MR. JEFFRESS:  Thank you, Your Honor.  And I just want

23   to say, Mr. Courtney said exactly what I think our agreement is

24   about the --

25            THE COURT:  Great.

1          MR. JEFFRESS:  So if that's okay with Your Honor,

2     we'll wait until April 1 --

3          THE COURT:  Sounds fine to me.

4          MR. JEFFRESS:  -- and get the report.

5          THE COURT:  Yes.  Perfect.  Thank you.

6     Mr. Miles.

7          MR. MILES:  Yes, Your Honor.

8     I think the only issue I'll deal with here I think on the

9     statements is the government indicated it doesn't really see

10    where in the conversation that Mr. Johnson would be led to

11    believe that it was about them talking to him.  And I have here

12    in my notes some quotes from the statement.

13    One is -- and this is all before the moment when they would

14    say he waived his rights.  We'd say there's no waiver.  But one

15    is, "We want to have a conversation with you so we can tell you

16    like what's going on and why we're here."

17    Another one is, "In order for us to talk to you, we're

18    going to have to walk you through your advice of rights."

19         THE COURT:  Talk -- you just said, "In order for us to

20    talk to you."  That suggests a two-way conversation.  In order

21    for us to -- in order for me to talk to you, we have to do

22    something.  That suggests to me, for us to have a conversation,

23    not for me to dictate to you all the facts I know.  Why doesn't

24    that sentence suggest that they are telling him, for us to talk,

25    which is to say for us to have a bilateral conversation, you

1     have to waive these rights?

2             MR. MILES:  I mean, if it said "with you."  It says

3     "to talk to you."  I would -- I read that to say we want to talk

4     to you.

5             THE COURT:  I'm going home to talk to my wife tonight.

6     Do you think that means I'm going to just be talking at her?

7     That would be problematic in a number of different ways.

8             MR. MILES:  Your Honor, I think that's a very

9     different -- if a person like you or I were to say that about a

10    conversation with our wife, it brings the issues the Court just

11    alluded to.  But for law enforcement agents to talk to a suspect

12    that has just been arrested I think brings up a lot of different

13    dynamics.

14            THE COURT:  Okay.

15            MR. MILES:  So I don't think it's unreasonable for one

16    to think "talk to you" is more appropriate in that setting.  But

17    I think the other one -- the first one I gave, which has the "so

18    we can tell you, like, what's going on and why we're here."

19    That's clearly -- that's them talking to him.

20        And then the -- when he was asked about having an

21    attorney -- or when he asked about having an attorney, the

22    agents said "so the agents can" -- and here's the quote, "tell a

23    little bit right now about what's going on."

24        And that's when he's asking about counsel.  And the

25    government's papers refer to that discussion -- I don't remember

the exact language, like "among other things."  You know.  And

the "among other things" is this.  They're saying, when he asked

about counsel, well, we want to tell you a little bit about

what's going on now.  And that's not just clarification, even if

we agree that it was ambiguous and they just wanted

clarification.  Clarification would be just, are you asking for

a lawyer?  But they didn't do that.  They went on and made that

statement as well.

And so I mean, I think the papers are clear.  I've made the

argument.  I just wanted to talk about some of the statements

and why we believe our argument is correct.  Thank you.

THE COURT:  Of course.  Thank you, Mr. Miles.

Mr. Courtney, I have just one follow-up question for you.

In thinking about the exclusionary rule and the chronology here,

it seems that at least perhaps a relevant question is whether

the government's decision to seek the warrant from Magistrate

Judge Faruqui was prompted by the detective's viewing of the

images.

I get the government's position that it did not rely on

that information in the warrant application.  But it seems to me

that some cases suggest that the decision to seek a warrant, if

it was prompted in part by the warrantless search or what was

gleaned therefrom, that that would be relevant to the

exclusionary rule inquiry.

So why don't I just frame a different question, which is to

1   say, what were the reasons for the government seeking the

2   warrant?  Was it just the uncertainty about whether they could

3   proceed, whether the government could proceed in the absence of

4   a warrant, or something else?

5            MR. COURTNEY:  I can't speak to it with a hundred

6   percent certainty because I wasn't involved in the case at the

7   time.  I've reviewed some correspondence, some email

8   correspondence, about it.  I can certainly follow up with the

9   Court if the Court has more specific questions.  But my

10  understanding is that there was an awareness at the time that

11  this particular question was being litigated in the courts and

12  that the decision had just come out of the Sixth Circuit and

13  that there was some awareness of the Sixth Circuit's decision,

14  which I believe issued about 25 days before our decision to

15  apply for the warrant.

16       Obviously the Sixth Circuit's decision goes the other way,

17  that there's -- warrant's not required, but I think there's a

18  recognition that we're not in the Sixth Circuit and that this is

19  an issue about which reasonable minds can disagree and now have

20  disagreed.

21       And so with the caveat that I was not involved in the

22  decisionmaking process, it's my understanding that it was based

23  on uncertainty in the law.

24       As to Your Honor's earlier question, obviously, I think

25  implicit in the fact that Detective Sullivan applied for the

warrant is that there was probably something there, because why

apply for a warrant if you've reviewed it and it's not child

pornography.  But given the steps that Detective Sullivan took,

which included being fully transparent with the court, applying

for the warrant, not including any of the information that was

gleaned, and then the steps that the court took, which involved

seeking a sworn declaration from Google, and the court's

determination that there was probable cause to issue a warrant

absent anything that Detective Sullivan might have done, just

based on the information that was available from Google, that

the good faith doctrine should still apply.

