## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **v.** | **Case No. 22-cr-0176 (CJN)** |
| **STEPHEN JOHNSON**<br>**Defendant.** | |

## STEPHEN JOHNSON'S MOTION FOR A NEW TRIAL

Stephen Johnson, through undersigned counsel, respectfully submits this Motion for a New Trial ("Motion"). For reasons that follow, pursuant to Fed. R. Crim. P. 33, the Court should grant the Motion and order a new trial.

## INTRODUCTION

Mr. Johnson's trial involved highly prejudicial errors. The result of those errors was to deny Mr. Johnson a fair trial consistent with his rights under the United States Constitution.

The trial included at least five serious errors, each of which compels a new trial. First, the Court admitted evidence from Mr. Johnson's laptop computer and smartphone recovered from an illegal search of those devices. The warrantless search of Mr. Johnson's electronic devices was a clear violation of his rights under the Fourth Amendment and, standing alone, compels a new trial at which the tainted evidence is excluded. Second, the Court allowed the government to present evidence from Mr. Johnson's account with Google LLC that law enforcement had again obtained through an unlawful search. While the Court correctly recognized that the government's warrantless search of the contents of Mr. Johnson's Google drive was unconstitutional, the Court erred in admitting the illegally seized evidence under the

good faith doctrine, which does not apply here.  Third, the Court erred in denying a mistrial after a juror favoring acquittal on all counts was publicly identified in open court, particularly under the coercive atmosphere that began with the failed jury poll.  Fourth, the Court erred in denying a mistrial based on the inappropriate provision of the parties' exhibit lists (which included descriptions of evidence not admitted at trial) to the jury.  Fifth, the Court erred under Rule 404(b) in admitting the quantity and quality of "other bad acts" evidence it did.  Mr. Johnson did not receive a fair trial in the face of such evidence, which had no direct relevance to the charges and yet was extremely prejudicial to the jury's consideration of the case.  And finally, to the extent the Court does not find any one error significantly consequential, the Court should grant Mr. Johnson's Motion based on the cumulative effect of the errors, which plainly meets the standard for a new trial.

## **BACKGROUND**

### I.     **CyberTip Reports and Search Warrants**

In October of 2020, Google LLC ("Google") provided the National Center for Missing and Exploited Children ("NCMEC") CyberTip reports concerning a Google account belonging to Stephen Johnson.  The CyberTip reports alerted NCMEC that, on September 21, 2020, and October 1, 2020, unreviewed files matching the hash values for apparent child pornography were suspected to have been uploaded to Mr. Johnson's Google account.  *See, e.g.,* ECF 123, Ex. A. Google's CyberTips were based on the "hash-matching" of images that Google employees or contractors had previously classified as apparent child pornography with certain images uploaded to Mr. Johnson's Google Drive.[1]  No one at Google had viewed the specific images

---

[1] Defense counsel repeatedly raised concerns about the training and reliability of the employees and contractors who performed this work.  The government failed to address defense counsel's concerns about several critical issues, including (1) whether the amount of training provided was

from Mr. Johnson's Google Drive prior to Google's transmission of the CyberTip reports to

NCMEC.  *See* 4/2 Tr. 5.

Once received from Google, NCMEC forwarded the CyberTips to the Northern Virginia

Internet Crimes Against Children ("ICAC") Task Force.  The Virginia ICAC Task Force—

without reviewing the images—sent them to the District of Columbia's Metropolitan Police

Department and ICAC Task Force member Detective Thomas Sullivan.  In December 2020, and

without first obtaining a search warrant, Detective Sullivan reviewed several of the allegedly

pornographic images from the CyberTip Reports.  Detective Sullivan confirmed that the images

constituted child pornography.  On December 16, 2020, as a result of his warrantless review,

Detective Sullivan issued an administrative subpoena to Comcast for subscriber information

regarding the IP addresses identified in the CyberTips.  On December 22, 2020, law enforcement

also served subpoenas on Sprint Corporation and T-Mobile as part of its investigation.

On December 28, 2020—*after* law enforcement had taken the above steps—the

government applied for a warrant for the CyberTip material.   The application for the warrant

stated that "the materials provided by Google ... were based solely on hash value matches and

were not reviewed by someone at Google."  3/21 Tr. 29.  The government also noted in the

warrant application that the affiant (Detective Sullivan) was "not relying on any information

obtained from these media files to form the basis of the probable cause in this search warrant."

*Id*.  After holding several hearings, Magistrate Judge Faruqui denied the application for a warrant

as unnecessary based on the private search doctrine.  *See* ECF 94, Ex. C.

---

sufficient enough to enable them to do their job properly; (2) whether any training accurately
informed them about what constitutes child pornography under federal law; (3) whether any
training methods effectively provided them with the knowledge and tools necessary for
identifying and tagging child pornographic material; and (4) whether any training they received
was conducted by a credible and reliable vendor.

On October 5, 2021, the government obtained a warrant to search Mr. Johnson's residence. *See* ECF 5; *see also* ECF 84, Ex. 1. The search warrant included two separate attachments: one specifying property to be searched (Attachment A) and the other specifying property to be seized (Attachment B). Attachment A listed Mr. Johnson's apartment as the thing to be searched. Attachment B, the things to be seized, listed, *inter alia*, Mr. Johnson's "digital devices." *See* ECF 84, Ex. 1 (search warrant application); *see also* ECF 84, Ex. 2-3 (Attachments A and B of the search warrant application). The search warrant was executed on October 7, 2021. *See* ECF 5. Based on this warrant alone, the FBI forensically searched all of Mr. Johnson's electronic devices, including his computers and phones.[2]

## II.      The Indictment and Pre-Trial Hearings

On May 20, 2022, the government obtained an indictment against Mr. Johnson. *See* ECF 43. The indictment charged Mr. Johnson with a single count of Transportation of Child Pornography, in violation of 18 U.S.C. § 2252(a)(1). *Id.* Mr. Johnson filed several pretrial motions on November 22, 2023, including a Motion to Suppress Evidence from Google Account ("Google Account Motion"), and a Motion to Suppress Evidence from Electronic and Storage Devices ("Devices Motion"). *See* ECF 82-87.[3]

---

[2] As discussed *infra*, the evidence recovered from Mr. Johnson's electronic devices formed the bulk of the government's trial presentation, including on the issue of Mr. Johnson's knowledge of the content of the images.

[3] On December 21, 2023, the government obtained a superseding indictment. The government obtained a second superseding indictment on February 8, 2024. ECF 110. Like the first superseding indictment, the second superseding indictment charged Mr. Johnson with fifteen counts of Transportation of Child Pornography and one count of Possession of Child Pornography. *Id.*

Also on November 22, 2020, the government filed a notice of its intent to introduce bad acts evidence under Fed. R. Evid. 404(b) ("Rule 404(b) Notice" or "Notice").  *See* ECF 81.[4]  In its Notice, the government stated its intent to offer several categories of evidence to show that Mr. Johnson allegedly "searched for and visited online material associated with the sexualization of underage teenage children."  *Id.* at 14.  The government identified as 404(b) evidence material from Mr. Johnson's browser history from between April 8 and October 2, 2020, showing navigation to certain files and folders on Dropbox.  The government also proposed to admit 404(b) evidence regarding Mr. Johnson's use of the Telegram messenger application in 2021, including three files extracted from Mr. Johnson's phone allegedly depicting child pornography. *Id.* at 5, 10.  In a later-filed Supplement to its Rule 404(b) Notice, the government further identified Mr. Johnson's alleged membership in Telegram groups and participation in Google Photos Communities advertising child pornography.  *See* ECF 126.  The defense opposed admission of this evidence as the type of prejudicial propensity evidence that is inadmissible under Rule 404(b) and under Rule 403 because its probative value was substantially outweighed by the danger of unfair prejudice, misleading jurors, confusing the issues, and wasting time.  *See* ECF 93.

On March 21, 2024, the Court held a motions hearing on certain of the pretrial motions. The Court addressed Mr. Johnson's Google Account Motion, Devices Motion, and several motions in limine at this hearing.[5]  *See* 3/21 Tr. 2.

---

[4] The defense filed an opposition to the Rule 404(b) Notice on December 6, 2023 (ECF 93), and the government filed a reply on December 19 (ECF 97).  The government filed a supplement to its 404(b) Notice on March 19, 2024.  *See* ECF 126.

[5] *See* ECF 82, 83, 84, 85, 95.

Regarding the Google Account Motion, the defense argued that the material seized from Mr. Johnson's Google Account must be suppressed because Detective Sullivan's warrantless review of the CyberTip material provided by NCMEC violated the Fourth Amendment. *Id*. at 3-5. Mr. Johnson argued that, due to Detective Sullivan reviewing the CyberTip material before applying for a search warrant, the government was precluded from introducing evidence from Mr. Johnson's Google account at trial.[6] *Id*. The defense explained that neither the private search doctrine nor the good-faith exception prevented application of the exclusionary rule. *Id*. at 6-15. The defense also argued that the Google Account evidence should be suppressed due to an unconstitutional trespass under *United States v. Jones*, 565 U.S. 400, 404-407 (2012), which held that governmental trespass onto property "for the purpose of obtaining information" requires a warrant, even if a private actor had already trespassed upon the same property. *See* 3/21 Tr. 5, 15; *see also* ECF 99 at 4-5, ECF 134 at 3-4.

The government argued that a warrant was not required for Detective Sullivan to view the images sent by NCMEC. *See* 3/21 Tr. 28. The government maintained that the private search doctrine exception to the warrant requirement applied and that, in any event, Detective Sullivan had acted within the parameters of the good faith exception to the exclusionary rule. *Id*. at 32-33, 36-37.[7]

Concerning the Devices Motion, the defense submitted that "it's very clear" that "there is no warrant for the search of the electronic devices, just no warrant." *Id*. at 16. Without a warrant, "there is no judicial officer who ever authorized a search of the digital devices." *Id*.

---

[6] To support this argument, defense counsel noted that there was no evidence that Google's system for determining whether material constituted child pornography was reliable. *See* 3/21 Tr. 7-9.

