## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **v.** | **Case No. 22-cr-0176 (CJN)** |
| **STEPHEN JOHNSON**<br>**Defendant.** | |

## <u>STEPHEN JOHNSON'S REPLY IN SUPPORT OF HIS MOTION FOR A NEW TRIAL</u>

Stephen Johnson, through undersigned counsel, respectfully submits this Reply in

Support of His Motion for a New Trial ("Motion").  ECF 179 ("Mot.").  For reasons that follow,

pursuant to Fed. R. Crim. P. 33, the Court should grant the Motion and order a new trial.

## <u>DISCUSSION</u>

As an initial matter, the government misstates the applicable legal standards.  Rule 33, on

its face, allows the Court to "vacate any judgment and grant a new trial if the interest of justice

so requires."  Fed. R. Crim. P. 33.  Courts have "wide discretion in determining whether to grant

a new trial."  *United States v. Williams*, 113 F.3d 243, 247 (D.C. Cir. 1997) (citing *United States*

*v. Tarantino*, 846 F.2d 1384, 1413 (D.C. Cir. 1988)).  This "broad discretion" standard also

played a key role in the sole case cited by the government.  *See United States v. Wheeler*, 753

F.3d 200, 208 (D.C. Cir. 2014).  Courts in the D.C. Circuit have held that extrinsic evidence

improperly taken into the jury room need only have raised "the slightest possibility that harm

could have resulted."  *See* Mot. at 18 (collecting case law); *see also United States v. Vasquez*,

597 F.2d 192, 193 & n. 1 (9th Cir. 1979) (collecting case law throughout federal circuits).

Additionally, while the government does not address this point, "the total effect of numerous

small missteps may deprive a defendant of a fair trial[.]"  *United States v. McGill*, 815 F.3d 846,

947 (D.C. Cir. 2016) (quoting *United States v. Celis*, 608 F.3d 818, 847 (D.C. Cir. 2010)); *see also* Mot. at 19.

## I.      The Government Continues to Offer No Basis for Upholding the Warrant for Mr. Johnson's Digital Devices and the Substantial Prejudice From the Error is Clear.

Contrary to the government's Response, the warrant to search Mr. Johnson's apartment did not authorize a search of his electronic devices.  That fact is plain from the face of the warrant, which repeatedly and expressly limited the "property to be searched" to Mr. Johnson's apartment itself.  *See* ECF 84, Ex. 1 at 3, Ex. 2.  The Magistrate expressly found that Detective Sullivan's affidavit "establish[ed] probable cause to search and seize" Mr. Johnson's apartment, *id.,* Ex. 1 at 3, not his electronic devices.  The Court's ruling that the warrant nonetheless authorized a search of Mr. Johnson's phone, computer, and other digital devices was erroneous and led to the admission of prejudicial evidence that warrants a new trial.

In its Response, the government notes that it has already prevailed on this issue.  *See* ECF 182 ("Opp.") at 6.  It did so with nothing more than it offers here: the bald and unsupported assertion that, contrary to the English language and its own warrant, the words "search" and "seize" mean the same thing.  As before trial, the government does not cite a single case in support.  Instead, it relies solely on the warrant's incorporation of Attachment B, which the warrant expressly describes as listing "the property to be seized."  *See* ECF 84, Ex. 1 at 3, Ex. 3 at 2.  If the "property to be seized" were co-extensive with "the property to be searched," then there would be no reason to have two separate sections of the warrant and two separate attachments, describing different categories of property.  The government's reading of the warrant, which disregards the express purpose of each attachment, is not "natural" given the warrant's "words of reference," *United States v. Maxwell*, 920 F.2d 1028, 1031 (D.C. Cir. 1990)

(requiring that the warrant use "suitable words of reference"), which do not incorporate Attachment B as a list of items to be searched.

The result of the government's illogical reading of the warrant is to nullify Mr. Johnson's Fourth Amendment right under *Riley v. California*, 573 U.S. 373 (2014), to be protected from searches of one's electronic devices absent a warrant for those devices. The Supreme Court was clear on what is necessary for the government to search a person's digital devices: law enforcement must "get a warrant." *Riley*, 573 U.S. at 403 ("Our answer to the question of what police must do before searching a cell phone seized incident to an arrest is accordingly simple— get a warrant."). The government did not do so here.[1]

The government knows what a warrant sufficient to search a person's electronic devices looks like. It drafted one, in this case, in 2023. The differences between the 2020 and 2023 warrants tell the Court what is obvious: that the 2020 warrant did not authorize a search of Mr. Johnson's devices. Whereas the 2020 warrant for Mr. Johnson's residence set out the "property to be searched" in Attachment A as only Mr. Johnson's apartment, *see* ECF 84, Ex. 2, the 2023 warrant's Attachment A delineates the "property to be searched" as follows:

> The property to be searched is two laptop computers and three cellphones, specifically: one HP laptop (Serial #5CD037BY27), one Lenovo laptop (Serial #PF1BH2S1), one Samsung Galaxy Note 10 Plus (IMEI: 356793100242338), one Apple iPhone 7 (IMEI: 356391102901108), and one Apple iPhone 6 (IMEI: 358372063450119), hereinafter the "Devices."

---

[1] At this stage of the proceedings, the extreme prejudice from admitting the evidence extracted from Mr. Johnson's electronic devices is clear: even the government has not taken the position that the erroneous admission of this evidence would have been harmless. Nor could it do so, given the evidence admitted from those devices and the jury's verdicts, which correspond to the "jump list" and other crucial, allegedly inculpatory evidence extracted from Mr. Johnson's laptop. *See generally* Mot. at 25 (collecting the evidence obtained from the devices).