THE COURT:  Thank you, Mr. Courtney.

So I had intended to rule orally today on all of the

motions that I identified at the top.  Well, saving ECF 95

because it sounds like there may not be anything for me to rule

on there.  I still intend to do that, that is to say I still

intend to rule orally, but I'm not prepared to do so today.

In particular, as I indicated in my questions earlier, I

had assumed, likely just my mistake rather than anyone's fault

at all, that -- a slightly different chronology with respect to

the application for the warrant from Magistrate Judge Faruqui.

And either that what Detective Sullivan had done was just get

the files and look at them maybe very briefly, or perhaps not at

all.  But I think for present purposes I have to assume that he

at least reviewed some of the files in substantial part.  And

I'm not suggesting that I think that that changes the analysis, but I need to think through whether and to what extent that changes the analysis.

Obviously, that's only relevant, really, to the good-faith exception question, because of course if no warrant is required, that doesn't really matter.

Just to be incredibly transparent, I had the view going into the hearing that the government's application to Magistrate Judge Faruqui -- put it this way:  Assuming it had happened before any searching by the detective -- was absolutely enough to satisfy the good-faith exception and exclusionary rule wouldn't apply.  And it's just this slightly different chronology that I had in my head that I want to think through.

And then to some extent obviously the rest -- not everything but some things flow from that.  So really what that means is I want to just cogitate on the questions a little bit. What we will do is, after I have done that, I will reach out to the parties and just schedule probably just a teleconference, and I will walk everyone through my decisions.  I will do that pretty quickly, because the whole goal of having this hearing today was to give the parties some concrete decisions now rather than on the eve of trial.  So that's still my plan.

But for present purposes I'm taking the motions under advisement and will be back in touch with everyone to schedule a hearing where I articulate my decisions orally on the questions.

1      Okay?  Anything else we should discuss in light of that,

2  Mr. Courtney?

3          MR. COURTNEY:  One question on that and then one

4  unrelated question.  Would the Court accept supplemental

5  briefing on the issue of the images having been viewed before

6  the warrant application?

7          THE COURT:  I guess I would accept supplemental

8  briefing on two questions.

9          MR. COURTNEY:  Okay.

10          THE COURT:  One is -- I think it's a factual

11  question -- just whether and to what extent there was -- and

12  I say whether and to what extent.  It's really to what extent

13  there was a review by Detective Sullivan of what percentage or

14  whatever of the images before the warrant application.  So that

15  would be one question.

16      And then the second would be whether there's a different

17  way of thinking about exclusionary rule in the event that there

18  was substantial review in advance of the warrant application.

19      Hypothetically, if the detective reviewed 100 percent of

20  all of the images or files -- I guess better way to put it,

21  assuming that, does the application for the warrant and what

22  happened with Magistrate Judge Faruqui still mean that the

23  good-faith exception applies.

24          MR. COURTNEY:  Understood.

25          THE COURT:  So I'm happy to hear from the government

1    on both of those things.  That might then delay my oral decision

2    on the question.

3            MR. COURTNEY:  We will endeavor to respond very

4    quickly, and if possible I will do it today.

5            THE COURT:  Okay.  Great.

6            MR. COURTNEY:  And then the unrelated question was

7    tomorrow our exhibits are due to the Court.  Under 18 U.S.C.

8    3509(n), the court can accept child pornography evidence.  I

9    was wondering if the court wanted us to include the child

10   pornography on the flash drive or if we should keep that in our

11   custody.

12           THE COURT:  Why don't you keep that in your custody

13   for present purposes.

14           MR. COURTNEY:  Thank you, Your Honor.

15           THE COURT:  Mr. Jeffress, on the assumption that the

16   government files something today, would you like a brief

17   opportunity to respond?

18           MR. JEFFRESS:  Yes, Your Honor.  Could we have to the

19   end of the day tomorrow?

20           THE COURT:  Absolutely.  So I'm not requiring the

21   government to brief this today, but if the government can brief

22   it today, then I'll hear from Mr. Johnson through counsel

23   tomorrow.  This works reasonably well for my schedule because

24   I was anticipating possibly doing the oral decision Monday.

25   Monday morning, possibly.  But we'll take it up when we see

1  the papers.

2     Mr. Jeffress?

3         MR. JEFFRESS:  Your Honor, I will not be physically

4  here, but I can do a teleconference.

5         THE COURT:  My plan was to very likely do it

6  telephonically and therefore not to have anyone in the courtroom

7  except court staff who have to be here to make it a public

8  hearing.

9         MR. JEFFRESS:  Okay.

10         THE COURT:  In other words, I wouldn't probably be

11  physically present.

12         MR. JEFFRESS:  Okay, great.

13         THE COURT:  All right.  Thank you all.

14     (Proceedings adjourned at 11:46 a.m.)

15

16

17

18

19

20

21

22

23

24

25

* * * * * *

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify
that the foregoing pages are a correct transcript from the
record of proceedings in the above-entitled matter.


*/s/ Bryan A. Wayne*
Bryan A. Wayne