[7] The magistrate judge declined to issue a warrant for purposes of judicial economy. *See* 3/21 Tr. 10.

The defense relied upon the Supreme Court's decision in *Riley v. California*, 573 U.S. 373 (2014), holding that a warrant is required before searching cell phones, and argued that "[i]t would just be a complete abrogation of [*Riley*] to allow the government to introduce the contents of a cell phone or a computer or anything else where they didn't get a warrant to do it."  3/21 Tr. 16.

The Court responded by referencing Attachment B, which authorized law enforcement to seize Mr. Johnson's fingerprint to unlock his phone.  The Court asked:

> Why would the warrant say that the government could get Mr. Johnson's fingerprint if it wasn't authorizing the search of his electronic devices? It says, "for the purpose of attempting to unlock devices in order to search the contents as authorized by this warrant."

*Id*. at 17.  Counsel responded that the warrant itself states "In the matter of the search of 600 H Street, Apartment 749."  *Id.* (quoting ECF 94, Ex. E at 2).  Counsel noted that Attachment A to the warrant identifies the property to be searched, which lists Mr. Johnson's apartment, but "doesn't say anything about the electronic devices."  *Id*.  Counsel further noted that the language the Court was referring to was in Attachment B, and Attachment B was expressly limited only to items that may be seized—not items that may be searched.  *Id*. at 18-20.  The defense noted that the warrant "does not incorporate Attachment B into the property to be searched on the plain face of the warrant."  *Id*. at 56.  The only thing particularly described in the warrant concerning what *could be searched* was the apartment described in Attachment A.  *Id*.

The government's position concerning its search of the devices was that "[t]he warrant expressly …  authorizes the search of digital devices recovered from the residence."  *Id*. at 41.  The government conceded that the attachment to the warrant application describing the property to be searched, Attachment A, did *not* mention electronic devices that may be recovered from the residence, *id*. at 42, but asked the Court to ignore the term "seized" on Attachment B and to

replace it with "searched."  The government argued that the terms are "functionally equivalent," *id*. at 43, notwithstanding the use of distinct attachments that on their face served distinct purposes.

The Court took the motions under advisement.  *Id*. at 61.  The Court noted that the hearing had altered its understanding of the chronology of events surrounding Detective Sullivan's review of CyberTip material.  *Id*. at 61; *see also id*. at 30 (the Court explaining it "had not realized before today that Detective Sullivan had reviewed all of the relevant files before the warrant application.").

On April 1, 2024, the Court held an evidentiary hearing on Mr. Johnson's Google Account Motion.  *See* 4/1 Tr. 3.  Detective Sullivan was the sole witness to testify at the hearing. He testified that he was the law enforcement officer who was exclusively responsible for investigating the CyberTips relating to Mr. Johnson's case.  *Id*. at 9-10.  He further testified that, through his prior experience handling CyberTip cases, he knew to get a search warrant before viewing CyberTip content when there is any uncertainty about whether a human had viewed the material being reported by the CyberTip.  *Id*. at 15-16.[8]

Detective Sullivan told the Court that, at the time he initially reviewed Mr. Johnson's CyberTip files, he believed that a human, at some time in the past, reviewed the files.  However, other portions of Detective Sullivan's testimony revealed that, from the moment he first received the CyberTip reports in Mr. Johnson's case, he could not possibly have known that the files in those reports were reviewed by a human.  The CyberTip reports themselves warned that a human

---

[8] Detective Sullivan testified about a specific instance in 2018 when he applied for a search warrant where he received a CyberTip from an ESP that used a hash matching system to identify suspected child pornography, but where the ESP did not indicate "whether or not a human reviewed the files."  4/1 Tr. at 16.

had not reviewed the material reported in the CyberTip reports.  *Id.* at 19, 44; *see also* ECF 123, Ex. A, B.  Detective Sullivan admitted that, at the time he first viewed the CyberTip material submitted by Google, he was "unsure of how they were hash matching."  4/1 Tr. 40.  And he acknowledged stating later in a sworn affidavit that the CyberTip files "were not reviewed by Google, nor NCMEC, prior to being sent to the Northern Virginia Regional Internet Crimes Against Children task force[.]"  *Id.* at 39-40.  Detective Sullivan saw no indication that anyone with the Northern Virginia ICAC Task Force had reviewed the CyberTip images before the files were sent to him.  Detective Sullivan also admitted that he was aware that the definition for child pornography used by Google in its CyberTip reports differed from the federal definition.  *Id.* at 54.

Despite his awareness of evidence that a human had not viewed Mr. Johnson's CyberTip files, and that Google's definition for child pornography did not match the federal definition, Detective Sullivan conducted a "general review" of the contents of the CyberTip files.  *Id.* at 11.[9] His "general review" involved viewing the contents of individual files by first looking at large thumbnail versions to determine if he recognized any child abuse material.  *Id.* His review also included a more detailed search that constituted clicking, opening, and viewing an unspecified number of video files in Mr. Johnson's CyberTip report.  *Id.* at 12-13, 56-57.  When asked by government counsel whether he had a warrant when conducting this general review of Mr. Johnson's CyberTip files, Detective Sullivan replied "[n]o, I did not."  *Id.* at 15.

Detective Sullivan further testified that the United States applied for warrants to search Mr. Johnson's Google account and to search the CyberTip files that Detective Sullivan had

---

[9] Because Detective Sullivan had difficulty recalling details about his search of Mr. Johnson's CyberTip files, much of his testimony concerning his search of these files was based on his general searching practices in other similar cases.

already searched.  *Id* at 24-26.  Both warrant applications relied on video files in Mr. Johnson's CyberTip report that Detective Sullivan reviewed without a warrant.  *Id*. at 58-59.  According to Detective Sullivan, "because we were seeing CSAM [Child Sexual Abuse Material] in those files, that there was a likelihood we were then going to follow up with a Google search warrant and investigate the case for prosecution, potentially."  *Id*. at 59.

On April 2, 2024, the Court held a Pretrial Conference at which it ruled on most of the pending motions.  Regarding the Google Account Motion, the Court acknowledged that the government's review of the images from the CyberTips constituted a "warrantless viewing of the files."  4/2 Tr. 4.  The Court rejected the government's argument that law enforcement did not need a warrant to view the CyberTip material due to the private search doctrine.  *Id*. at 5. Nevertheless, the Court found that the exclusionary rule did not apply to Detective Sullivan's warrantless search of materials provided by Google because "the good faith exception clearly applies to the government's ultimate viewing of all of the files in 2021."  *Id*. at 8.  As a result, the Court ruled that "[a]ny evidence obtained as a result of that viewing of the files will not be excluded."  *Id*. at 10.

With respect to Mr. Johnson's Devices Motion, the Court found that "the warrant's incorporation of Attachment B authorize[d] the government to seize and examine Mr. Johnson's digital devices and their contents."  *Id*. at 16.  The Court determined that Attachment B, when "read in context, indicates that the warrant allows the government to do what might be called a search in order to seize information contained within the devices found within the residence."  *Id*.

### III.    Mr. Johnson's Trial and The Court's Evidentiary Rulings

Mr. Johnson's trial began on April 8, 2024.  The Court ruled on certain of the disputed 404(b) issues on the first day of the trial, after jury selection.  *See generally* 4/8 Tr. 227-229.  The

Court held the 404(b) evidence generally "admissible as probative of intent, knowledge, non-mistake[]" or "not actually … 404(b)" and reserved judgment on specific uses of the evidence for the trial, based on the "particular use of a particular piece of information," suggesting that the Court would exclude the proposed evidence if it became overly prejudicial or cumulative.  *Id.*

During the trial, however, the Court did not exclude a single piece of the government's evidence as inadmissible under Rule 404(b) or Rule 403.  Over defense objections, the Court admitted evidence that Mr. Johnson: (1) visited certain Dropbox folders several months prior to the charged conduct; (2) belonged to Telegram groups advertising child pornography and had three uncharged CSAM images on his phone many months after the charged conduct ("Telegram Evidence"); (3) was added by other Google users to Google photo albums alluding to child pornography, long after the charged conduct ("Google Photos Evidence"); and (4) had the Tor browser installed on his computer.

Government witness Special Agent Laura Cavillo testified that Mr. Johnson's Google Chrome browser history showed that he had visited a Dropbox folder labeled "black teens and underage thots" ten times between June 26 and July 2, 2020.  4/9 Tr. 445-447; 4/10 Tr. 588-589. She further testified that "thot" refers to "that ho over there."  4/9 Tr. 446.  The government introduced no evidence that any of the files in that Dropbox folder were later found on Mr. Johnson's computer, phone, or Google drive.  During the defense case, forensic expert Michelle Bush testified without challenge from the government that there was no evidence Mr. Johnson had ever downloaded material from this Dropbox folder.  *See* 4/11 Tr. 857-858.

The Court also permitted the government to introduce documents and elicit extensive testimony about Mr. Johnson's alleged use of the Telegram messenger app and his purported membership in Telegram groups advertising child pornography.  *See* 4/10 Tr. 569-571.  All of the

Telegram evidence was from 2021, months after the charged conduct in the case.  The
government's digital forensics expert, Dero Tucker, testified that individuals use Telegram to
"communicate in an encrypted channel and exchange and send and receive, view CSAM."  *Id.* at
645.  Mr. Tucker went on to describe messages found on Mr. Johnson's phone that did not
involve Mr. Johnson, but in which other users were advertising or seeking child pornography.
Mr. Tucker also described three CSAM images found in a "Telegram images" folder extracted
from Mr. Johnson's phone.  *Id.* at 649, 652.  On cross-examination, Mr. Tucker admitted that
*none* of the relevant messages were sent by Mr. Johnson, and that the government had no
evidence Mr. Johnson had ever read those messages—which were among 1.5 million total
messages recovered from his phone.  *Id.* at 726-727.  The defense's expert Ms. Bush testified that
Mr. Johnson had been added to over a hundred Telegram groups, but that there was no evidence
of any engagement by him in the groups relating to CSAM.  4/11 Tr. 968.  She also testified that
Telegram defaults to automatically downloading media content from chats or channels, such that
Mr. Johnson did not knowingly download the Telegram images.  *Id.* at 956-959.  The government
recalled Mr. Tucker in rebuttal on the issue of whether the three images of child pornography
found on Mr. Johnson's phone were automatically downloaded.  4/12 Tr. 1155-1156.