ECF 135 at 4.[2]

The government relies on the Court's observation that Attachment B, which describes "property to be seized," states that law enforcement may seize biometric information from Mr. Johnson "for the purpose of attempting to unlock the Device(s)'s security features in order to search the contents as authorized by this warrant."  ECF 84, Ex. 3 at 5; *see also* 4/2 Tr. 16-17. Even if this one isolated statement from Attachment B was read to suggest confusion on the affiant's part, it is far too slender a reed to support a search of Mr. Johnsons' digital devices given the strength of the Fourth Amendment interest set forth in *Riley*.  *See generally Riley*, 573 U.S. at 398 ("the privacy interests here dwarf those in *Robinson* [414 U.S. 218]."); *see also United States v. Jones*, 565 U.S. 400, 413-414 (2012) (Sotomayor, J., concurring) ("The Government usurped Jones' property [to surveil him through digital tracking] … thereby invading privacy interests long afforded, and undoubtedly entitled to, Fourth Amendment protection.").  The motivating purpose of Attachment B was plain: to state with particularity what law enforcement was looking for, so it would only seize property relevant to the criminal conduct being investigated (i.e. child pornography), including only devices capable of storing evidence of child pornography.  The objectively reasonable interpretation of the warrant is that it authorized law enforcement to seize specified items so, *inter alia*, it could search the contents of them pursuant to a second warrant, such as the one it applied for in 2023.  The warrant does not

---

[2] Additionally, the captions on the 2020 warrant application and the 2020 warrant, which are identical, state as follows: "In the Matter of the Search of . . . 600 H STREET APARTMENT #749 NORTHEAST WASHINGTON, DC 20002 UNDER RULE 41."  ECF 84, Ex. 1 at 2.  The captions on the 2023 application and 2023 warrants, by contrast, identify the devices to be searched ("TWO LAPTOP COMPUTERS AND THREE CELLPHONES").  ECF 135 at 1.

provide authority to search items the Magistrate designated for seizure only.[3]

The Fourth Amendment did not permit the government to search Mr. Johnson's phone and computers based on the warrants to *search* Mr. Johnson's residence and *seize* Mr. Johnson's devices. The Court's pretrial decision was erroneous, and the substantial prejudice from the error is now clear, *see supra*, n.1, and the interests of justice warrant a new trial.

## II.   The Good Faith Exception Does Not Apply to the Warrantless and Reckless Review of the Images From Mr. Johnson's Google Account.

On the issue of whether law enforcement's warrantless review of the images from Mr. Johnson's Google Drive violated the Fourth Amendment, under either the private search doctrine and/or a *Jones* trespass theory, the government points to the Court's finding immediately before trial that, regardless of the violation, Detective Sullivan acted in good faith. *See* Opp. at 6-7; *see also* 4/2 Tr. 7-12. The government continues to ignore two factors undermining the Court's ruling: (1) that the good faith exception generally applies to reliance on a deficient warrant, but not to the absence of a warrant; and (2) that, even assuming the good faith exception applies here, Detective Sullivan acted recklessly. Faced with significant uncertainty regarding the legality of his conduct, the objectively reasonable path was for Detective Sullivan to seek guidance on whether he could legally search Mr. Johnson's images without a warrant, which would (and later did) lead to a decision to apply for a warrant. The failure to do so was reckless, placing Detective Sullivan's conduct outside the good faith exception.

---

[3] It is notable that neither during the pretrial proceedings nor in its Response has the government invoked the good-faith exception. That is because a reading of the warrant as encompassing authorization per *Riley* to search Mr. Johnson's digital devices is objectively unreasonable, so as to fall outside the boundaries of *United States v. Leon*, 468 U.S. 897, 922-23 (1984).

First, the government offers no response to the cases cited in Mr. Johnson's Motion emphasizing that the good faith doctrine generally applies to reliance on a deficient warrant, as opposed to a situation where the officer did not seek a warrant at all.  *See* Mot. at 26-27.

Second, even assuming the good faith doctrine applies in the absence of a warrant, Detective Sullivan acted recklessly.  He knew or should have known that the warrantless search of Mr. Johnson's property presented a Fourth Amendment issue.  Among other factors counseling caution, he had little knowledge of the process regarding, or the credibility of, Google's CyberTips.  He was aware that the definition for child pornography used by Google differed from the definition under federal law.  He also knew that, even though the Virginia Internet Crimes Against Children ("ICAC") Task Force had possessed the images for some time before sending them to him, there was no indication any law enforcement officer had previously searched the files.

Detective Sullivan had a plethora of authoritative resources from which he could have sought guidance on whether he should have obtained a warrant prior to reviewing the contents of Mr. Johnson's Google Drive.  Those included: (1) multiple prosecutors with the D.C. United States Attorney's Office; (2) the FBI, including the agents in ICAC; and (3) Google and NCMEC representatives, who could have explained the limitations of the prior search.  Choosing to plow forward in the face of such uncertainty was not based on an "objectively reasonable good-faith belief that [his] conduct [was] lawful," *Davis v. United States*, 564 U.S. 229, 238 (2011), but rather a heedless disregard of the obvious dangers in searching a person's property without a search warrant.  Mr. Johnson should therefore be granted a new trial without the unconstitutionally obtained evidence from his Google account.

**III.     The Resumption of Deliberations after Jury Polling Revealed a Lone Holdout Juror Led to Impermissible Juror Coercion.**

The government's arguments regarding the coercion of Juror No. 1 are flawed in several respects.  While the government devotes considerable energy to the continued polling of all jurors, Mr. Johnson is not seeking a new trial based on the Court's continued polling of jurors after Juror No. 1 revealed that he did not agree with the verdict.  Rather, Mr. Johnson argues the Court erred *after* jury polling was completed by sending the jury back to deliberate *after* the poll revealed that there was only one juror who did not agree with the announced verdicts.  Given the 11-to-1 split that was disclosed through polling, there was a substantial risk that Juror No. 1 would experience undue pressure and coercion to fall in line with the remaining jurors and return guilty verdicts the second time around.[4]  The appropriate remedy was a mistrial.