Additionally, the Court allowed the government to introduce evidence, through Mr.
Tucker, of three Google Photo albums that had been shared with Mr. Johnson nearly a year after
the charged conduct in this case.  These albums were titled "13-17 lesbian cp," "CINCITY
PYT," and "pyt videos."  4/10 Tr. 640-642.  Mr. Tucker admitted on cross-examination that none
of these albums were created by Mr. Johnson, and that the government had no evidence Mr.
Johnson had seen the albums or the accompanying chats.  *Id.* at 720-722.  Once again, the
defense had to call its expert, Ms. Bush, to rebut this evidence.  She explained that the forensic

evidence showed no interaction by Mr. Johnson with these albums, the albums were not present on his phone, and that no CSAM material was recovered from the albums.  4/11 Tr. 852-854, 919-921, 964-966.

Finally, the Court allowed the government to introduce evidence about the Tor browser.[10] The government elicited from Mr. Tucker that Tor was installed on Mr. Johnson's computer and that "Tor is a specialized web browser that allows the user to access the dark web."  4/10 Tr. 611. Yet Mr. Tucker admitted on cross examination that there was no allegation in this case involving the use of Tor and that he did not see any browsing artifacts on Mr. Johnson's computer that showed visits to Tor websites.  *Id.* at 705.  Defense forensic expert Ms. Bush subsequently testified that if Mr. Johnson had been using Tor, there would be evidence of it on the extraction from his laptop computer, which there was not.  4/11 Tr. 969-971.

### IV.    Provision of the Clerk's Draft Exhibit Lists to the Jury

The jury began deliberating on Friday, April 12, 2024.  *See* 4/12 Tr. 1268.  On Tuesday, April 16, the Court notified the parties that a courtroom deputy had given the courtroom clerk's annotated drafts of both parties' exhibits lists to the jury on Friday afternoon.  *See* 4/16 Tr. 1338. Those drafts included descriptions of all proposed evidence, including evidence that was never admitted, though the clerk had unsuccessfully attempted to "black[] out [the descriptions] with black highlighter."  *Id.*  The Court had not been aware that the jury had access to the lists and "would not have authorized that[.]"  *Id.*

---

[10] When discussing motions in limine, the government represented that it did not intend to introduce anything relating to the Tor browser.  *See, e.g.,* 4/2 Tr. 26.  At trial, during cross-examination of Special Agent Cavillo, the defense sought to establish that Mr. Johnson only accessed CSAM through legitimate Internet sites, as opposed to the dark web.  *See* 4/9 Tr. 467-470.  The Court then ruled, over the defense's objection, that "the government's evidence as to Tor is now both more probative than it was before and less prejudicial than it would have been because of the line of questioning yesterday."  4/10 Tr. 570.

The Court noted that "it's possible that some of the redacted names could be viewed, if someone wanted to look … even not that hard." *Id.* at 1340. Defense counsel reported that it appeared that each "blacked out" exhibit entry could be seen through and read "without much difficulty" and without any need to "have to hold it up to a light or anything extra to see through." *Id.* at 1345. The Court agreed and assumed "that the jury could and did read each and every one of the blacked out entries." *Id.* at 1349. Among other things, the "blacked-out" entries on the exhibit lists revealed to jurors that Mr. Johnson had given a post-arrest statement, and the statement was on the government's list but not the defense's list. *Id.* at 1346. It also revealed that the "vast majority" of the defendant's proposed evidence was not admitted, while almost all of the government's had been. *Id.* at 1345-1346; *see also* ECF 161, 162.

The defense moved for a mistrial, which the Court denied. *Id.* at 1349. Instead, the Court adopted a curative jury instruction the parties agreed upon given the Court's denial of the motion for a mistrial. *Id.* at 1346-1350. The Court instructed the jury to disregard the exhibit lists, stating that "you should not weigh anything in those documents, including their length, as evidence in this case" and "the lightly redacted or the drawn-through entries concerned exhibits never entered into evidence, so you should disregard those entirely as well." *Id.* at 1352-1353.

## V.       The Two Verdicts, Jury Polling and the Lone Holdout Juror

Around mid-day on April 17 (after approximately three days of deliberation), the jury informed the Court it had reached unanimous verdicts. *See* 4/17 Tr. 1358-1359. The foreman announced that Mr. Johnson had been found guilty of six counts of transportation of child pornography and the one count of possession of child pornography, and acquitted him of the remaining nine counts of transportation of child pornography. *Id.* at 1359-1362. The Court then polled the jury. *Id.* at 1363. The Deputy Clerk asked Juror No. 1 whether his "individual verdict is the same as that just announced." *Id.* Juror No. 1 cried "No." *Id.* at 1363. As agreed by both

parties and the Court, in rejecting the verdict announced by the foreperson, Juror No. 1 "slumped

forward in his seat and began sobbing and crying[,]" he "bent over and sobbed[,]" and

"immediate[ly] … unequivocal[ly]" said "No."  *Id.* at 1368, 1370.  The Court then proceeded to

poll the remaining eleven jurors, who all said "Yes."  *Id.* at 1363-1364.  The jury was sent back

to the jury room and told to continue its deliberations because they had "not reached a

unanimous verdict[.]"  *Id.* at 1364, 1381.

Immediately after the jury was excused, Mr. Johnson moved for a mistrial.  Id. at 1365.

Mr. Johnson's motion for a mistrial was summarily denied.  *Id.*

After a short break, Mr. Johnson renewed his motion for a mistrial, pointing to Juror No.

1's "reaction" and the "dynamics" surrounding the polling of the entire jury.  *Id*. at 1370.  Given

these circumstances, Mr. Johnson argued that there was an "extreme risk of coercion," and that

"the other jurors could coerce [Juror No. 1] into a verdict that's not consistent with the verdict

[Juror No. 1] wants to give."  *Id*.  Mr. Johnson expressed further concern about the potential

pressure that the lone holdout juror would face in the jury room, particularly as the jury had

indicated just the day before that it might come to a decision in "15 more minutes," but did not,

even after several more hours.  *Id.* at 1370-1371.

The parties argued differing legal standards for a mistrial.  Defense counsel agreed with

the government that Rule 31 allows the Court to have the jury continue deliberations or declare a

mistrial, and agreed that "manifest necessity" is the standard.  *Id.* at 1375-1376.  However, citing

*United States v. Khatallah*, 41 F.4th 608, 638 (D.C. Cir. 2022), the defense submitted that the

"central issue" for the manifest necessity standard is "substantial prejudice" to the defendant and

reviewed the factors the *Khatallah* court had looked to, which supported defendant's motion for

a mistrial.  4/17 Tr. 1376.  Defense counsel explained how Juror No. 1's reaction, both verbal

and non-verbal, was clear evidence that the verdict was "inconsistent with what his wishes were" and "he feels coerced to give a different answer to his fellow jurors." *Id.* at 1377.  Counsel argued that the factors for manifest necessity under *Khatallah* were met: the "closeness of the case … the centrality of the issue … [a]nd … steps to mitigate the errors of effect." *Id.* at 1377-1378.

The Court denied the motion for a mistrial and adopted Mr. Johnson's proposed alternative instruction, which it read to the jury. *Id.* at 1379-1381.

When the Court reconvened, Mr. Johnson renewed his motion and explained further reasons to declare a mistrial, including that "when the numerical division of the jurors has been disclosed … especially when it's 11 to 1 … that he's the holdout," the circumstances are unduly coercive and require a mistrial. *Id.* at 1386 (citing *United States v. Ligon*, 781 F. Supp. 1, 8 (D.D.C. 1991)).  Counsel also noted that a publicly disclosed 11 to 1 split among the jurors was coercive "as a matter of law," because it jeopardized the secrecy of the deliberations.  4/17 Tr. 1387-1392.  In response to the Court's inquiry about whether a mistrial is required in such situations considering that Rule 31 permits resuming jury deliberations after polling jurors, counsel explained, and the Court later acknowledged, it would have been possible for the Court to abort polling as soon as a "No" was revealed so that the full numerical split was not revealed. *Id*. at 1388, 1391.  Mr. Johnson's counsel argued that allowing the jurors to resume deliberations would be unfairly prejudicial to Mr. Johnson and that "unfair prejudice[] to the defendant" is the "most important consideration" for a motion for mistrial. *Id.* at 1392.

The Court denied the motion again, stating that "it would mean Rule 31 is a nullity[,]" even though "one could conduct a poll and stop it such as to reveal part but less than full numerical disclosure[.]" *Id.* at 1394-1396.

Approximately three hours after the jury poll, the jury notified the Court it had again reached verdicts. *Id.* at 1396-1400. This time, Mr. Johnson was found guilty of five counts of transportation of child pornography and one count of possession of child pornography, acquitting him of the remaining ten counts of transportation of child pornography. *Id; see also* ECF 166.

The jury was polled again. 4/17 Tr. 1400. When asked whether he or she agreed with the verdict, each juror answered "Yes," but Juror No. 1 did so with "his head down … unable to look anybody in the eye … and in a very soft-spoken manner and … a reluctant tone[.]" *Id.* at 1401. The Court also noted that Juror 11 "also reflected some small hesitation … in answering the verdict." *Id.* at 1402. The defense renewed its motion for mistrial, which was denied. *Id.*

All jurors except Juror No. 1 were excused. *Id.* at 1403. The Court questioned Juror No. 1 about his assent to the verdict, particularly whether "that verdict was your verdict" and "that the evidence … establishes the defendant's guilt on every count the jury found him guilty of … just the ones that the jury found guilt on." *Id.* at 1404-1405. Juror No. 1 repeatedly cut the Court short, curtly stating "Yes" and "Yes, it's fine." *Id.* He began, again, with his "head down, very reluctant, long pause, and then very soft spoken said yes[,]" which he strengthened as the Court kept repeating the question whether he "in fact, agree[d] that the government proved the defendant guilty[.]" *Id.* at 1405-1406. Eventually, Juror No. 1 stated that "it's a very serious charge … it's a bad situation for everybody" and agreed with his fellow jurors' verdict "for the charges that we all agreed upon." *Id.* at 1404-1405. Defense counsel renewed the motion for a mistrial, which the government opposed, and the Court denied. *Id.* at 1406-1407.