Contrary to the government's argument, the Court need not be the one coercing the jury, nor does coercion need to happen within the courtroom.  Potential coercion within the jury room, by fellow jurors, is a common and foreseeable issue under Rule 31(d).  *See, e.g., United States v. Ligon,* 781 F. Supp. 1, 5 (D.D.C. 1991) (upholding the decision to declare a mistrial rather than send a jury back to deliberate, due in part to "the risk that an unjust or coerced verdict will be rendered after protracted and exhausting deliberations by the jury")*; see also Williams v. United*

---

[4] The government's Opposition ignores the significance of the correlation between Juror No. 1 being the sole hold out and the coercion that Juror No. 1 reasonably could have endured.  At one point in the government's Opposition, when purportedly recounting the relevant facts, the government omits any discussion of the fact that Juror No. 1 was the only holdout, stating: "The defense asked to poll the jury.  Juror 1 said that this was not his verdict and then leaned forward in his seat, sobbing.  The Court finished polling the jury.  The defense then moved for a mistrial." Opp. at 9 (citations omitted).  This characterization of events ignores the 11-to-1 split and it fails to appreciate that defense counsel moved for a mistrial only after polling of all jurors revealed that Juror No. 1 was the only juror who did not agree.  It also ignores other relevant facts about Juror No. 1's behavior, including that his reaction was immediate, sharp and unequivocal (stating a strong "No!" not a calm "I do not agree," as implied by the government), and that his immediate sobbing was coupled with him covering his face with his hands.  It was unduly coercive to require Juror No. 1 to resume deliberations under these facts.

*States,* 419 F.2d 740, 746 & n. 8 (D.C. Cir. 1969) (noting that a "case in which the announcements of the jurors make it clear that one juror differs with the others, and the return to the jury room is for the purpose of obtaining a unanimity that plainly did not exist … is also apparently contemplated by Rule 31(d), but there may well be a problem of coerciveness under the particular facts of the case.").  As the Supreme Court acknowledged in *Brasfield*, the effect of publicly revealing the exact numerical division of a jury "cannot properly be known … but in general its tendency is coercive." *Brasfield v. United States,* 272 U.S. 448, 450 (1926).  To hold otherwise would be to encroach upon the fundamental role of the jury, "from whose deliberations every consideration other than that of the evidence and the law as expounded in a proper charge, should be excluded." *Id.* at 450.  Indeed, the drafters of Rule 31 acknowledged the possibility that "an individual juror … has been forced to join the majority during deliberations" and therefore would not "voice dissent from a collective response." *See* Fed. R. Crim. P. 31 (Adv. Comm. Notes, 1998 Amend.).  Put simply, the government's claim that a failed jury poll is not coercive "unless the court coerced the jurors," Opp. at 10, is unfounded both in law and fact.

The case law relied on by the government is nonbinding, misstated, irrelevant, and unpersuasive against the binding precedent Mr. Johnson has cited.  The government misapplies *Williams*. *See* Opp. at 10.  *Williams* involved the first juror "indicating … confusion with the jury verdict," *id.,* due to what turned out to be "merely a mistake in hearing, or understanding," *see Williams v. United States*, 419 F.2d 740*,* 746 (D.C. Cir. 1969); unlike Mr. Johnson's case, it did *not* involve a juror's genuine disagreement.  This is a crucial distinction under this Circuit's case law. *Id.* at 745-46 ("There is a distinction in law and in fact between actions of the trial judge to obtain clarity in place of confusion, and actions that produce a likelihood that a juror has been coerced."); *see also United States v. Mathis*, 535 F.2d 1303, 1307 (D.C. Cir. 1976) ("jury

polls are a matter where the need for clarity is at its zenith."); and *United States v. McCoy*, 429 F.2d 739, 741-42 (D.C. Cir. 1970) (holding a conviction "must be reversed" where the case is like one with "no assurance that the jury freely and fairly arrived at a unanimous verdict" rather than one where the juror was "merely confused."); *but see* 4/17 Tr. 1363-70 (discussing the immediate and unequivocal negative response by Juror No. 1).  Therefore, precedent in this Circuit supports reversal, as jury polling revealed disagreement and a mistrial was not declared.[5]

The facts here belie the government's effort to minimize the potential for coercion of Juror No. 1.  The deliberative process was clearly very stressful and burdensome for Juror No. 1, even before he was revealed as the holdout.  When expressing his disagreement with the verdicts announced by the foreperson, Juror No. 1's refusal was "immediate" and "unequivocal."  *See* 4/17 Tr. 1363-70.  And after his quick and forceful "no," based on the government's own account, Juror No. 1 "slumped forward in his seat and began sobbing and crying."  *Id*. at 1368.  After polling of the remaining jurors showed that Juror No. 1 was the only juror who disagreed with the verdict, the Court told the jury to return to the jury room and that, "in light of what we just heard," the jury was not excused from service.  *Id*. at 1364.  When the jury later returned to the courtroom, it was told to continue deliberating and "keep an open mind about the

---

[5] Also, the government's out-of-circuit authority is distinguishable.  *See* Opp. at 11.  In *Penniegraft*, the government's keystone case, the Fourth Circuit held against the defendant because it reviewed on appeal for a higher standard, because of the failure of defense counsel to object and because of its own discretion in light of a circuit split, all decisive facts that do not apply to Mr. Johnson's case. *United States v. Penniegraft*, 641 F.3d 566, 575, 579 (4th Cir. 2011) ("each case involving continued polling of a jury after one juror dissents must be viewed on its own merits (or demerits), considering all the facts and circumstances.").  *Fiorilla*, *Gambino*, *Amos* and *Carraway* were faced with the same standard and similar facts.  *See, e.g., United States v. Fiorilla*, 850 F.2d 172, 175-76 (3d Cir. 1988) (analyzing the "exceptional circumstance limitation to the reversal requirement" and collecting case law that do "not require *per se* reversal once a jury poll reveals an internal division of the jurors.").

case with a view to listening to others and expressing your own point of view to see whether you can reach a unanimous decision." *Id*. at 1380-81.