## <u>LEGAL STANDARDS</u>

The Federal Rules of Criminal Procedure permit the court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33; *see also* 3 Wright &

Miller, Federal Prac. & Proc. § 556 (1982) ("Any error of sufficient magnitude to require reversal on appeal is an adequate ground for granting a new trial."). Trial courts have "wide discretion in determining whether to grant a new trial." *United States v. Williams*, 113 F.3d 243, 247 (D.C. Cir. 1997) (citing *United States v. Tarantino*, 846 F.2d 1384, 1413 (D.C. Cir. 1988)); *see also United States v. Kelly*, 790 F.2d 130, 133-134 (D.C. Cir. 1986) (describing the standard for a motion for a new trial, applied at the "sound discretion of the trial judge"); *see also United States v. Wheeler*, 753 F.3d 200, 208 (D.C. Cir. 2014) (collecting case law on the discretion of trial courts in ruling on Rule 33 motions). Courts have inquired into whether there were "exceptional circumstances" that "prevented the defendant from receiving a fair trial." *Greene v. United States*, 279 A.3d 363, 368 (D.C. 2022) (citing *Tyer v. United States*, 912 A.2d 1150, 1167 (D.C. 2006)). Where a motion for a new trial is timely filed and does not rest on newly discovered evidence, the "interest of justice … is broader in scope than the limitations which have been held applicable where the motion is based on newly discovered evidence." *Benton v. United States*, 188 F.2d 625, 627 (D.C. Cir. 1951).

Similarly, an error affects "substantial rights" where it had a "substantial and injurious effect or influence in determining the … verdict." *United States v. Lawson*, 494 F.3d 1046, 1053 (D.C. Cir. 2007) (quoting *United States v. Dominguez Benitez,* 542 U.S. 74, 81 (2004)); *see generally United States v. Olano*, 507 U.S. 725, 725 (1993) (holding "substantial rights" for appellate purposes "normally means that the error must be prejudicial, affecting the outcome of the district court proceedings."); *see also United States v. Linares*, 367 F.3d 941, 952 (D.C. Cir. 2004) (drawing parallels between substantial rights and constitutional rights). Where extrinsic, prejudicial evidence was improperly taken into the jury room, reversal is required if there is "the slightest possibility that harm could have resulted." *Dallago v. United States*, 427 F.2d 546, 560

& n. 58 (D.C. Cir. 1969) (citing *United States v. Adams*, 385 F.2d 548, 550-551 (2d Cir. 1967);

*see also United States v. Vasquez*, 597 F.2d 192, 193 & n. 1 (9th Cir. 1979) (collecting case law

throughout federal circuits).

Finally, if any one error alone is not deemed sufficient, "the total effect of numerous

small missteps may deprive a defendant of a fair trial[.]"  *United States v. McGill*, 815 F.3d 846,

947 (D.C. Cir. 2016) (quoting *United States v. Celis*, 608 F.3d 818, 847 (D.C. Cir. 2010)).  The

Court must "analyze[] each ground for the defendant's motion separately," while also

"consider[ing] the cumulative effect of all the prosecution's missteps."  *United States v.*

*Khatallah*, 313 F. Supp. 3d 176, 196 (D.D.C. 2018) (citing *United States v. Holmes*, 413 F.3d

770, 774-775 (8th Cir. 2005)).

## <u>ARGUMENT</u>

I.   **The Court Should Grant Mr. Johnson a New Trial Because the Government Relied On Evidence Recovered From the Unconstitutional Searches of His Electronic and Storage Devices in Violation of the Fourth Amendment.**

The bulk of the government's evidence at trial—both its direct evidence and evidence the

Court admitted under Rule 404(b)—was derived from Mr. Johnson's phone and laptop computer.

Because law enforcement seized this evidence in violation of the Fourth Amendment, Mr.

Johnson should receive a new trial.

Searches conducted by government agents without a warrant are presumptively

unreasonable under the Fourth Amendment.  *See Arizona v. Gant*, 556 U.S. 332, 338 (2009)

("searches conducted outside the judicial process, without prior approval by judge or magistrate,

are *per se* unreasonable under the Fourth Amendment").  Government searches of electronic

devices capable of storing large amounts of data, such as cell phones and computer hard drives,

violate the Fourth Amendment if conducted without a warrant.  *See Riley v. California*, 573 U.S.

373, 401 (2014) ("a warrant is generally required before [searching a cell phone], even when a

cell phone is seized incident to arrest").

The warrant on which the government purportedly relied to search Mr. Johnson's

electronic devices did not authorize a search of those devices. The warrant only permitted law

enforcement to search Mr. Johnson's apartment. *See* ECF 84, Ex. 1 at 2. This limitation is plain

from the face of the warrant. The warrant's caption states, "In the Matter of the Search of 600 H

STREET APARTMENT #749 NORTHEAST WASHINGTON, DC 20002 UNDER RULE 41."

*Id*. The other part of the warrant specifying what may be searched under the warrant is

"Attachment A." That document, which is entitled "Property to be searched," states in its

entirety:

> The property to be searched is 600 H Street, Apartment #749, Northeast,
> Washington DC 20002. (the "PREMISES") which is a multi-unit
> apartment building named "The Apollo." Apartment #749 is located on
> the seventh floor of the apartment building and is described as a gray door
> with a placard labeled 749 to the right of the door in white font on a gray
> background as depicted in the below photograph.[11]

ECF 84, Ex. 2. Another attachment to the warrant, Attachment B, concerns "the property to be

seized." *See* ECF 84, Ex. 1 at 2. Attachment B identifies various devices such as mobile phones

and computers. ECF 84, Ex. 3. As Attachment B's title makes very clear, the items listed in that

attachment may be seized only. Accordingly, while the warrant's incorporation of Attachment B

authorized *the seizure* of various electronic devices found in Mr. Johnson's residence, it did not

authorize law enforcement to search those devices because the things that may be searched were

expressly limited to what was identified in Attachment A.

This Court denied Mr. Johnson's Devices Motion, finding that "the warrant's

incorporation of Attachment B authorize[d] the government to seize and examine Mr. Johnson's

---

[11] The photograph in Attachment A depicts what is apparently the front door to Mr. Johnson's
apartment.

digital devices and their contents."  4/2 Tr. 16.  The Court explained further that "the body of the attachment, read in context, indicates that the warrant allows the government to do what might be called a search in order to seize information contained within the devices found in the residence."  *Id*.

The Court's ruling was erroneous.  The Supreme Court has unambiguously held that searches and seizures of items not specifically identified in the warrant are warrantless searches and seizures.  *See Groh v. Ramirez*, 540 U.S. 551 (2004).  In *Groh*, a law enforcement officer applied for a search warrant to search an individual's property and to seize various weapons suspected of being unlawfully located at the property.  *Id*. at 554.  The officer's search warrant application identified various types of weapons suspected of being unlawfully located at the property, and stated that the anticipated search of the property was for those suspected illegal weapons.  *Id*.  The application was supported by a detailed affidavit "that set forth the basis for [the officer's] belief that the listed items were concealed on the [property]."  *Id*.  The application, affidavit, and a warrant form completed by the officer were presented to a magistrate judge for approval.  *Id*.  While the warrant described the house the officer sought to search, "it failed to identify any of the items that petitioner intended to seize."  *Id*.  The warrant was signed by the magistrate judge, and a team of law enforcement officers, which included the officer who applied for the search warrant, searched the property for the weapons described in the search warrant application.  *Id* at 554-555.  No illegal weapons were recovered during the search and criminal charges were never filed against the property's owner.  *Id*. at 555.

The property's owner eventually sued the officers raising various claims, including that the officers' conduct violated the Fourth Amendment to the United States Constitution.  *Id*.  Regarding the Fourth Amendment claim, the Supreme Court held that "[t]he warrant was plainly

invalid" and, by not describing the items to be seized, "the warrant was so obviously deficient that [the Supreme Court] must regard the search as 'warrantless.'"  *Id*. at 557-558.  The Court explained that "[t]he fact that the *application* adequately described the 'things to be seized' does not save the *warrant* from its facial invalidity."  *Id*. at 558 (emphasis in the original).

The Court in *Groh* noted that a warrant may cross-reference other documents and those other documents may be incorporated into the warrant only if, through appropriate words of incorporation, the documents convey the intent of the judicial officer issuing the warrant.  *See id*. at 557-560.  To properly incorporate documents into a warrant, the documents must accompany the warrant and the warrant must use satisfactory language to incorporate the documents by reference.  *See United States v. Maxwell*, 920 F.2d 1028, 1031 (D.C. Cir. 1990) (an affidavit in support of a search warrant may be construed as part of the warrant "only if (1) the affidavit accompanies the warrant, and in addition (2) the warrant uses suitable words of reference which incorporate the affidavit by reference") (internal quotations and citations omitted).

The only documents incorporated into the warrant in the instant case are Attachments A and B, as both attachments are mentioned in the warrant followed by the words "incorporated by reference."  ECF 84, Ex. 1 at 2.  But even if these attachments were properly incorporated into the warrant by reference, each attachment must be understood in the express manner in which it was incorporated.  Attachment A was incorporated to describe the property to be *searched*; and Attachment B was incorporated to describe only the property to be *seized*.  Thus, the plain meaning of the warrant, even when incorporating Attachments A and B, is that the items described in Attachment B may only be seized and the only property that may be searched is the apartment described in Attachment A.