Given everything that occurred, Juror No. 1 was well aware he had been publicly exposed as the only person on the jury unwilling to agree with the verdict announced by the foreperson. The judge, prosecutors, fellow jurors, everyone present in the courtroom, and all other members of the public who were informed of the situation, knew that Juror No. 1 was the lone holdout preventing the case from concluding. These circumstances created a substantial risk that Juror No. 1 would be coerced into agreeing to a verdict that did not represent his position.

Contrary to the government's assertion, the authorities cited in Mr. Johnson's motion are not all cases "finding error in polling jurors in deadlock situations," Opp. at 12. *See, e.g., McCoy*, 429 F.2d at 741-42 (reversing a conviction because the juror's disagreement was not "attributable to any confusion[]" and the trial judge only met with the juror later, without any of the parties, to give the juror "an opportunity to state her question."). The cases cited in Mr. Johnson's Motion about juror coercion after the revelation of a deadlocked juror retain their importance, as they elucidate generally applicable principles on jury polling and coercion. *See, e.g., United States v. Ligon*, 781 F. Supp. 1, 7-8 (D.D.C. 1991) (collecting case law and analyzing the risks and purposes of jury polling).

The government's argument that defense counsel was required to object to the continued polling is meritless. Because the defense does not contend that the continued polling of the jurors alone warranted a mistrial, the lack of objection by Mr. Johnson's counsel does not show the absence of a coercive atmosphere. At the time Juror No. 1 expressed his disagreement with the verdict, neither party nor the Court knew how the remaining jurors would respond to the poll. And since Juror No. 1 responded in the negative, the parties immediately knew the verdict

was not unanimous, meaning *either* the government or the defense could have asked the court to discontinue polling immediately, and requested that the jurors resume deliberations without revealing the numerical division.  This option would have significantly reduced any coercion concern and presented a circumstance under which requiring jurors to continue deliberating would have been proper under Fed. R. Crim. P. 31.  An *equally* appropriate response for the parties would have been to wait until the entire jury was polled before determining the proper course of action and, if the dissenting vote was not alone, resuming deliberations because concerns about coercion would have been minimized.  The latter approach would have been proper and in accordance with Rule 31 *if* polling showed that enough additional jurors disagreed.  But, as here, when polling of the *entire* jury showed that there was *only one* dissenting juror, the risk of subsequent coercion in the jury room was too great and the Court should have ordered a mistrial.

The government's opposition concerning the jury coercion issue also relied on factual speculation that the Court should ignore.  For example, the government argues that it is unlikely that Juror No. 1's verdict was coerced because the jury acquitted on one additional count in the second verdict.  This argument is baseless.  Juror No. 1's objection to the verdicts was to all of the verdicts; not just a single count.  Moreover, there is no evidence to suggest that the additional not guilty verdict was the result of an atmosphere free of coercion.  In fact, given the totality of circumstances, common sense suggests the opposite.  A more plausible explanation for the changed verdict is that jurors compromised with Juror No. 1 by agreeing to acquit Mr. Johnson of one additional count in exchange for his guilty verdict on the remaining six counts.  Indeed, Juror No. 1's conduct during announcement of the second verdict was consistent with having experienced coercion.  When Juror No. 1 was polled about his second verdict, unlike all other

jurors, he answered with "his head down" and "was unable to look anyone in the eye or the Court in the eye." *See* 4/17 Tr. 1401.  When stating that he agreed with the verdict, Juror No. 1 was "very soft-spoken" and his tone was apparently "reluctant." *Id.*  The Court indicated its agreement about Juror No. 1's hesitancy and noted that a *second* juror also appeared hesitant, stating "I believed Juror 11 also reflected some small hesitation, perhaps less than Juror 1, in answering the verdict." *Id.* at 1402.

Questioning of Juror No. 1 about the second verdict, outside the presence of the other jurors, did not alleviate concerns regarding whether Juror No. 1 experienced coercion.  He never discussed whether he experienced any undue pressure or coercion.  And, once again, his conduct and demeanor during questioning suggested that he was coerced.  At the very beginning of his *voir dire*, Juror No. 1 had "his hand on his head" with his "head down." *Id.* at 1405.  When first asked if he agreed with the verdict, Juror No. 1 appeared "very reluctant." *Id.*  There was a "long pause" and, when eventually answering "yes", Juror No. 1 did so in a "very soft spoken" voice. *Id.* at 1405-1406.  When considering Juror No. 1's continued hesitancy and all prior events, there is a serious risk that the jury's second verdict was achieved by coercion.

The government also speculates about the impact some members of the gallery may have had on the jury's verdict.  The government goes on at length regarding the reaction to the first verdict by Mr. Johnson's "supporters" in the gallery.  *See* Opp. at 4, 8, 12.  First, there is no evidence that any member of the jury heard anyone from the gallery say, "I hope you can sleep at night." Opp. at 8.  There is no statement from any member of the jury indicating that any juror heard that comment.  And, although the government claims this statement was "yelled" by someone from the gallery, neither counsel for the government nor defense counsel, both of

whom were closer to the gallery than the jury was, heard the remark.[6]  Second, regardless of what part of the gallery's reaction was heard by the jury, there is no evidence that any juror was impacted by that reaction.  At no time, including during Juror No. 1's *voir dire* after the second verdict, did any member of the jury say that the reaction from members of the gallery influenced the poll.  And third, even if the jury was influenced by the gallery's reaction to the first verdict,[7] a mistrial was still warranted if there was a substantial risk that Juror No. 1's guilty verdicts were coerced.  *See generally United States v. Dorsey*, 865 F.2d 1275, 1277 (D.C. Cir. 1989) ("Any criminal defendant … being tried by a jury is entitled to the uncoerced verdict of that body.") (quoting *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988)).