Interpreting the incorporation of Attachment B into the warrant to mean that the items

described in that attachment may only be seized and not searched also makes sense given the

context.  Attachment B begins by stating that "[t]he items to be seized are fruits, evidence,

information, contraband, or instrumentalities" relating to specifically identified child abuse

offenses.  *See* ECF 84, Ex. 3 at 1.  References in the body of Attachment B to "child

pornography," "correspondence or communications," and "internet usage" are not authorizations

to search seized devices for this type of evidence.  Rather, Attachment B is merely describing

with particularity the type of devices that may be seized from the residence.  The detailed

information provided in Attachment B serves to limit the scope of the type of devices that may

be seized to only devices that may contain evidence of the crimes being investigated.  Therefore,

only devices that could contain child pornography, correspondence or communications,

information about internet usage, and other types of evidence described in Attachment B may be

seized.  By limiting the scope to only devices that may contain evidence of the specified child

abuse offenses, Attachment B precludes law enforcement from seizing electronic devices that

could not possibly contain evidence of the crimes at issue.  Thus, for example, Attachment B

does not authorize the seizure of electronic devices such as radios, stereo equipment, clocks,

watches, headphones, coffee makers, or televisions that cannot connect to the internet.  The

descriptive information provided in Attachment B serves to narrow the scope of the kinds of

devices that law enforcement may seize from Mr. Johnson's residence to devices that could

contain evidence about the child abuse offenses being investigated—devices such as computers,

smart phones, external hard drives, and thumb drives.

Language in Attachment B about obtaining from Mr. Johnson physical biometric

characteristics that may be needed to unlock devices seized from his residence is consistent with

the defense's position that this warrant did not authorize a search of the seized devices.  The

magistrate may have allowed the government to access biometric characteristics from Mr. Johnson while he was in their presence and custody to make it much easier and more efficient for the government to search those devices *later* in the event a warrant to search those devices was applied for and granted in the *future*. Delaying collection of the biometric information from Mr. Johnson until after a warrant to search the devices has been issued would have been unnecessarily complicated and time consuming. The government would likely need to file a motion with the Court seeking an order compelling Mr. Johnson to accompany law enforcement to allow them to gather biometric characteristics from him to unlock his electronic devices. From the government's perspective, proceeding in this manner is also riskier and more difficult because the government's motion may be opposed by defense counsel. And, even if the government's challenged motion is granted, the government must then deal with the logistics of arranging a meeting with the defendant (an arrangement that can be particularly burdensome if the defendant is incarcerated) and ensuring that proper protocols are in place as law enforcement interact with a defendant who is represented by counsel. Given these risks and complexities, it makes sense that the government would seek a warrant to immediately obtain physical biometric characteristics from Mr. Johnson to unlock devices seized from his residence *before* obtaining a warrant to search those devices.

Moreover, the officer's statement in Attachment B about obtaining Mr. Johnson's biometric characteristics "to unlock the Device(s)'s security features in order to search the contents as authorized by this warrant" does not grant law enforcement additional authority beyond what the warrant by its plain terms authorizes. *See* ECF 84, Ex. 3 at 5. The government's claim that the warrant authorizes the search of the contents of any device is simply incorrect and nonsensical given the distinct attachments. There is no assurance that the

magistrate found probable cause for law enforcement to search the contents of any devices or that the magistrate intended to authorize a search of any device.  And, if the magistrate intended to authorize the search of the contents of seized devices, the Fourth Amendment requires that the court's authorization be stated in the warrant with greater particularity than the vague and overly broad description provided by Detective Sullivan in Attachment B.

For reasons discussed above, law enforcement officers violated Mr. Johnson's Fourth Amendment rights by searching his electronic devices without a warrant.  The Court should accordingly grant Mr. Johnson a new trial which does not involve the admission of evidence obtained in violation of the Fourth Amendment, including (1) the "jump lists;" (2) the metadata from the devices; (3) the name and structure of folders on the laptop; and (4) the evidence admitted under Rule 404(b), as described above and in Section III *infra*.

II.    **The Court Should Grant Mr. Johnson a New Trial Because Evidence from His Google Account Should Have Been Suppressed, As Law Enforcement Searched His Google Account in Violation of the Fourth Amendment and the Good Faith Exception Does Not Apply.**

The government also violated Mr. Johnson's Fourth Amendment rights when searching material from his Google account.  First, Detective Sullivan conducted a warrantless review of files from Mr. Johnson's Google account that were contained within Google CyberTip reports that had been forwarded to law enforcement by NCMEC.  Second, the government violated Mr. Johnson's Fourth Amendment rights again when it searched his entire Google account based on a warrant that was tainted by Detective Sullivan's initial unlawful search.

After several hearings on Mr. Johnson's motion to suppress evidence from his Google account, the Court found that the government's warrantless review of material from Mr. Johnson's Google account raised a "significant question."  4/2 Tr. 4.  The Court was unpersuaded by the government's argument that evidence from Mr. Johnson's Google account

was admissible under the private search exception or the independent source doctrine.  *Id*. at 4-7,

11-13.  And without making any definitive findings about whether a warrant was required for

Detective Sullivan to view material from Mr. Johnson's Google account in the CyberTip reports,

the Court concluded that the good-faith exception rendered the exclusionary rule inapplicable in

this case.  *Id*. at 7-8.  For reasons discussed below, this Court's ruling that the good-faith

exception applied was erroneous.

      The good-faith exception to the exclusionary rule was created to avoid suppression of

evidence in cases where the impact of excluding unlawfully obtained evidence is unlikely to

deter future police misconduct.  *See United States v. Leon*, 468 U.S. 897, 916 (1984).  The good-

faith exception is reserved for situations where law enforcement acts with an "objectively

reasonable good-faith belief that their conduct is lawful."  *Davis v. United States*, 564 U.S. 229,

238 (2011) (internal quotations omitted).  When Fourth Amendment violations by law

enforcement are not based on an officer's good-faith belief that he was acting lawfully, the good-

faith exception does not apply and exclusion of the unlawfully obtained evidence remains the

appropriate remedy.  *Leon*, 564 U.S. at 922-923.  For example, when a law enforcement officer's

affidavit in support of a search warrant is knowingly or recklessly misleading, or when a police

officer unreasonably relies on a deficient warrant, the exclusionary rule applies.  *Id*. at 923.

      In the instant case, Detective Sullivan did not act in good faith under an objective test.

The government concedes that, soon after Detective Sullivan obtained the CyberTip reports and

accompanying files from Mr. Johnson's Google account, he reviewed those files—which he

knew no law enforcement officer had previously reviewed—without a warrant.  Detective

Sullivan could not have had an objectively reasonable belief that his conduct was lawful.  First,

he had no warrant to rely on at all, but instead merely the hope that an *exception* to the warrant

requirement justified his actions, thereby lacking the bare minimum for the good-faith exception

to apply—a warrant, however flawed.  *See, e.g., United States v. Raymond*, No. CR 21-380

(CKK), 2023 WL 7005341, at *11 (D.D.C. Oct. 24, 2023) (collecting good-faith exception case

law to show they are "innocuous" and "tend to revolve around a defective warrant."); *see

also Herring v. United States*, 555 U.S. 135, 143-144 (2009) (holding the lack of a search

warrant underlying "patently unconstitutional" conduct meant the good-faith exception did

not apply); *United States v. Griffith*, 867 F.3d 1265, 1279 (D.C. Cir. 2017) (holding an obviously

overbroad and defective warrant meant the good-faith exception did not apply

"notwithstanding the absence of any reason to suppose that officers acted in bad faith in relying

on an invalid warrant."); *see also* 3/21 Tr. 16 ("there was no warrant for the search of the

electronic devices, just no warrant.").

Even if Detective Sullivan's reliance on an *exception* to the warrant requirement was

permissible, his testimony revealed that, at the time he conducted the warrantless search of the

CyberTip files from Mr. Johnson's Google account, he knew or should have known his search

was illegal.  Specifically, Detective Sullivan knew (or acted in reckless disregard of) the

following:

- Files identified as "child pornography" in the CyberTip reports may include files that do not violate federal child pornography laws because the definition for child pornography used in CyberTip reports differed from the definition used in the federal child abuse statutes relevant to the potential crimes Detective Sullivan was investigating.  4/1 Tr. 54.[12]

- He "was unsure of how they [Google] were hash matching."  *Id*. at 40.

---

[12] In his applications for warrants in connection with Mr. Johnson's case, Detective Sullivan cited 18 U.S.C. §§ 2252 and 2252A as the relevant statues pertaining to his investigation.  *See, e.g.*, ECF 94, Ex. A.  These statutes prohibit material depicting "sexually explicit conduct," as defined in 18 U.S.C. § 2256.  The definition used by the CyberTips to determine what constitutes "child pornography" is much broader than the "sexually explicit conduct" definition provided in 18 U.S.C. § 2256.  *See* ECF 123, Ex. A at 11; *but see* 18 U.S.C. § 2256(2)(A).

- The CyberTip reports associated with Mr. Johnson's case indicated that no human at Google reviewed the files reported in the CyberTips.[13]  *Id.* at 44-45; Gov. Ex. 1.

- There was no evidence that any law enforcement officer had previously reviewed the CyberTip files.  *See* 4/1 Tr. 32.

- A warrant was required if the service provider "had not had a human review that file prior to NCMEC."  *Id.* at 15.

- Based on his prior experience with CyberTips, he needed to seek a warrant before reviewing CyberTip material that had been identified only through a company's hash matching system.  *Id.* at 15-16.

- He had access to multiple resources, including Assistant United States Attorneys, FBI agents, Google representatives, and NCMEC staff, that could have advised him whether a warrant was needed before searching Mr. Johnson's CyberTip files.  *Id.* at 34-37.

Despite knowing all of the above, Detective Sullivan chose not to seek a search warrant for the CyberTip files or even to consult with anyone before viewing Mr. Johnson's CyberTip files.  *Id.* at 40-41.  Instead, Detective Sullivan reviewed them without a warrant and then, based on his warrantless review of the files, submitted a draft application to the United States Attorney's Office for a warrant to search Mr. Johnson's entire Google account.  *Id.* at 22-23.