In sum, the Court *could* have stopped the polling when Juror No. 1's dissenting vote was revealed.  *United States v. Dorsey*, 865 F.2d 1275, 1276-1278 (D.C. Cir. 1989) (affirming the lower court's decision when it "immediately stopped the polling" upon reveal of a dissenting juror).  Had the Court done so, it could have sent the jury back to deliberate further, as set forth in Rule 31(d).  *Id.* at 1276 (explaining the jury instructions that the Court gave when the polling was aborted and jury returned to the jury room); *see also* Mot. at 32 & n. 14.  However, once the Court did *not* do so, and the exact numerical division of the jury had been revealed, especially when that number was 11-to-1, it would have been "proper for the trial judge to declare a mistrial

---

[6] When counsel for the government reported the alleged comment to the Court, government counsel acknowledged that he "did not personally hear" the statement.  *See* 4/17 Tr. 1368.  Mr. Johnson's counsel also reported that he "did not hear" any such statement.  *Id.* at 1369-1370.

[7] While there is no evidence of any such influence, it is also not clear that any influence the gallery could have had on the jury would have been favorable to Mr. Johnson.  The government speculates that jurors may have been more reluctant to convict Mr. Johnson after hearing the gallery's response.  But it is also plausible that the gallery's response could have offended members of the jury and that angry jurors who felt attacked by Mr. Johnson's "supporters" could have been more incentivized to pressure fellow jurors to reach unanimous guilty verdicts.  The secrecy of jury deliberations means either theory is equally valid and the government's attempts at theorizing on this point are unnecessary.

on this ground alone[.]" *Mullin v. United States*, 356 F.2d 368, 370 (D.C. Cir. 1966).  In Mr.

Johnson's case, by continuing the polling, revealing a numerical division of 11-to-1, and *then* not

declaring a mistrial – all of which led to a substantial risk of coercion in the jury room – the

interests of justice require a new trial.

IV.    **The Jury's Improper Receipt of the Exhibit Lists Does Not Need to Have Caused Prejudice, But It Would Also Meet That Standard.**

The government's Opposition misstates both the facts and law surrounding the exhibit list

issue.  Regarding the facts, the government claims that "[s]ome, if not all, of the 'blacked out'

exhibit descriptions could be seen through the black marker" and that the Court assumed the

highlighted exhibits were transparent merely for "analytical purposes."  Opp. at 13-14.  The

government's statements minimize the ease and extent to which jurors could see through the

lightly redacted exhibit list.  The jury was able to "see through the redaction and read what's

there" for each and every exhibit, "without much difficulty" and without holding the exhibit lists

"up to a light or [doing] anything extra to see through."  4/16 Tr. 1345.  Significantly, the

government never refuted this description of the poorly redacted exhibit lists.

Regarding the law, the government misstates the applicable standard for determining

whether a new trial is warranted.  The government claims that "without showing prejudice, no

new trial is warranted" and centers its argument on the lack of a prejudicial effect.  *See* Opp. at

15-20.  However, as explained in the Motion, a new trial is required whenever extrinsic evidence

is improperly taken into the jury room if there exists "the slightest possibility that harm could

have resulted."  *Dallago v. United States*, 427 F.2d 546, 560 & n. 58 (D.C. Cir. 1969) (citing

*United States v. Adams*, 385 F.2d 548, 550-551 (2d Cir. 1967); *see also United States v. Vasquez*,

597 F.2d 192, 193 & n. 1 (9th Cir. 1979) (collecting case law throughout federal circuits).  The

correct standard is significantly lower than prejudice, requiring a new trial when there is a

"reasonable possibility that the extrinsic material could have affected the verdict." *Vasquez*, 597 F.2d at 193-194 & n. 1 (explaining the standard is lower because it is a "fundamental principle that the government has the burden of establishing guilt solely on the basis of evidence produced in the courtroom and under circumstances assuring the accused all the safeguards of a fair trial."); *see also Turner v. State of La.*, 379 U.S. 466, 472-473 (1965) ("evidence developed against a [criminal] defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel").

The cases cited by the government for an actual prejudice standard do not apply here. Grappling with the complexities of appellate procedure and unclear records, *Treadwell, Roy* and *Wiley* all reviewed on appeal for harmless or plain error. *See generally United States v. Treadwell*, 760 F.2d 327, 339-40 (D.C. Cir. 1985) (harmless error); *see also United States v. Wiley*, 846 F.2d 150, 157-58 (2d Cir. 1988) (same); *see also United States v. Roy*, 473 F.3d 1232, 1237-38 (D.C. Cir. 2007) ("[B]ecause Roy did not object to the indictment before it was submitted to the jury-notwithstanding the court's invitation to counsel to inspect it-we review the denial for plain error."). This case is not an appeal and, therefore, the correct standard is *not* prejudice, reversible error, or harmless error. The correct standard is the risk of harm.

Notwithstanding the government's complaints about Mr. Johnson's "one 1969 case to argue that the exhibit list prejudiced the jury[,]" Opp. at 18, the (multiple) opinions cited in the Motion are more persuasive than those the government cites. As explained above, prejudice is *not* the correct standard, and the cases underlying the government's point apply this incorrect standard. Unlike the government's citations, *Dallago* is a D.C. Circuit opinion with numerous factual parallels to the instant case. *See generally Dallago v. United States*, 427 F.2d 546, 553-

560 & n. 23, 58 (D.C. Cir. 1969); *see also* Mot. at 34-36 & n. 15-16.  The government itself

identifies a parallel to *Dallago*, as the parties here also "agreed to keep [certain] documents out

of evidence."  *See* Opp. at 18 (citing *Dallago*, 427 F.2d at 558).  The government's attack on

*Dallago* also loses credibility due to its misplaced reliance on *Guida*, an out-of-circuit,

unpersuasive opinion from 1986, and *Bentley*, which also applied a heightened standard on

appeal because of a failure to object.  *Id.* at 17-18; *see generally United States v. Guida*, 792 F.2d

1087 (11th Cir. 1986); *see also United States v. Bentley*, 489 F.3d 360, 364 (D.C. Cir. 2007)

("when a defendant has failed to timely object to an error at trial, we apply plain error review").