Additionally, by not obtaining any information about the details of the alleged training received by Google contractors who determine which files get classified as containing child pornography, law enforcement knew—or, at least, should have known—that the reliability of Google's entire hash matching system was precarious.  While the government obtained from Google statements about Google employees and contractors being "trained on the federal statutory definition of child pornography and how to recognize it on [Google's] products and services," despite repeated challenges from defense counsel, the government never provided any

---

[13] After considering the evidence and arguments by counsel, the Court found that "it appears that no Google employee had viewed Johnson's images and videos, as opposed to someone else's copy or partial copy of those images and videos."  4/2 Tr. 5.

detail about the alleged training these individuals received.  *See* ECF 94, Ex. B at 3, ¶ 6.  The

lack of information about the alleged "training" Google employees and contractors received to

make determinations about what constitutes child pornography should have increased Detective

Sullivan's concerns regarding the uncertainty of how Google was making hash matching

decisions.  Without more information about the extent of any training, the accuracy of the

information conveyed during any training, and the source of the training, a well-trained officer

had no good-faith basis for relying on representations by Google about what constitutes child

pornography.

Based on the above facts, Detective Sullivan could not possibly have had an objectively

good faith belief that he was acting lawfully when he reviewed the contents of Mr. Johnson's

Google CyberTip file without a warrant.  He viewed the CyberTip files despite his awareness

that videos and images in the files were classified as child pornography based on a definition for

child pornography that was significantly different than the one that applied to the potential

crimes he was investigating.  He also viewed the CyberTip files despite knowing that a human

may not have ever viewed the files to confirm that they contained evidence of suspected child

pornography offenses.  In a similar CyberTip investigation that Detective Sullivan had handled

prior to Mr. Johnson's case, Detective Sullivan knew that he was obligated to get a warrant.

And, if Detective Sullivan had any questions or uncertainty, he had a multitude of resources

available to him from which he could have sought guidance.  Under these circumstances,

Detective Sullivan's warrantless search of Mr. Johnson's CyberTip files was a reckless, if not

deliberate, disregard of Mr. Johnson's Fourth Amendment rights.

In addition, Supreme Court precedent makes it clear that Detective Sullivan violated Mr.

Johnson's Fourth Amendment rights through unconstitutional trespass, regardless of the nature of

the antecedent private search.  *See* ECF 99 at 4-5; ECF 134 at 3-4; *see also* 3/21 Tr. 5, 15, 51.

Under the *Jones* trespass test, the government needs a warrant to search property "for the

purpose of obtaining information," even when a private party had previously entered into or

interfered with the property, and even if the evidence sought to be suppressed is digital in nature.

*United States v. Jones*, 565 U.S. 400, 404-407 (2012); *see also* Andrew MacKie-Mason, *The*

*Private Search Doctrine After Jones*, 126 Yale L.J. F. 326, 328 (2017) (explaining the *Jones*

theory of trespass applies "even if the trespass does not violate the property owner's reasonable

expectation of privacy … [t]he fact that someone has previously entered or interfered does

almost nothing to erode the interest in exclusion.").  Put simply, it did not matter whether Google

or anyone else looked through the Google Account evidence before Detective Sullivan did—he

needed a warrant, and without one, he trespassed in violation of the Fourth Amendment.

Because the issuance of the warrant permitting the government to search Mr. Johnson's

entire Google account was tainted by Detective Sullivan's warrantless search of the CyberTip

files, all evidence seized from Mr. Johnson's Google account should have been suppressed.  The

impact Detective Sullivan's unlawful search had on his application for a warrant to search Mr.

Johnson's Google account was significant.  Detective Sullivan admitted that he understood the

government would seek a warrant to search Mr. Johnson's Google account "because we were

seeing CSAM in those files" that Detective Sullivan reviewed without a warrant.  4/1 Tr. 59.

And, as the affidavit in support of the Google search warrant shows, Detective Sullivan informed

the magistrate judge that he "reviewed the files provided by Google" and he included in his

affidavit graphic details of about four video files from the CyberTip reports that he was able to

offer only because of his warrantless review of those files.  *See* ECF 94, Ex. D at 21.

Accordingly, the good-faith exception to the exclusionary rule does not save the evidence from

Mr. Johnson's Google account from being suppressed.

### III.    The Resumption of Deliberations After Jury Polling Revealed the Identity of a Lone Holdout Juror Was Coercive, Mandating a New Trial.

The Court erred when it resumed deliberations, over the defense's motion for a mistrial, after Juror No. 1 openly disagreed with the verdicts, slumped forward, covered his face with his hands, began crying, and unequivocally stated that he did not agree with the verdict just announced. *See* 4/17 Tr. 1363-1370. Instead of discontinuing the jury poll at that point, the Court continued polling until the 11-to-1 split among the jurors was revealed—publicly identifying Juror No. 1 as the lone holdout—and then sent the jury back to continue its deliberations. This created a substantial risk of juror coercion and requires a new trial.

Jury polling has "long been regarded as a useful and necessary device for preserving the defendant's right to a unanimous verdict." *United States v. Brooks*, 420 F.2d 1350, 1354 (D.C. Cir. 1969). However, "[t]he Supreme Court has condemned, as coercive in its tendency, a judge's action in asking a jury reporting inability to agree to reveal its division and then sending the jury back." *Williams v. United States*, 419 F.2d 740, 746 (D.C. Cir. 1969) (citing *Brasfield v. United States*, 272 U.S. 448, 450 (1926)). As another court in this District has explained, "polls of the jury are dangerous since responses about the numerical division of the jury have been held to be error *per se* … [t]his rule is designed to prevent coerced verdicts." *United States v. Ligon*, 781 F. Supp. 1, 8 (D.D.C. 1991) (citing *United States v. Amaya*, 509 F.2d 8 (5th Cir.1975)).

Contrary to the Court's concern when it denied Mr. Johnson's motion for mistrial, *see* 4/17 Tr. 1395, the Supreme Court's holding that revelation of the numerical division of a jury is coercive is not inconsistent with Federal Rule of Criminal Procedure 31(d). Rule 31 provides that if a juror poll "reveals a lack of unanimity, the court may direct the jury to deliberate further or may declare a mistrial and discharge the jury." Fed. R. Crim. P. 31(d); *see also United States*

*v. Mathis*, 535 F.2d 1303, 1307 (D.C. Cir. 1976) ("The purpose of the poll is to test the uncoerced unanimity of the verdict … eliminating any uncertainty as to the verdict announced by the foreman." (internal citations omitted)).  There are several ways in which a "lack of unanimity" could be revealed during a jury poll in a non-coercive way, permitting a court to direct the jury to continue deliberating without violating the defendant's Constitutional right to a unanimous verdict (though that is not what happened here).  Critically, Rule 31 does *not* require that the exact split as to a jury's votes be revealed during the poll.  For example, in *United States v. Dorsey*, the D.C. Circuit affirmed the District Court's decision when it "immediately stopped the polling" upon reveal of a dissenting juror (there, Juror No. 4) and then gave a jury instruction to, "return to the juryroom [sic] for further consideration of [the jury's] verdict", "continue your deliberations" if the jury has not reached a unanimous verdict and remember "any member is free to change his or her vote on any issue submitted to you."  865 F.2d 1275, 1276-1278 (D.C. Cir. 1989).[14]

Rule 31 also encompasses situations in which an apparent lack of unanimity is a result of confusion rather than disagreement with the substance of the verdict (though, again, that is not what happened here).  For example, in *Williams*, the court found that when a juror appeared to be confused by the polling methodology as well as by difficulty hearing the clerk, it was not coercive to ask the jury to return to the jury room, where further discussion may "clear up that

---

[14] That instruction "tracked almost exactly the instruction prescribed for aborted jury polls by Instruction 2.93 [of the District of Columbia Bar Model Criminal Jury Instructions,]" which is currently codified in Instruction 2.603 of the Model Criminal Jury Instructions, "Return of the Jury After Polling."  *See* Young Lawyers Section, Bar Association of the District of Columbia, Criminal Jury Instructions, District of Columbia 2-143 (5th Ed. 2016); *see also Dorsey*, 865 F.2d at 1276 (stating the trial judge's instruction in full).  Indeed, that Model Instruction offers additional language for use "where there has been a particularly high likelihood of juror coercion," including lone dissenter cases.  *Id.* at 2.603 (comment).

whatever seemed to suggest a division in the courtroom was merely a mistake in hearing, or understanding, and that in fact there was unanimity." *Williams*, 419 F.2d at 745-46; *see generally United States v. Mathis*, 535 F.2d 1303, 1307 (D.C. Cir. 1976) ("jury polls are a matter where the need for clarity is at its zenith … the court should shape the form of the poll so as to minimize possible confusion by the jurors." (internal citations omitted)); *but see United States v. McCoy*, 429 F.2d 739, 741-742 (D.C. Cir. 1970) (holding the conviction "must be reversed" where the case is much closer to one with "no assurance that the jury freely and fairly arrived at a unanimous verdict" rather than one where the juror was "merely confused.").

In this case, however, Juror No. 1 was not confused by the poll. His disagreement with the verdict was clear and unequivocal, as demonstrated by his tone of voice, body language, and crying. *See* 4/17 Tr. 1363-1370. And unlike *Dorsey*, the Court did not stop the poll after Juror No. 1 disagreed with the verdict. By continuing to poll the rest of the jury, singling out Juror No. 1 as the single holdout, the Court created the substantial risk of coercion that the Constitution and Supreme Court precedent forbids. *Id.* at 1363. Mr. Johnson must be granted a new trial to ensure that his right to a unanimous verdict, free of coercion, is not infringed.