As the Court is aware, defense counsel contemporaneously objected and moved for a mistrial.

*See* 4/16 Tr. 1345-47.

       Even if prejudice was the standard (which it is not), the cases upon which the government

relies state that the presumption is against the government, explaining "[n]onconstitutional error

*is prejudicial* if one cannot reasonably conclude that the judgment was *not substantially swayed*

by the error."  *Treadwell*, 760 F.2d at 339 (emphasis added); *see also Wiley*, 846 F.2d at 157

("Concededly, extra-record information that comes to the attention of a juror is presumptively

prejudicial." (internal citations omitted)).  The government has failed to show, or even attempt to

show, that this presumption of prejudice has been overcome by evidence that the jury was *not*

substantially swayed by the error.  Accordingly, even by the government's misstated standard, it

has not presented evidence counseling against a new trial.

       The record in this case convincingly shows that a new trial is warranted under both the

correct risk of harm standard and the government's inapplicable prejudice standard.  The exhibit

lists at issue in this case were undoubtedly harmful and prejudicial.  First, the Motion does *not*

only "focus[] on two entries relating to the defendant's post-arrest statement as potentially

prejudicial." Opp. at 14.  Rather, the Motion explicitly identifies multiple highly prejudicial facts the jury was made aware about: (1) the fact that Mr. Johnson gave an interview that must have been recorded in some fashion to constitute an individual exhibit; (2) that said interview was on the government's list, but not the defense's exhibit list, suggesting that Mr. Johnson's statement was favorable to the government's case and unfavorable to Mr. Johnson's; (3) the fact that the government's list of evidence was significantly longer than the defense list (349 against 18); and, finally, (4) the fact that most of the government's evidence was introduced and admitted, while only a fraction of Mr. Johnson's evidence was (328 out of 349 against 4 out of 18 not blacked out).  *See* Mot. at 34-35 & n. 18.  All of this information, combined, created a serious risk of harm that the jury could have considered in convicting Mr. Johnson.

Second, the government's claims about the poorly redacted, unadmitted evidence on the exhibit lists being "cumulative" are untrue.  *See* Opp. at 16-17.  The fact Mr. Johnson gave a recorded "Interview" to law enforcement that was significantly detailed enough to warrant transcribing the interview was significantly new information.  And knowledge of the recorded and transcribed interview was not previously revealed to the jury by defense counsel's cross examination of Dero Tucker.  Eliciting from Mr. Tucker that "Mr. Johnson gave the passcode to the Lenovo computer the very day he was arrested" is not nearly the same as informing jurors about the existence of a recorded interview that Mr. Johnson gave to the police on the day of his arrest.  *Id.* at 17 (citing 4/10 Tr. 675).  Evidence about Mr. Johnson giving a password during his arrest does *not* mean speaking to law enforcement about anything else and does *not* carry the same significance as a post-arrest recorded and transcribed interview.  The fact Mr. Johnson gave a recorded "Interview" to law enforcement after his arrest, and the fact that the government was the only party that chose to include the recorded interview and a transcript of that interview as its

trial exhibits, were both completely new to the jury, not implicated by defense counsel's question, and highly prejudicial to Mr. Johnson's defense.

The exhibit lists, which disclosed Mr. Johnson's post-arrest interview and various other unintroduced or inadmissible pieces of evidence, deprived Mr. Johnson of the constitutional safeguards that are assured to all those criminally accused.  As the Supreme Court has explained, "evidence developed against a [criminal] defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel[.]"  *Turner v. State of La.*, 379 U.S. 466, 472-473 (1965); *see also United States v. Vasquez*, 597 F.2d 192, 193-194 & n. 1 (9th Cir. 1979) ("fundamental principle that the government has the burden of establishing guilt solely on the basis of evidence produced in the courtroom and under circumstances assuring the accused all the safeguards of a fair trial.").  Criminal defendants have a right to counsel, confrontation and due process, all served by the procedures for introduction and admissibility of evidence.  This deprivation of Mr. Johnson's constitutional rights was harmful and prejudicial to the defense.

The closeness of the case contributed to the severe harm and prejudice that Mr. Johnson experienced.  As the Motion explained, the jury deliberated for three days and ended up acquitting Mr. Johnson on ten out of the sixteen counts.  *See* Mot. at 35-36; *see also Osborne v. United States*, 351 F.2d 111, 118 (8th Cir. 1965) (jury's deliberation for two full working days, requesting an additional exhibit and rereading of instructions, all "lends credence to the view that the case was a close and a difficult one … long deliberation by the jury and its conscientious effort reflected by its notes … makes it likely that the exhibit was examined."); *Dallago v. United States*, 427 F.2d 546, 559 (D.C. Cir. 1969) ("one would expect that if the evidence of guilt was overwhelming the jury would have succumbed much sooner.").  Mr. Johnson was

prejudiced by the disclosure of inadmissible evidence because it is more likely that the improper information could have impacted the jury's verdict on close issues.  The jury could have concluded that Mr. Johnson's interview was on the government's exhibit list because it included facts that proved Mr. Johnson's knowledge and intent with regard to the charged offenses.

Under either a risk of harm standard or the incorrect prejudice standard, Mr. Johnson has shown that the jury's exposure to harmful and unadmitted evidence warrants a new trial.  Both the risk of harm and prejudice are obvious from the novel information introduced by the post-arrest statement and from the other parts of the exhibit lists, the harmfulness of the information, the closeness of the case, and the importance of due process safeguards of a criminal trial.