## IV. The Jury's Access to the Draft Exhibit List Warrants a New Trial.

A conviction must be reversed and a new trial granted where the jury received evidence not admitted during trial and its presence raised "the slightest possibility that harm could have resulted." *Dallago v. United States*, 427 F.2d 546, 560 & n. 58 (D.C. Cir. 1969) (quoting *United States v. Adams*, 385 F.2d 548, 550-551 (2d Cir. 1967)). As other circuits have summarized, the "reasonable possibility that the extrinsic material could have affected the verdict" must lead to a new trial, as it is a "fundamental principle that the government has the burden of establishing guilt solely on the basis of evidence produced in the courtroom and under

circumstances assuring the accused all the safeguards of a fair trial." *United States v. Vasquez*, 597 F.2d 192, 193-194 & n. 1 (9th Cir. 1979) (collecting case law); *see also Turner v. State of La.*, 379 U.S. 466, 472-473 (1965) ("evidence developed against a [criminal] defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel").

On April 16, the parties and the Court were informed via jury note that the deputy clerk's annotated drafts of the exhibit lists and witness lists had been provided to the jury.[15]  *See* 4/16 Tr. 1337-1338.  The exhibits that were not admitted during trial were "[s]harpied over the name of the exhibit[,]" but a review of the pages revealed that for all of the entries "without much difficulty, [one could] see through the redactions and read what's there."  *Id.* at 1341, 1345.  The Court agreed it "would not have authorized" access to the draft lists and assumed "that the jury could and did read each and every one of those blacked out entries."[16]  *Id.* at 1338, 1349.

A new trial must be granted because there is a strong likelihood that the jury's access to the extraneous information in the draft, annotated exhibit list was prejudicial to Mr. Johnson.  *See Dallago*, 427 F.2d at 553 & n. 23 ("it is perfectly plain that the jury room must be kept free of

---

[15] It is unclear how long the draft exhibit lists had been present in the jury room.  The jury began its deliberations in the afternoon on Friday, April 12.  They deliberated all day on Monday, April 15, and the parties were not notified about the exhibit list error until midday on April 16.  But even if the lists were not present for that entire period, the effect would still be prejudicial, particularly given that the import of the lists could be understood with little more than a glance. *See Dallago*, 427 F.2d at 556 (finding extrinsic evidence prejudicial when it was present in the jury room for only three hours out of five days of deliberations and was buried in the last two pages of an 87-page exhibit).

[16] The Court was correct to presume, without inquiring, that the jurors had reviewed the contents of the draft exhibit and witness lists.  *See Vasquez*, 597 F.2d at 193 ([T]he actual impact upon the jury of such [extrinsic] evidence cannot be accurately measured or ascertained. ... Consequently, it is a useless exercise even to ask jurors whether such evidence in fact affected their verdict."); *Dallago*, 427 F.2d at 556 ("with its [extrinsic evidence's] presence in the jury room incontrovertibly appearing, we could not prudently presume that it was not read.")

evidence not received during trial, and that its presence, if prejudicial, will vitiate the verdict.")
First, the exhibit list revealed to the jury a key fact that was not admitted during the trial: Mr.
Johnson had made a post-arrest statement to the police.  Significantly, Mr. Johnson's post-arrest
statement was on the government's list—but *not* defense counsel's list—which could have led
jurors to conclude that the contents of the statement were inculpatory.  *See* ECF 162 (Defendant's
Exhibit List); *see also* ECF 161 (Government Exhibit List) at 20, Ex. 202-202A.[17]

Second, based on the number of exhibits crossed out on each party's draft list, the lists
telegraphed to the jury that the "vast majority" of the evidence proposed by Mr. Johnson was
deemed inadmissible by the Court or insignificant by counsel, whereas a much greater quantity
of the government's evidence was admitted.  *See* 4/16 Tr. 1345-1346.[18]  This may have left jurors
with the impression, even implicitly, that the government's case was stronger than it actually
was, and/or that defense counsel had doubts about the strength of their proposed evidence.

Although the weight of the government's evidence must be considered when determining
whether the error was prejudicial, *see Dallago*, 427 F.2d at 558, in this case the evidence was not
so overwhelming as to render harmless the erroneous provision of extrinsic evidence to the jury.
This was a close case.  The jury deliberated for more than three days before reaching a verdict,
"and one would expect that if the evidence of guilt was overwhelming the jury would have
succumbed much sooner."  *Id.* at 559; *see also Osborne v. United States*, 351 F.2d 111, 118 (8th

---

[17] The draft exhibit lists with the blacked-out "draft redactions" are no longer available, as they
were not made part of the record.  However, the annotated exhibit lists were available on the
docket.  *See* ECF 161, 162, 163.  These drafts contain annotations of the date that any given
evidence was marked for identification and/or received in evidence, with those cells left blank
when neither occurred or evidence was not received in evidence.  The Court can infer from the
blank cells in the "Received in Evidence" column which entries would have been blacked out.

[18] Based on the annotated exhibit lists, 14 out of 18 entries in Mr. Johnson's list (approximately
77.8%) were blacked out, against only 21 out of 349 (approximately 6%) entries blacked out in
the government's list.

Cir. 1965) (jury's deliberation for two full working days, requesting an additional exhibit and re-reading of instructions, all "lends credence to the view that the case was a close and difficult one."). The jury also ultimately acquitted Mr. Johnson on ten counts of transportation of child pornography that were very similar to the charges upon which the jury convicted him, indicating that the jurors were drawing a very fine line between guilt and innocence. Under these circumstances, there was much more than the required "slightest possibility that harm could have resulted" from the provision of the draft exhibit lists. *Dallago*, 427 F.2d at 560. A new trial should therefore be granted.

## V. Mr. Johnson Should Be Granted a New Trial Because the Court Erroneously Admitted Evidence Under Rule 404(b) and Rule 403.

Rule 404(b)(2) permits the introduction of evidence of other bad acts for purposes other than propensity, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b)(2). However, any such evidence should not be admitted unless the court also finds that its probative value is not substantially outweighed by a danger of unfair prejudice, confusing the issues, undue delay, wasting time, or needlessly presenting cumulative evidence. *See* Fed. R. Evid. 403. A court must exclude evidence under Rule 404(b) if the evidence is insufficient to find that the defendant actually committed the other crime or act. *See United States v. Bowie*, 232 F.3d 923, 930 (D.C. Cir. 2000). "The exclusion of bad acts evidence is founded not on a belief that the evidence is irrelevant, but rather on a fear that juries will tend to give it excessive weight, and on a fundamental sense that no one should be convicted of a crime based on his or her previous misdeeds." *United States v. Daniels*, 770 F.2d 1111, 1116 (D.C. Cir. 1985) (citing *Michelson v. United States*, 335 U.S. 469, 475-76 (1948)).

Courts in this Circuit thus follow a two-step analysis when determining whether to admit evidence of a defendant's other bad acts.  "First, we inquire whether that evidence is relevant to a material issue other than character.  If so, we proceed to the second inquiry, whether the probative value is substantially outweighed by the prejudice" under Rule 403.  *United States v. Mitchell*, 49 F.3d 769, 774-775 (D.C. Cir. 1995).

 In this case, the Court abused its discretion by admitting evidence under Rule 404(b) where there was insufficient evidence to establish that Mr. Johnson had actually committed the alleged other bad acts, when the other acts allegedly occurred long after the charged conduct, and/or because its probative value was substantially outweighed by the risk of unfair prejudice and other considerations under Rule 403.  This was a close case, in which Mr. Johnson was acquitted on 10 of 16 counts and therefore the Court cannot find these errors harmless, either individually or in combination.

     **a.  Dropbox Folders**

The Court permitted the government to introduce evidence that Mr. Johnson clicked on a Dropbox folder entitled "black teens and underage thots" ten times in June and July, 2020, purportedly to show his intent, knowledge, or lack of mistake when allegedly possessing and transporting child pornography between September 21 and October 1, 2020— several months later.

Even if the Court found that the government had satisfied the relevance requirement under Rule 404(b), this evidence should have been excluded under Rule 403.  The probative value of this evidence was minimal because, unlike with similar files on Mega, none of the CSAM files in the Dropbox folder were found in Mr. Johnson's computer, phone, or Google drive, and the defense was able to show that Mr. Johnson never downloaded any files from that

Dropbox folder.  *See* 4/11 Tr. 857-858.  Particularly when the government was introducing other evidence from Mr. Johnson's browser history referring to files that *were* later found in his Google drive, the Dropbox evidence was highly likely to confuse jurors.  The risk of unfair prejudice was particularly high because many of the files in the charged counts were innocuous-looking strings of letters and numbers, *see* Counts 1, 3, 10-15, whereas the phrase "black teens and *underage thots*" was much more inflammatory.  Indeed, the government repeated this folder name approximately four times in its opening and closing arguments.  *See* 4/9 Tr. 301, 446; *see also* 4/12 Tr. 1207, 1222.  Moreover, the Dropbox evidence was needlessly cumulative given the other evidence that the government introduced of Mr. Johnson's knowledge, intent, and lack of mistake, including the Mega evidence and discussion of the alterations to the file structure from "courses" to "Haute Gurls."  *See, e.g.,* 4/12 Tr. 1207-1210, 1215-1217, 1219.

> **b.  Telegram Evidence**

The Court also erred in allowing the government to introduce extensive evidence about the Telegram application, messages that Mr. Johnson received there, and three images of child pornography extracted from Telegram on Mr. Johnson's phone when it was seized in October 2021—a year after the charged conduct (collectively, the "Telegram evidence").  The Telegram evidence failed both prongs of the admissibility test for other bad acts evidence.  *See Mitchell*, 49 F.3d at 774-775.

*First*, the Telegram evidence failed to meet the relevancy test under Rule 404(b)(2).  The government had no evidence—and did not represent to the Court that it could show—that Mr. Johnson sent, *or even read*, any Telegram messages related to child pornography.  *See* 4/10 Tr.

726-728; *see also* 4/11 Tr. 902-903.[19]  Mr. Johnson's passive presence on Telegram without interacting with any child pornography content does not tend to show that he knowingly and intentionally possessed or transported the charged files.