The government's arguments concerning the effectiveness of the court's curative instruction are also unpersuasive.  First, the government's arguments about the curative instruction are based on the false premise that the lightly redacted exhibit lists caused only "minimal prejudice."[8]  As discussed above, the true harm caused by exposing jurors to the lightly redacted exhibit lists was likely substantial.  Second, no curative instruction, including the one given by the Court, could possibly erase from the jury's memory information it learned about unadmitted exhibits through the lightly redacted exhibit lists.  *See generally Gray v. Maryland,* 523 U.S. 185, 190 (1998) ("[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.") (citing *Bruton v. United States*, 391 U.S. 123, 135 (1968)).  Therefore, there was a substantial risk that jurors

---

[8] The government states that "[t]his type of curative instruction can cure any minimal prejudice." Opp. at 19.

improperly considered the unadmitted exhibits during their deliberations even though the court instructed them to disregard that evidence, justifying a new trial.

**V.      Telegram and Google Photos Evidence Should Have Been Excluded Because There Was Insufficient Evidence That Mr. Johnson Committed Another Bad Act.**

The government argues that the Telegram and Google Photos evidence was probative of Mr. Johnson's "intent to possess child pornography and his knowledge that he was doing so." Opp. at 23.  However, in doing so, the government completely ignores the first prong of the test for admissibility under Rule 404(b):  the evidence must be *relevant* to an issue other than character.  *United States v. Mitchell*, 49 F.3d 769, 774-775 (D.C. Cir. 1995).

"In the Rule 404(b) context, similar act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor."  *Huddleston v. United States*, 485 U.S. 681, 689 (1988); *see also United States v. Bowie*, 232 F.3d 923, 930 (D.C. Cir. 2000).  "Evidence of similar acts must also be sufficient to support a jury finding that the defendant committed the other crime or act."  *United States v. Long*, 328 F.3d 655, 660 (D.C. Cir. 2003) (citing *Huddleston*, 485 U.S. at 689).  To make this determination, the court must examine all the evidence and decide whether the jury could reasonably find that the defendant committed the other act by a preponderance of the evidence.  *See Huddleston*, 485 U.S. at 689-90.  Often, this means the court allows the government to introduce evidence concerning another act, and then, after further trial proceedings, assesses whether the prosecution met its burden to demonstrate that "the act occurred and that the defendant was the actor."  *Id.*  If the government has not met that burden, the court must instruct the jury to disregard the evidence.  *Id.*

The government's opposition greatly overstates the evidence of Mr. Johnson's actual conduct with respect to Telegram.  The government argues that Mr. Johnson "*accessed* several Telegram groups advertising child pornography" and "the *defendant had downloaded* three

images containing child pornography from Telegram."  Opp. at 24 (emphases added).  However, this categorization of intentional, affirmative acts by Mr. Johnson is inconsistent both with the evidence at trial and with the government's proffer of the evidence in its pretrial 404(b) briefing. *See* Opp. at 21 (referencing evidence that Mr. Johnson's "*cellphone* had downloaded three images containing child pornography" and that he was a "*member* of Telegram groups advertising child pornography") (emphases added).

 The government's opposition wholly fails to address the insufficiency of the evidence that Mr. Johnson committed any relevant act with respect to Telegram or Google photos.  *See* Mot. at 38-39, 41.  The government provided no evidence that Mr. Johnson was aware that he had been added to the Telegram or Google Photos groups advertising child pornography; there was no evidence of him sending, reading, viewing, or reacting to any of the messages at issue or even knowing about the messages.  *Id*. at 38, 41.  Nor was there sufficient evidence upon which the jury could conclude that Mr. Johnson knowingly and intentionally downloaded the three images recovered from his phone.  At best, the expert testimonies of Mr. Tucker and Ms. Bush stood in equipoise on this point, *see id.*, meaning that the government had not met its burden to show that Mr. Johnson had committed a bad act.

The government argues that "'passive presence' is often the point when seeking out and viewing child pornography."  Opp. at 25.  This misconstrues Mr. Johnson's argument.  Passive presence is not probative if a person is unwittingly added to a group and never interacts with it.  In this case, the evidence showed that Mr. Johnson was unknowingly *admitted* to the groups.  Without evidence that Mr. Johnson either (1) chose to join those Telegram groups or Google Photos albums or (2) realized that he had been added to them and chose to remain, there is simply no basis for the jury to "reasonably conclude that the [bad] act occurred and that [Mr.

Johnson] was the actor." *Huddleston*, 485 U.S. at 689. Therefore, the Court erred when it did not exclude or instruct the jury to disregard this evidence.

**VI.     Unfair Prejudice of Dropbox Evidence Was Not Mitigated.**

The government concedes that Mr. Johnson never downloaded child pornography from the Dropbox folder, *see* Opp. at 24, and it does not contest Mr. Johnson's point that any probative value of the Dropbox evidence was cumulative of other government evidence offered to show Mr. Johnson's knowledge, intent, or lack of mistake, *see* Mot. at 38.

The government also ignores Mr. Johnson's argument that the repeated use of the phrase "black teens and underage thots" presented a risk of unfair prejudice that outweighed the probative value of this cumulative evidence. Significantly, unlike the vast majority of the cases cited by the government, it cannot point to any steps taken by either it or the Court to mitigate this risk of unfair prejudice. *See, e.g., Hardrick*, 766 F.3d 1051, 1056 (9th Cir. 2014). No such limits were placed on the government's presentation here. Government witnesses and counsel repeated the inflammatory name of the Dropbox folder "black teens and underage thots" over and over. The unqualified and unconditional admission of this evidence was error.