Likewise, the government had insufficient evidence that Mr. Johnson *knowingly* possessed the three child pornography images recovered from a "Telegram images" folder on his phone.  The government's expert Mr. Tucker and the defense's expert Ms. Bush strongly disagreed about whether Telegram's *default* settings would have caused these images to be automatically downloaded onto Mr. Johnson's phone without his knowledge.  *See* 4/10 Tr. 731-732, 734-735, 739-740; *but see* 4/11 Tr. 896-897, 957-959.  Yet there was no testimony whatsoever about the *actual* settings in the Telegram app on Mr. Johnson's phone.  Moreover, one of the images had "white gurlz" written across it, *see* 4/10 Tr. 648; Gov. Ex. 401-D, which was inconsistent with all other evidence in the case demonstrating Mr. Johnson's sexual interest in African Americans.  Thus, the Court should have excluded evidence of the Telegram images under Rule 404(b) because there was insufficient evidence for the jury to find that Mr. Johnson actually committed the bad act of knowingly possessing those images.  *See Bowie*, 232 F.3d at 930.

Furthermore, the Telegram evidence all post-dated the charged conduct by several months.  The Telegram messages the government introduced were allegedly received by Mr. Johnson between January 31 and June 15, 2021.  4/10 Tr. 645-652.  The government did not establish when the Telegram images were downloaded to Mr. Johnson's phone, but they were recovered in October 2021.  The relevancy of subsequent acts that occur long after the charged

---

[19] The government did not contest this point, eliciting only that one could affirmatively leave a group after being added.  *See* 4/11 Tr. 922-923.

conduct is minimal.  *See Mitchell*, 49 F.3d at 776.  Thus, Mr. Johnson's alleged conduct in 2021 is not probative of his knowledge or intent during the charged conduct four to twelve months *earlier*.

 *Second*, even if relevant, any probative value of the Telegram evidence was substantially outweighed by countervailing concerns in Rule 403, particularly the danger of unfair prejudice, wasting time, and needlessly presenting cumulative evidence.  *See* Fed. R. Evid. 403.  The unfair prejudice to Mr. Johnson was significant.  Although Telegram has many legitimate uses, Mr. Tucker was permitted to testify broadly that "individuals" use Telegram to "communicate in an encrypted channel and exchange and send and receive, view CSAM or child sexual abuse material."  4/10 Tr. 645.  Then, without any evidence that Mr. Johnson even read the messages, Mr. Tucker read to the jury graphic and offensive language from them, including "pyt black teen no limit," "includes young hos, cp, fetishes, incest, rape," and "links to young hose *(sic)* and no limit and cp."  *Id.* at 645-651.  And, as discussed above, the government introduced three graphic images of child pornography, without establishing that Mr. Johnson knowingly possessed them.

 In addition, the Telegram evidence essentially became a trial-within-a-trial, with literally *hours* of expert testimony presented about how one gets added to a Telegram chat and how Telegram's default settings operate.  Indeed, a significant portion of the government's rebuttal case was devoted to the Telegram evidence, including testimony about further investigation that Mr. Tucker had done after his testimony in the government's case-in-chief.  *See* 4/12 Tr. 1144.  This was a significant waste of time.

 Finally, to the extent any of the Telegram evidence was relevant and probative of Mr. Johnson's knowledge and intent for the charged offenses, it was needlessly cumulative.  The government introduced significant evidence of Mr. Johnson's conduct in the period leading up to

the charged offenses that was relevant to those elements, as well as direct evidence about aspects of the charged files and their folder structure that it argued was proof of knowledge, intent, and lack of mistake. The Telegram evidence was surplusage that should never have been admitted.

### c.   Google Photos Evidence

Similarly, the Google Photos Evidence also failed both prongs of the admissibility test for other bad acts evidence. *See Mitchell*, 49 F.3d at 774-775.

This evidence failed the relevancy prong of Rule 404(b) because there was insufficient evidence for the jury to conclude that Mr. Johnson committed any "bad act" with respect to Google Photos. *See Bowie*, 232 F.3d at 930. Mr. Johnson did not create the albums, *see* 4/10 Tr. 720-722; there was no evidence he had seen any chats or comments posted in the albums, *see id.*; there was no evidence Mr. Johnson knew he had been added to the albums, *see* 4/11 Tr. 852-854, 919-921, 964-967; and no child pornography material was recovered from the albums, *see id.*

In addition, the Google Photos Evidence was even more remote in time than the Telegram Evidence. For example, the shared photo album "pyt videos" was created on September 21, 2021, *see id.* at 920, Gov. Ex. 401-G,—almost a year after the charged conduct—and thus not probative for the same reasons discussed above.

The Google Photos Evidence also failed to meet the second prong because its minimal probative value was substantially outweighed by unfair prejudice, wasting time, and needlessly presenting cumulative evidence. *See* Fed. R. Evid. 403. It was unfairly prejudicial for the government to introduce evidence implying that Mr. Johnson was seeking out child pornography in Google photo groups when it had no evidence that he ever interacted with any of those groups or their users. This evidence also wasted time because it required the defense to elicit testimony from Ms. Bush to interpret the technical information in the Google photos section of the search

warrant return, *see* 4/11 Tr. 852-854, and explain how artifacts from a Google photo album could end up on an extraction from Mr. Johnson's phone without his doing anything to make that happen, *see id.* at 964-966.  Finally, to the extent any of the Google Photos Evidence was relevant and probative of Mr. Johnson's knowledge and intent for the charged offenses, it was needlessly cumulative, for the same reasons discussed above.

### d. Tor Browser

Evidence of the Tor browser on Mr. Johnson's computer should have been excluded as irrelevant and/or more prejudicial than probative.  *See* Fed. R. Evid. 402, 403.

Before trial, the government had told the Court and defense that it did not intend to introduce evidence about Tor.  *See* 4/10 Tr. 565-567.  At trial, during cross-examination of Special Agent Cavillo, the defense sought to establish that Mr. Johnson only accessed CSAM through legitimate internet sites, as opposed to the dark web.  *Id; see also* 4/9 Tr. 466-473.  The government then notified the Court that it would seek to introduce Tor evidence through its digital forensic expert.  4/9 Tr. 502.  Defense counsel objected, noting that the government has no evidence that Tor was used for any nefarious purpose and that introducing the fact that Mr. Johnson had Tor on his computer served no purpose other than character assassination.  *Id.* at 502-503; *see also* 4/10 Tr. 566-568.  The Court disagreed, ruling that "the government's evidence as to Tor is now both more probative than it was before and less prejudicial than it would have been because of the line of questioning yesterday."  4/10 Tr. 570.

Mr. Tucker's testimony then illustrated just how irrelevant this evidence was.  Mr. Tucker testified that Tor was installed on Mr. Johnson's computer when it was seized approximately a year after the charged conduct.  *Id.* at 611, 613.  But he admitted there was not so much as an *allegation* in the case that Mr. Johnson had used Tor to search for child pornography and that his

computer did not show any use of Tor whatsoever.  *Id.* at 705.  The absence of any evidence that Mr. Johnson had *used* Tor was corroborated by the defense expert Ms. Bush.  *See* 4/11 Tr. 969-971.  The mere presence of an unused browser on Mr. Johnson's computer, long after the charged conduct, does not make it any more or less likely that Mr. Johnson knowingly and intentionally possessed or transported child pornography as charged in this case.

Even if the presence of Tor on Mr. Johnson's computer had any relevance (and it did not), it should have been excluded under Rule 403 because any probative value was substantially outweighed by unfair prejudice.  The government was allowed to smear Mr. Johnson's character by informing the jury that Tor allows the user (*i.e.*, Mr. Johnson) to access the "dark web."  4/10 Tr. 611.  Notably, the government did not identify the Tor browser in its Rule 404(b) Notice, presumably because mere installing Tor is neither a crime nor a "bad act."  However, the government then proceeded to elicit testimony about Tor for precisely the purpose that Rule 404(b) forbids: to show that Mr. Johnson acted in accordance with the bad character of someone who searches for child pornography on the "dark web."

### VI.   The Court Should Grant Mr. Johnson's Motion Based on the Cumulative Effect of the Errors Listed Above.

Mr. Johnson respectfully submits that the errors grouped above in sections I, II, III, IV and V are each, standing alone, sufficient to provide him with a new trial.  To the extent the Court disagrees, however, the cumulative effect of those errors plainly warrants vacating Mr. Johnson's conviction.  *See, e.g., United States v. McGill*, 815 F.3d 846, 947 (D.C. Cir. 2016) ("the total effect of numerous small missteps may deprive a defendant of a fair trial[.]") (quoting United States v. Celis, 608 F.3d 818, 847 (D.C. Cir. 2010)); *United States v. Oberle*, 136 F.3d 1414, 1423 (10th Cir. 1998) ("The cumulative effect of two or more individually harmless errors has the potential to prejudice the defendant to the same extent as a single reversible error.").  The

Court must both "analyze[] each ground for the defendant's motion separately," and "consider[] the cumulative effect of all the prosecution's missteps."  *United States v. Khatallah*, 313 F. Supp. 3d 176, 196 (D.D.C. 2018) (citing *United States v. Holmes*, 413 F.3d 770, 774-775 (8th Cir. 2005)).  Even if the errors above did not individually warrant a new trial, which Mr. Johnson submits they do, their cumulative effect plainly necessitates it.

## CONCLUSION

For all the foregoing reasons, Mr. Johnson respectfully requests that the Court grant him a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.

Respectfully Submitted,

*/s/ Jonathan Jeffress*
Jonathan Jeffress (D.D.C. No. 479074)
Courtney R. Forrest (D.D.C. No. 996740)
Tony Miles (D.D.C. No. 484450)
Washington, D.C. 20005
Phone: (202) 640-2850
Fax: (202) 280-1034
jjeffress@kaiserlaw.com
cforrest@kaiserlaw.com
tmiles@kaiserlaw.com

*Counsel for Stephen Johnson*

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of July 2024, the foregoing was served electronically on the counsel of record through the U.S. District Court for the District of Columbia Document Filing System (ECF) and the document is available on the ECF system.

*/s/ Jonathan Jeffress*
Jonathan Jeffress