**VII.    The Defense Did Not "Open the Door" To Irrelevant and Prejudicial Testimony About Tor.**

At trial, it was uncontested that Mr. Johnson only accessed child pornography through legitimate websites on the ordinary internet with which jurors would all be familiar, such as Mega and Dropbox. The defense stressed, in both its opening and cross-examination of Special Agent Cavillo, that the government had no evidence that Mr. Johnson had visited websites on the "dark web" that specifically cater to people looking for child pornography. *See* 4/9 Tr. 309, 466-467. Crucially, the defense was making arguments and eliciting evidence about the *websites* Mr. Johnson visited, not the *internet browser* he used to access those sites. Browsers do not contain

content; rather, they help users navigate to and find websites that contain content.  Tor can access the "dark web," but it also allows users to access the "clear internet" that regular people use every day.  4/10 Tr. 611.

Although defense counsel made a passing, ambiguous reference in his opening to the "main website" at issue in this case not being "from Tor", his cross-examination of SA Cavillo was eliciting information about *websites*, not *browsers*.   Defense counsel did not bring up Tor in any of his questions, nor was he asking about browsers Mr. Johnson used to access child pornography.  Rather, he was asking the witness to confirm that websites *exist* on the dark web that are exclusively designed for child pornography.  *See* Opp. at 27-28 (quoting 4/9 Tr. 467).  It was SA Cavillo who spontaneously mentioned Tor in a single response, and defense counsel immediately interrupted her to move the testimony away from that topic:

Mr. Jeffress:    You don't see any dark web investigations?

SA Cavillo:     In the users that I've seen, the majority of them are on chats or other ways of getting the links. On occasion, we see the Tor, as in The Onion Router, but ---

Mr. Jeffress:    You keep mentioning "chats." You didn't talk to Mr. Courtney about any chats that Mr. Johnson had with anybody, did you?

4/9 Tr. at 467.

Defense counsel's questioning did not elicit any testimony about what Tor was or what it was used for.  Nor did defense counsel follow up on SA Cavillo's response to establish that there was no evidence that Mr. Johnson had ever used Tor.  Thus, defense counsel did not "open the door" to Tor—if anything, he emphatically slammed it shut.

During the discussion of the defense's objections on this issue, the Court noted that the defense had not "really open[ed] the door" to evidence about Tor.  *See* 4/10 Tr. 570.  As the Court framed the issue, the thrust of the defense's cross-examination of SA Cavillo was that "it

is more likely that a mistake was made here or it's less likely that there is mens rea when the government only has evidence that Mr. Johnson was using traditional Internet sites to access CSAM … Leaving the impression, I think, that that is the only evidence in the case is that he uses only such sites." *Id.*

Even assuming the "opening the door" doctrine applies here, it was improper to allow the government to introduce evidence about Tor that did nothing to counter the "impression" that Mr. Johnson used only traditional Internet sites to access child pornography and instead introduced only unfair prejudice.  The D.C. Circuit and other courts of appeals have cautioned that curative admissibility "is a shield, not a sword":

> Although the government may prevent a defendant from using rules of evidence to select and enter pieces of evidence wholly out of context, **the government may not shore up a prosecution by pushing through the open door evidence not "necessary to remove any unfair prejudice"** created by defense counsel's tactics. In sum, the range of otherwise-inadmissible evidence that may be squeezed through an "open door" is limited.

*United States v. Brown*, 921 F.2d 1304, 1308-09 (D.C. Cir. 1990) (emphasis added); *see also*

*United States v. Baird*, 29 F.3d 647, 653-54 (D.C. Cir. 1994) (quoting *Brown*, 921 F.2d at 1307).

When the opposing party has introduced evidence on an issue, the trial court has the discretion to permit the other party to introduce otherwise inadmissible evidence on the same issue "when it is needed to rebut a false impression that may have resulted from the opposing party's evidence."

*United States v. Rea*, 958 F.2d 1206, 1225 (2d Cir. 1992) (citing *Brown*, 921 F.2d at 1307).[9]

Thus, as the Court formulated the issue, the only evidence that potentially should have been admitted based on the defense "opening the door" is evidence that Mr. Johnson *used* the

---

[9] The government cites *Lopesierra-Gutierrez*, 708 F.3d 193 (D.C. Cir. 2013), for the proposition that admission of the Tor evidence was proper because defense counsel opened the door. However, *Lopesierra-Gutierrez* addresses the admissibility of the recorded phone call in a single paragraph and contains no description or discussion of what in the defense's line of questioning "opened the door" to otherwise inadmissible evidence.  *Id.* at 206.

Tor browser or *used* websites on the "dark web."  But that is *not* what the government did—because such evidence does not exist.  Instead, the government introduced testimony that, although Tor was installed on Mr. Johnson's computer, the evidence *did not show any use of Tor whatsoever.*  4/10 Tr. 705.  The government then unfairly "squeezed through" character-smearing testimony from Mr. Tucker that Tor allows users to access the "dark web"—though the government well knew that Mr. Johnson *had not done so*.

The defense did not open the door to irrelevant and prejudicial Tor evidence.  And even if the Court concludes that the cross-examination of SA Cavillo left a misleading impression that the government was entitled to rebut, the evidence it elicited far exceeded that limited scope and was unfairly prejudicial to Mr. Johnson.

## CONCLUSION

For all the foregoing reasons, in the interests of justice, Mr. Johnson respectfully requests that the Court grant the Motion and grant him a new trial under Rule 33 of the Federal Rules of Criminal Procedure.

Respectfully Submitted,

*/s/ Jonathan Jeffress*
Jonathan Jeffress (D.D.C. No. 479074)
Courtney R. Forrest (D.D.C. No. 996740)
Tony Miles (D.D.C. No. 484450)
Washington, D.C. 20005
Phone: (202) 640-2850
Fax: (202) 280-1034
jjeffress@kaiserlaw.com
cforrest@kaiserlaw.com
tmiles@kaiserlaw.com

*Counsel for Stephen Johnson*