# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **v.** | **Case No. 1:22-cr-00176 (CJN)** |
| **STEPHEN JOHNSON** | |
| **Defendant.** | |

## STEPHEN JOHNSON'S MEMORANDUM IN AID OF SENTENCING

Jonathan Jeffress (D.D.C. No. 479074)
Courtney R. Forrest (D.D.C. No. 996740)
Tony Miles (D.D.C. No. 484450)
Washington, D.C. 20005
Phone: (202) 640-2850
Fax: (202) 280-1034
jjeffress@kaiserlaw.com
cforrest@kaiserlaw.com
tmiles@kaiserlaw.com

*Counsel for Stephen Johnson*

# TABLE OF CONTENTS

I.     PROCEDURAL HISTORY ........................................................................ 2

II.    PERSONAL AND PROFESSIONAL HISTORY ........................................... 5

  A.  Childhood, High School and College Years ..................................................... 5

  B.  Career and Volunteering ................................................................................. 8

  C.  Circumstances Surrounding the Offense ........................................................ 12

  D.  Dr. Felix's Psycho-Sexual Evaluation ............................................................. 14

III.  THE REQUESTED SENTENCE OF 60 MONTHS IS APPROPRIATE BASED ON
     THE FACTORS SET FORTH IN 18 U.S.C. § 3553(a) ................................ 16

  A.  Nature and Circumstances of the Offense, and History and Characteristics of the
     Defendant, § 3553(a)(1) ................................................................................. 16

  B.  Purposes of Sentencing, § 3553(a)(2) ............................................................ 19

     1.  Seriousness of the Offense ...................................................................... 20

     2.  Adequate Deterrence ............................................................................... 21

     3.  Protection of the Public ........................................................................... 22

     4.  Educational or Vocational Training, Medical Care, or Other Treatment ................. 25

  C.  Kinds of Sentences Available and the Guidelines Range, § 3553(a)(3), (4) .................. 26

     1.  Kinds of Sentences ................................................................................. 26

     2.  Sentencing Guidelines ............................................................................ 28

  D.  Pertinent Policy Statements and the Flawed Sentencing Guidelines in Child Pornography
     Cases, § 3553(a)(5) ....................................................................................... 38

     1.  The United States Sentencing Commission's Position ............................................ 38

     2.  The Department of Justice's Position ...................................................... 43

     3.  Federal Court Sentences ......................................................................... 44

     4.  Policy Based Variance is Warranted in Mr. Johnson's Case .................................... 46

  E.  Need to Avoid Unwarranted Sentencing Disparities, § 3553(a)(6) ................................ 48

     1.  District of Columbia Cases That are Most Similar to Mr. Johnson's Case ............. 49

     2.  District of Columbia Cases Involving More Serious Conduct Than Mr. Johnson's
        Case.......................................................................................................... 50

     3.  District of Columbia Cases Involving Substantially More Serious Conduct Than Mr.
        Johnson's Case ........................................................................................ 51

4.     Cases in Other Districts in Which the Conduct is Similar to, or More Serious Than, Mr. Johnson's Conduct ........................................................................................... 54

F.    Need to Provide Restitution, § 3553(a)(7) .......................................................... 56

**IV.**    **FINANCIAL ABILITY TO PAY A FINE** ..................................................... 59

**V.**    **CONCLUSION** ........................................................................................... 60

This is a tragic case.  Mr. Johnson is an impressive young person with significant promise.  He comes from a good family with strong values—one that has always strived to help others.  Mr. Johnson learned to do the same.  His conviction and impending sentence on charges such as these are heartbreaking not only for his loved ones, but for anyone with an objective view of this case.  While Mr. Johnson's strength of character and family support will in time help him overcome this experience, there is no question that his life and the lives of his loved ones will be forever changed by it.

If one accepts the jury's verdicts, the Court is presented with a young man who suffered from a pornography addiction that, during the worst parts of COVID, spiraled out of control to include the viewing of illegal images.  Importantly, once Mr. Johnson realized Google had detected his conduct back in October 2020, he ceased all involvement with CSAM.  This is the rare case where the defendant has already shown, even without the intervention of the judicial system, that viewing CSAM is not who he is or something beyond his control.  This is also the rare case where the Court can have 100% confidence from Mr. Johnson's post-2020 conduct that he will not go down this path again.

While sufficiently serious to warrant a term of imprisonment, the conduct here did not involve personal interactions (or even any discussion of personal interactions) with children.  It did not involve the distribution of child pornography to any other person.  Notwithstanding the formal legal characterization, the conduct was simple possession only.  And driven in part by Mr. Johnson's decision to exercise his right to a trial, the government has performed an exhaustive forensic investigation here.  If there was evidence demonstrating anything beyond Mr. Johnson's simple possession of CSAM, law enforcement would surely have found it.

When assessing the § 3553(a) factors in this case—and especially when compared against sentences imposed in similar cases in this Court, *or even against sentences for the actual distribution of CSAM to others*—the sentence here should be the mandatory minimum, sixty months. As the Court is aware, the number one predictor of recidivism in these cases is the strength of the defendant's familial and community support, and that support could not be stronger here. A sixty-month sentence is also consistent with—if not significantly longer than—the sentences imposed in cases with similar (or even worse) facts in this Court. Indeed, Mr. Johnson is facing a sixty-month mandatory minimum only because of his decision to exercise his constitutional right to go to trial. Had he not done so, there would be no mandatory minimum penalty and the appropriate sentence under the § 3553(a) factors would be significantly lower than 60 months.[1]

## I.    PROCEDURAL HISTORY

Mr. Johnson was arrested and his apartment searched on October 7, 2021. *See* ECF 5. During the search, law enforcement seized and forensically examined all five of Mr. Johnson's electronic devices, including three phones and two computers. Mr. Johnson gave law enforcement the passwords and his fingerprint biometrics to unlock his devices. Mr. Johnson made his initial appearance and was released on personal recognizance under the supervision of the Pretrial Services Agency and the third-party custody of his mother, Patricia R. Johnson. *See* ECF 211 ("PSR") at ¶ 8.

Mr. Johnson maintained a spotless record throughout years of pretrial release. For two and a half years under high-intensity supervision, Mr. Johnson remained at home with limited

---

[1] As the record reflects, the government made a possession plea offer to Mr. Johnson before trial that would have eliminated any mandatory minimum penalty and would have resulted in an agreed upon guideline range of 78-97 months. *See* ECF 106.

exceptions, with GPS and Internet monitoring, as well as constant supervision by his custodian. He was prohibited from using any Internet-enabled devices (a particularly severe restriction given his career and business in digital marketing) and reported weekly to his Pretrial Services officer. *See generally* ECF 7, 16, 25, 33, 39. Pretrial services submitted regular compliance reports during Mr. Johnson's supervision, with *all twenty-one* reports throughout the two and a half years of supervision noting that he was fully "compliant with the conditions of release imposed by the Court." ECF 144; *see also* ECF 11, 19, 24, 28, 33, 35, 40, 46, 49, 53, 56, 59, 62, 65, 66, 68, 71, 75, 105, 108. Mr. Johnson fully complied with informing his probation officer of his weekly permitted outings, charging his GPS monitoring device daily, refraining from accessing Internet-enabled devices, and abiding by all other conditions of his release. *See, e.g.,* ECF 144 at 2; *see also* ECF 144-1 at 1 (marking "YES" for compliance in the contact reports for *all* telephone check-ins in 2024); *see also* ECF 108-1 at 1-4 (marking "YES" for compliance in the contact reports for *all* telephonic and in-person check-ins from October 12, 2021 to January 23, 2024); PSR at ¶¶ 8-30 (listing Mr. Johnson's key pretrial release conditions and concluding he "was compliant with his pretrial release conditions while under supervision."). Put simply, Mr. Johnson was a model supervisee.

After several continuances, Mr. Johnson's trial began on April 8, 2024. After trial, Mr. Johnson was found guilty of five counts of transportation of child pornography and one count of possession of child pornography and acquitted of the remaining ten counts of transportation of child pornography. *Id*; *see also* ECF 166. Mr. Johnson was ordered to self-surrender two days later, even though, as the Court noted, "if [the Court] had the discretion to do so, [it] would [have] allow[ed] Mr. Johnson to continue on his conditions of pretrial release pending sentencing

… [b]ecause I do think he's conducted himself appropriately while on pretrial release, during the trial, et cetera." *Id.* at 1421.

Pursuant to the Court's order, Mr. Johnson self-surrendered on April 19, 2024.  He has been at the Correctional Treatment Facility since then, in isolation for his own safety given the nature of his charges.

After self-surrendering, Mr. Johnson experienced significant financial difficulties as a result of his bank freezing his accounts.  His accounts were frozen due to concerns about Mr. Johnson's activities regarding the liquidation of assets.  Mr. Johnson liquidated some assets— and attempted to liquidate others—the day before he self-surrendered for the purpose of facilitating ongoing payment of bills and other debt during his incarceration and to provide his wife Adanna Johnson with access to funds for her living expenses.[2]  On May 15, 2024, the government filed an Application for Prejudgment Writ of Garnishment ("Application").  *See* ECF 180.  In the Application, which lists Mr. Johnson's bank as the "Garnishee," the government sought to garnish funds in Mr. Johnson's bank accounts for purposes of securing those assets for collection on any future court order regarding restitution or forfeiture in connection with the instant case.  *Id.*[3]  Mr. Johnson's bank responded to the government's Application by continuing to freeze *all* funds in Mr. Johnson's accounts indefinitely.

Because of the debilitating impact the freezing of all funds in the accounts had on Mr. and Mrs. Johnson's financial affairs, and because Mr. Johnson has always been agreeable to

---

[2] Mr. Johnson's conduct under the circumstances was understandable and the government has conceded that "there could be legitimate reasons for the defendant to prepare his finances before self-surrendering."  *See* ECF 174-3 at 3.
[3] Two days before filing the Application, upon consideration of a separate motion filed by the government, this Court entered a restraining order that significantly restricted the way in which Mr. Johnson, his family members, or other agents could use his assets.  *See* ECF 173.

making his funds available for payment of any court-ordered financial penalty, Mr. Johnson worked out an agreement with the government concerning his assets. First, the parties sought—and eventually received—an amended restraining order from this Court that restricted Mr. Johnson's use of his account by prohibiting him, his family members, and any agents from reducing the value of money or property in the accounts to an amount below $250,000. *See* ECF 177. Second, on August 22, 2024, because the amended restraining order did not cause the bank to unfreeze Mr. Johnson's assets, this Court entered an Interim Disposition Order as requested by the government in a consent motion. *See* ECF 189. The Interim Disposition Order requires Mr. Johnson's bank to "remove any additional hold on" funds exceeding $250,000, and to "not further encumber any remaining accounts pursuant to the Writ of Garnishment." *Id*.

## II.  PERSONAL AND PROFESSIONAL HISTORY

### A.  Childhood, High School and College Years

Mr. Johnson was born on September 2, 1987, in Washington, D.C., to Patricia Rattley Johnson and Hugh Anderson Johnson. His father worked as a USAID employee, an aide to Congressman Mickey Leland, and an Assistant U.S. Attorney. He died in a plane crash when Mr. Johnson was just two years old, while on a humanitarian mission to Ethiopia. *See, e.g.,* Ex. A at 1 (Letter from Pastor Reginald Mazyck). Mr. Johnson grew up in what was then a rough area of D.C. in Northeast, across the street from a park named after his father. He was raised by his mother, a lawyer and professor at Wesleyan University, and his extended family, which included his maternal grandparents, aunts, uncles, and cousins. *See generally* PSR at ¶¶ 89-90. People in his broader community, including his uncle and his pastor, served as strong male role models, and his mother was a wonderful and loving parent. *Id.* at ¶ 90; *see also* Ex. A (Letter from Pastor Reginald Mazyck); Ex. B (Letter from Adrian Washington). At the same time,

however, a son misses not having his dad, and the young Mr. Johnson was no different; he felt his father's absence in his life.

The family moved to Maryland, and Mr. Johnson quickly began to fill his father's shoes. He was one of his sister's biggest supporters and became a "leader within every community that surrounds him." *See* Ex. C (Letter from Dara Johnson).  Key among these were his neighborhood and his church, with both becoming places that supported and nurtured him, allowing him to flourish.  *See* Ex. D (Letter from Patricia Johnson).  Mr. Johnson's neighborhood snow shoveling business demonstrated his "leadership, compassion and entrepreneurial spirit" at a young age, and a missions trip to Jamaica at age 13 ignited "his passion for travel and service to others."  *Id.*  Multiple pastors or former pastors, including his mother and the Rev. Dr. Denise King-Miller, highlight the role of "Christian ethics and values … expressed throughout his life."  Ex. E (Letter from Rev. Dr. Denise King-Miller); *see also* Ex. D ("I raised Stephen and his sister with the help of my family, and my faith in God.") (Letter from Patricia Johnson); *see also* Ex. F ("He sought to do justly, love mercy, and walk humbly with his God as noted in the Bible (Micah 6:8).") (Letter from Donna Mazyck).  His family friend and pastor wrote how he "embraced these Godly principles of integrity and forthrightness and used them to mold [his] character."  Ex. A (Letter from Pastor Reginald Mazyck).  In the wake of his trial and incarceration, his wife writes how Mr. Johnson has only "grown closer to God."  Ex. G (Letter from Adanna Johnson).  Every Christmas, for instance, Mr. Johnson would get up early and travel into town to distribute winter hats, gloves and coffee to those living on the streets of D.C.  *See* Ex. E (Letter from Rev. Dr. Denise King-Miller).  He quickly grew to organize this event, and inspired others in his neighborhood to join him.  *Id.*; *see also* Ex. H (Letter from Patric Holly).  As summarized by his aunt, one of several people who provided character

testimony during Mr. Johnson's trial, his "father's death and legacy of caring for others profoundly impacted Stephen," as he and his family spent "hundreds of hours over the years volunteering" and Stephen remained a "rock and steady support for his mother" and community. *See* Ex. I (Letter from Donna Rattley).  In short, Mr. Johnson has been respectful, compassionate and altruistic from a young age, guided by his father's legacy, his community, his extended family, and his faith.

Mr. Johnson attended St. Albans High School, one of the most prestigious high schools in D.C.  As one of few black students there—and the only student from Mr. Johnson's neighborhood—Mr. Johnson felt out of place.  He struggled emotionally with the "balancing act" of growing up in a primarily black neighborhood while attending a predominantly white private high school.  PSR at ¶ 91.  His mother describes how his experiences at the time "helped to form a well-rounded young man, who appreciated people from all walks of life."  Ex. D (Letter from Patricia Johnson).

After graduating from St. Albans, Mr. Johnson went to study at Florida A&M University. *See* PSR at ¶ 107.  He found this change inspiring, as he was the first in his group of friends to go to college; his childhood friend from the neighborhood, Patric Holly, credits him with his decision attend university in Florida and begin his own career.  *See* Ex. H (Letter from Patric Holly).  Like he did for many others, Mr. Johnson welcomed Mr. Holly to his home in Florida for months, paying for his food and living expenses, so that he could get up on his feet.  *Id.*; *see also* Ex. J (Letter from Sarah Vaughn).  Unfortunately, Mr. Johnson's time in Florida was cut short when his family encountered financial difficulties and he suffered a foot injury.  *See* Ex. D (Letter from Patricia Johnson).  Never one to let challenges get in the way, after returning home,

Mr. Johnson transferred to the University of the District of Columbia and worked for a D.C. City Councilman to fund his own education.  *Id.*; *see also* Ex. K (Letter from Kimberly Dailey).

Mr. Johnson's time at UDC was transformative in multiple ways.  Not only did he earn his college diploma, but he also met his future wife, Adanna Quashie (now Adanna Johnson).  *See* Ex. D (Letter from Patricia Johnson); *see also* Ex. G (Letter from Adanna Johnson).  He did so as the result of another impactful event, the study abroad program.  Even though UDC did not have an active study abroad program, Mr. Johnson took initiative with the business school and became the first UDC student to study abroad in Rome, Italy.  *See* Ex. D (Letter from Patricia Johnson).  For his initiative, he was recognized by the Dean of the business school, and the presentation he and his future wife gave to the university inspired other UDC students to study abroad.  *Id.*; *see also* Ex. G (Letter from Adanna Johnson).  Again, he played host to his friends, letting them stay for free in his apartment however long they wanted, and going out of his way to stay "thoughtful, intentional, and caring."  *See* Ex. J (Letter from Sarah Vaughn).  Mr. Johnson graduated from UDC in 2012 with a bachelor's degree in business administration.  *See* PSR at ¶ 107; *see also* Ex. R (Picture of Diploma from UDC).  He has gone on to utilize his leadership, compassion, courage, and global outlook in several ways as he has achieved greater success.

### B.    Career and Volunteering

Throughout his career, Mr. Johnson's entrepreneurial activities always had a "dual focus": build a profitable business, while simultaneously benefiting the community, be that local or global.  *See* Ex. D (Letter from Patricia Johnson).  After working for various marketing or sales companies for a few years after college, he formed his own business in 2018.  *See generally* PSR at ¶¶ 111-115.  First, he founded a travel business, aimed at enabling African American millennials, like himself, to live or travel abroad.  *See* Ex. D (Letter from Patricia Johnson).

Besides ensuring his customers' health and happiness, he was cognizant of the broader social impact of his business, ensuring "no harm came to anyone even tangentially affected by his business." *See* Ex. J (Letter from Sarah Vaughn).  His ambitions to help others only grew, building multiple successful businesses and helping across the world.  *See* Ex. D (Letter from Patricia Johnson); *see also* Ex. B (Letter from Adrian Washington).

Mr. Johnson's interest in business began to grow, and so did his interest in the "good he could accomplish for people who lacked basic needs in life."  *See* Ex. F (Letter from Donna Mazyck).  Leaning on his own ability to rebound from mistakes, he was quick to use the lessons from his business trials and tribulations to teach members of his neighborhood, including those who had been in trouble with the law or otherwise facing hardship, how to apply for a job or even start their own businesses.  *See* Ex. H (Letter from Patric Holly); *see also* Ex. J (Letter from Sarah Vaughn).

Following the success of his travel company, Mr. Johnson founded his digital marketing company, SRJ Digital, in 2018.  *See* PSR at ¶ 111.  The company was highly successful, providing employment to five individuals and grossing roughly 2 million dollars in 2022.  *Id.*

Even as his wealth grew, Mr. Johnson never forgot to give back.  He has demonstrated a passion for altruism, both local and global, direct and indirect.  Within his neighborhood, he continued to bring people together, shoveling snow, raking leaves, volunteering to help low-income individuals, giving employment advice for those in need and even holding a free stock market seminar for women over the age of 60.  *See* Ex. D (Letter from Patricia Johnson); *see also* Ex. H (Letter from Patric Holly).  Within his family and friends, he continued sharing the lessons he learned in building his business, lending a listening ear and supportive shoulder whenever needed, and encouraging others to succeed and give back.  *See, e.g.,* Ex. J (Letter from

Sarah Vaughn); *see also* Ex. C (Letter from Dara Johnson); *see also* Ex. E (Rev. Dr. Denise

King-Miller); *see also* Ex. H (Letter from Patric Holly).  Members of both his extended family

write about the "calming, soft-spoken cousin Stephen" they could always rely on, through the

"unconditional and consistent encouragement from him."  *See* Ex. L (Letter from Sam

Washington); *see also* Ex. M (Letter from Jessica Washington) ("He's a major champion of my

career, and his influence has been a driving force in my life.").

But Mr. Johnson's altruism was not limited to his own community, or even his own city.

He would attend his aunt's classes at Pepperdine University in California to talk to

undergraduate students about his mission work and global travels, inspiring them to step out of

their comfort zones to help others.  *See* Ex. K (Letter from Kimberly Dailey).  He went with a

local church pastor to one of the poorest slums in Guatemala to provide clothes and materials to

children in need.  *See* Ex. D (Letter from Patricia Johnson).  He also accompanied his mother on

a volunteer trip to Uganda, where he conducted free all-day workshops for Ugandan

entrepreneurs, discussed marketing and outreach strategies with the founder of the Widow

Orphan Support Organization to expand its impact, and donated funds to sponsor members of the

organization.  *Id*.  Pictures of those volunteer trips are attached, showing the closeness he had to

those he helped, regardless of the distance from his home.  *See* Ex. N (Pictures of Volunteering

in Uganda and Guatemala).  Even when he was not there in person, he would continue his

support, donating regularly and in large sums, and encouraging others to do the same.  *See, e.g.,*

Ex. E (Letter from Rev. Dr. Denise King-Miller); *see also* Ex. F (Letter from Donna Mazyck);

Ex. I (Letter from Donna Rattley); Ex. G (Letter from Adanna Johnson); Ex. D (Letter from

Patricia Johnson).  Notably, his generosity has never faltered through his own hardships, with his

monthly donations to charity and church continuing even after his pre-trial home detention and

his post-trial incarceration.  *See, e.g.,* Ex. O (Water Project Receipts); *see also* Ex. P (Union

Church and Destiny Harvest Giving Statements).  The founder of the organization took to social

media to thank Mr. Johnson:



Mr. Johnson has always been a bedrock of his family, friends and community, a "mentor

and role model" at "the beating heart of" his family bond, and an "incredible son, husband,

nephew, and friend."  *See* Ex. M (Letter from Jessica Washington).  He has worked to help

others both here in D.C. and in remote corners of the world.  Even while on pre-trial release in

this case, he continued to support those he could in his church and in his family.  *See* Ex. F

(Letter from Donna Mazyck); *see also* Ex. I (Donna Rattley); *see also* Ex. L (Letter from Sam

Washington) ("In the years since his trial began, Stephen has remained a light to myself and all those around him … Despite all he is going through, his primary commitment is always to ensuring that those closest to him are okay, and his stoic strength has been a rock for all of us."). Those closest to him have watched Mr. Johnson "engage in very difficult conversations, that most people would avoid, with grace and courage" and remain steadfast in their conviction "beyond a shadow of a doubt that Stephen can make a tremendously positive impact on our society."  Ex. Q (Letter from Andrew Dailey).  In the footsteps of his late father, Mr. Johnson remains "committed to caring for others less fortunate than himself and solving global problems."  Ex. E (Letter from Rev. Dr. Denise King-Miller).  Church, faith, altruism, humility and a strong moral compass all were and continue to be integral for Mr. Johnson.  Even after all his trials and tribulations, the Court can see his community wrote in droves to express their support, as well as their "sincerest hope that he will be allowed to join our family on the outside soon."  Ex. M (Letter from Jessica Washington).

## C.     Circumstances Surrounding the Offense

Accepting the jury's verdicts, Mr. Johnson's illegal conduct was an outgrowth of his adult pornography addiction, which grew exponentially worse during COVID.  During this time, an isolated Mr. Johnson began spending too much time on the internet and too much time watching pornography.  Excessive pornography use inevitably leads to interest in different kinds of pornography, and what appears to have happened here is that Mr. Johnson at the time felt somewhat attracted to—or at least insufficiently disgusted by or afraid of—images featuring young girls.  That is the extent of his crime, and he will pay a severe price for the remainder of his life for it, regardless of the sentence imposed.

Compared to other possession cases, Mr. Johnson's offense conduct features a number of mitigating factors. First, Mr. Johnson's foray into this material was relatively brief. Based on the government's thorough investigation, it appears Mr. Johnson interacted with this material from only around April 2020 to October 2020, when he received the notice from Google suspending his account. While the government attempted to prolong the offense conduct to the jury beyond October 2020 by using Rule 404(b) evidence excavated from Mr. Johnson's phone involving Telegram and Google Photos, that evidence was not convincing in general, and especially not for the specific purpose of showing that Mr. Johnson's offense conduct extended beyond October 2020 when he received the email from Google. The facts are that Mr. Johnson received the Google alert; conducted the panicked Google searches for psychological help the Court has already seen from the trial evidence; immediately told his mother, Patricia Johnson, what had happened; and did not involve himself with illegal pornography again.[4] That is why law enforcement's search of the devices seized from in October 2021 did not reveal the ongoing possession of any illegal images.

Second, and relatedly, the Court has already seen that Mr. Johnson has both the desire and willpower to stop this conduct, as he has done *for over four years now.* Fortunately, even under the government's allegations and evidence, Mr. Johnson's involvement with CSAM was never so deep or prolonged that it became pervasive. Particularly when compared to other cases prosecuted in this Court, the conduct here was short-lived, and the number of images low (especially when compared to the amount of adult pornography). The material underlying the

---

[4] As the Probation Office notes, he searched, among others, for the terms "psychologist to help break bad habits," "sex addiction therapist in dc" and "is talking to a psychologist protected." PSR at ¶ 54. As explained during closing arguments, his search pattern was indicative of someone "looking for help and what could happen next." 4/12 Tr. at 1232-33.

offense conduct did not involve violent images or images of infants or toddlers, and did not involve images of boys, a critical factor in how forensic psychologists such as Dr. Felix classify offenders and determine the likelihood of recidivism.  *See* Report of Dr. Tashna Felix ("Report"), ECF 213 (under seal) at 17-18 (receiving a 0 in Items 3-7 of the CPORT assessment tool "designed to predict the sexual recidivism of men convicted of child pornography offenses," including scores of 0 on "Indication of pedophilic interests," "More boy than girl content in child pornography" and "More boy than girl content in other child depictions").

### D.    Dr. Felix's Psycho-Sexual Evaluation

At the suggestion of the Probation Officer, the defense retained Dr. Tashna Felix to conduct a forensic evaluation of Mr. Johnson.  As her report reflects, Dr. Felix's work was extensive and involved a battery of tests commonly used by forensic psychologists to assess offenders and predict risk and recidivism, as well as a forensic interview.  *See* Report at 2-3.  The tests Dr. Felix administered include: Mental Status Examination (MSE); Personality Assessment Inventory (PAI); Beck Anxiety Inventory (BAI); Beck Depression Inventory (BDI); Substance Abuse Subtle Screening Inventory (SASSI); Sexual History Questionnaire; Internet Sex Screening Test (ISST); Sexual Adjustment Inventory (SAI); Levinson Victim Empathy Scale (LVES); Bumby Cognitive Distortions Scale: The MOLEST Scale; Child Pornography Offender Risk Tool: Version 2 (CPORT); and the STATIC-99R.

Dr. Felix's report first discusses the severe psychological toll this matter has taken on Mr. Johnson over the past three years, a time during which Mr. Johnson has been severely depressed and even on the brink of suicide.  His depression has increased since his placement at CTF, where he has been held in isolation due to the nature of his charges.  *See* Report at 4 (noting that Mr. Johnson "does report current suicidal ideation, which started in October 2021, following his

arrest and has persisted to the present time"). This is unsurprising: it is difficult to imagine more psychologically stressful circumstances than those under which Mr. Johnson has lived for the last several years.

On any future risk posed by Mr. Johnson, Dr. Felix's report is clear: the risk is low. *See, e.g.*, Report at 19 ("Based on the structured clinical assessment, Mr. Johnson presents a low risk of sexual recidivism. He has no history of prior sexual offenses, maintains a stable and supportive relationship, and has shown compliance with treatment and legal expectations."). Indeed, on all of the critical scales and measures for validating risk assessment, Mr. Johnson's future risk scored as low to non-existent. *See id.* at 13-15 ("In summary, results from the sexual risk measures outlined above, Mr. Johnson's risk assessment indicates a low risk for sexual addiction and deviant behaviors[.]"). Among the many tests he took, he also demonstrated an "above average capacity for victims." *Id.* at 15. Notably, his Static-99R score, a widely used metric for sexual recidivism including by the Department of Justice, Mr. Johnson's score totaled "0," placing him in the "Below Average Risk" range. *Id.* at 16.[5] Looking at all the tests and all the protective factors presented by Mr. Johnson, Dr. Felix's assessment of low risk was supported by Mr. Johnson's "amenability to treatment and his willingness to learn healthier lifestyle skills and not fall back into maladaptive ways of coping" and the fact Mr. Johnson simply "does not meet the criteria for a sexual disorder at this time." *Id.* at 16-17. Another common metric, Mr. Johnson's CPORT score, was also a grand total of only two, with one of those points due to the instant offense and another due to his DUI conviction over twenty years ago. *Id.* at 17-18. By any measure, be that "sexual assessments" or "structure clinical assessment," Mr. Johnson presents "a low risk of sexual recidivism." *Id.* at 19.

---

[5] The Static-99R is the primary tool the Department of Justice relies upon in screening prisoners for involuntary civil commitment, for example.

### III.   THE REQUESTED SENTENCE OF 60 MONTHS IS APPROPRIATE BASED ON THE FACTORS SET FORTH IN 18 U.S.C. § 3553(a)

The function of the sentencing court is, after consideration of various factors, to impose a sentence that is "sufficient, but not greater than necessary."  18 U.S.C. § 3553(a) ("[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in [18 U.S.C. § 3553(a)(2)]").[6]  In addition to the factors discussed in § 3553(a)(2), sentencing courts must consider "the nature and circumstances of the offense and the history and characteristics of the defendant;" "the kinds of sentences available;" the United States Sentencing Guidelines; "any pertinent policy statement;" "the need to avoid unwarranted sentence disparities;" and "the need to provide restitution to any victims of the offense."  18 U.S.C. § 3553(a).

#### A.   Nature and Circumstances of the Offense, and History and Characteristics of the Defendant, § 3553(a)(1)

Mr. Johnson's offense conduct was an aberrant and relatively brief episode in a life otherwise well-lived.  Stephen Johnson is a fundamentally good man from a wonderful family. As the Court knows from both the trial and the letters submitted to it, Mr. Johnson has strong interpersonal relationships and knows how to love, value, and help others—and does so.  He is "an incredible cousin, son, husband, nephew, and friend," *see* Ex. M (Letter from Jessica Washington), an entrepreneur, philanthropist, and a bedrock member of his community.  Mr. Johnson's character and history support a sentence at the mandatory minimum.

---

[6] In accordance with 18 U.S.C. § 3553(a)(2), the imposed sentence needs:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Mr. Johnson's criminal history is minimal.  The only blemish on his record is a DUI conviction in March 2007, almost 20 years ago, pursuant to a guilty plea.  *See* PSR at ¶ 82.  He was 19 years old at the time, a sophomore student at Florida A&M University.[7]  *Id.* at ¶¶ 82, 107.  Even so and in spite of his youth, he accepted responsibility, pled guilty, and completed his sentence, which matched his offense.  *Id.*  His record has been spotless since.

Mr. Johnson is well educated.  He attended and graduated from St. Albans High School, a prestigious private school, as one of its small handful of black students.  *Id.* at ¶¶ 91, 107.  He then moved down to Florida to pursue a college education at Florida A&M University, inviting and inspiring others from his neighborhood to do the same.  *Id.* at ¶ 107; *see also* Ex. H (Letter from Patric Holly).  Tragically, an injury to his foot and financial difficulties faced by his family resulted in him having to leave Florida A&M.  *See* Ex. D (Letter from Patricia Johnson).  But he did not give up – he persevered, enrolling in the University of the District of Columbia and working part-time to support himself and his mother, and finally earn his college diploma.  *Id.*;

---

[7]  Youth matters when considering this prior conviction.  Several fields of the criminal justice system, including Supreme Court case law and D.C. statute, recognize that those under the age of 25 must be treated differently in their sentencing.  *See, e.g., Roper v. Simmons*, 543 U.S. 551, 569-70 & n. 62 (2005) (banning the use of capital punishment on juveniles); *Graham v. Florida*, 560 U.S. 48, 68 & n. 64 (2010); *Miller v. Alabama*, 567 U.S. 460, 471 (2012); *see also* D.C. Code § 24-403.03 (counselling against lengthy prison terms for those who committed an offense under the age of twenty-five).  This follows the growing body of scientific research that recognizes that the prefrontal cortex portion of the frontal lobe, associated with the ability "to control impulses, suppress aggression, consider the impact of their behavior on others, consider the future consequences of their behavior, take personal responsibility for their actions, and resist the influence of peers" does not fully mature until age twenty-five. 5 Laurence Steinberg, et. al., *Psychosocial Maturity and Desistance From Crime in a Sample of Serious Juvenile Offenders*, JUVENILE JUSTICE BULLETIN (OFFICE OF JUVENILE JUSTICE AND DELINQUENCY PREVENTION) (March 2015) at 7; *see also* Elizabeth Sowell, et. al*., In Vivo Evidence for Post-Adolescent Brain Maturation in Frontal and Striatal Regions*, NATURE NEUROSCIENCE at 860 (Oct. 2019); 7 Mariam Arain, et. al., *Maturation of the Adolescent Brain*, 9 NEUROPSYCHIATRIC DISEASE AND TREATMENT 449, 453 (April 2, 2013).  Essentially, science and law both recognize what parents often do: young people make mistakes.

*see also* Ex. K (Letter from Kimberly Dailey); Ex. R (Picture of Diploma from UDC); PSR at ¶¶

107, 108 (noting Mr. Johnson's education and "specialized skills").

Mr. Johnson can persevere, rebuild, and recover to have a successful life.  As a child

growing up without a father and with debilitating asthma, as a student living in a primarily black

neighborhood while studying at a predominantly white private school, and as a college student

transferring to UDC and working to fund the education himself, Mr. Johnson's adolescent years

were marked by significant challenges.  *See* Ex. D (Letter from Patricia Johnson); *see also* PSR

at ¶ 91; *see also* Ex. I (Letter from Donna Rattley); *see also* Ex. C (Letter from Dara Johnson).

Yet throughout these valleys, he remained a "rock and steady support" for all those around him

and "caring for others less fortunate than himself," maintaining his "faith in the good nature of

people."  *See* Ex. I (Letter from Donna Rattley); *see also* Ex. E (Letter from Rev. Dr. Denise

King-Miller); *see also* Ex. B (Letter from Adrian Washington).  Now, too, and in the years since

his arrest for the instant offense, Mr. Johnson "has remained a light to [his family] and all those

around him."  *See* Ex. L (Letter from Sam Washington).  As summarized by one of the many

family members who have watched Mr. Johnson grow up, sat through the trial, and wrote a letter

of support to the Court, "given the opportunity, Stephen can recover and will go on to lead a

meaningful, productive, and law-abiding life."  Ex. I (Letter from Donna Rattley).

And most importantly, Mr. Johnson has built and maintains strong ties to his family,

friends, and the broader community.  While significant and beneficial in itself, this is also the

most important issue when it comes to predicting recidivism.  Without rehashing all of the facts

described in the Personal Background section, the Court can observe the love Mr. Johnson has

for his family and the love his family has for him from the materials attached to this

memorandum, including the letters of support from five aunts and uncles, two cousins, his

mother, wife, and sister.  The Court saw many of these people in the gallery throughout Johnson's trial, and the government saw them pray with him in the hallways of the corridor as they awaited the jury's verdict.  They are "painfully aware of the charges on which he was convicted" and the details of the offense conduct, yet they all have stood with him throughout his house arrest, his trial, and his pre-sentencing detention; "his entire family stands with him and will be there to love and support him" for however many years to come.  Ex. S (Letter from Brenda Donald); *see also* Ex. L (Letter from Sam Washington); *see also* Ex. Q (Letter from Andrew Dailey); *see also* Ex. I (Letter from Donna Rattley); *see also* Ex. D (Letter from Patricia Johnson).  Childhood friends, family friends, neighbors and other members of the community all rally around him just the same.  *See, e.g.,* Ex. H (Letter from Patric Holly); *see also* Ex. J (Letter from Sarah Vaughn).  In the words of his wife, they have all seen Mr. Johnson "learn, grow and become a better man" and now all they ask for is "the opportunity to walk in the grace and freedom that we have come to believe in … the opportunity to use all of our experiences, the good and the bad, to make a positive impact in society."  Ex. G (Letter from Adanna Johnson). His community eagerly awaits Mr. Johnson's return and will help ensure his future success.

B.    **Purposes of Sentencing, § 3553(a)(2)**

Under § 3553(a), the purposes of sentencing include "the need for the sentence imposed": "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2).

### 1.    Seriousness of the Offense

While serious, Mr. Johnson's conviction—including all relevant conduct—is limited to the possession of child pornography and the transportation of that pornography via the internet on only two occasions and to his own Google Drive.  Mr. Johnson's offense does not involve the production of child pornography, distribution of child pornography, advertising of child pornography, selling or buying of children, transporting children for purposes of prostitution, sexual contact with children, or any attempt to commit any of these child abuse offenses.  In terms of child abuse cases prosecuted in federal court, the conduct here falls on the least egregious end of the spectrum.

When evaluating the content of the child pornography and the way in which it was stored and handled, Mr. Johnson's offense conduct is less concerning than even the typical *possession* of child pornography case.  There is no indication Mr. Johnson had any preference for material depicting infants, toddlers, or even prepubescent children.  Even according to the government's account, the total amount of child pornographic files involved in Mr. Johnson's offense does not exceed 250.  The number of files is substantially fewer than the number of files associated with the typical child pornography offense in the Internet era.[8]  The government's own evidence showed that Mr. Johnson did not spend much time viewing child pornography in particular[9] and

---

[8] Based on fiscal year 2019 data compiled by the Sentencing Commission, the median number of child pornography images and videos for all 2019 cases sentenced under §2G2.2 was 4,265.  *See* United States Sentencing Commission, *Federal Sentencing of Child Pornography: Non-Production Offenses* (2021) at 30, fig. 13.  The median number for receipt cases that year was 4,672, and the median number in possession cases was 2,350.

[9] The government conducted a detailed and thorough forensic evaluation on Mr. Johnson's devices, and that evaluation only showed that Mr. Johnson played (or attempted to play) five files depicting child pornography.  *See* Government Trial Exhibit 412A.

that he did not store the material in any organized manner.[10]  Finally, Mr. Johnson never discussed, chatted, or texted anything with anyone about abusing children or about child pornography.

Therefore, when considering the seriousness of the offense, a sentence at the five-year mandatory minimum—along with decades of registration as a sex offender and all of the other collateral consequences attaching to a conviction of this nature—is more than sufficient to provide just punishment for the offense.

## 2.    Adequate Deterrence

A sentence at the five-year mandatory minimum is also more than sufficient to satisfy the purposes of deterrence.  By their nature, mandatory minimum sentences send a strong deterrent signal.  A five-year term of imprisonment is substantial and enough to adequately deter Mr. Johnson and others from engaging in this type of conduct.

The shameful nature of the offense and the humiliating experience Mr. Johnson has experienced since his arrest in 2021 and will continue to endure in the future all have a powerful deterrent effect.  For the past three years, he has been forced to have nightmarishly difficult conversations with his wife, mother, sister, and other close family members about the offense and about other sensitive private matters.  As a result of his conviction, Mr. Johnson will be required to register in the future as a sex offender for a substantial period of time.  As a registered sex offender, Mr. Johnson will be required to register in each jurisdiction where he resides, works, or even visits.  He will be required to remain active in the registration process because periodic recertification is required in each jurisdiction.  Information concerning his

---

[10] The government's forensic examination determined that the child pornography was stored on Mr. Johnson's devices and in his Google Drive account in the same file path structure that the material was in when it was originally obtained.

registration will be publicly available and numerous websites will make this information easily available to members of the community. Mr. Johnson's friends, neighbors, co-workers, and anyone else in the community will know about Mr. Johnson's conviction and will be aware of his status as a "sex offender." The widespread availability of this information will surely create barriers for Mr. Johnson when seeking professional, housing, and educational opportunities. This intense level of shame and humiliation will certainly deter Mr. Johnson and everyone else from viewing any pornography, much less illegal pornography. Accordingly, a sentence of five years of incarceration will satisfy the goal of specific and general deterrence.

### 3.    Protection of the Public

Because Mr. Johnson's presence in the community poses no current or future public safety risk, a sentence exceeding five years will serve no community safety purpose. The nature of the offense, seriousness of the offense, and Mr. Johnson's background all indicate that the public will be 100% safe with Mr. Johnson in the community, as it was during his years-long term of pretrial supervision and even prior to that. Since Mr. Johnson was alerted by Google in the Fall of 2020 about misconduct concerning his Google Drive account, there is no evidence that Mr. Johnson has engaged with illegal pornography. In fact, when Mr. Johnson's devices were searched by law enforcement in 2021, no child pornography was discovered on any of his computers.

Mr. Johnson's unblemished record during the 2 1/2 years from October of 2021 to April of 2024 when he was on pretrial release is compelling evidence that the public needs no protection from Mr. Johnson. He successfully complied with stringent release conditions, including internet restrictions, avoiding direct contact with children, and wearing a GPS monitoring device. As the 21 Pretrial Services Agency "Status Reports" that have been filed in

his case demonstrate, Mr. Johnson did not suffer a single violation during his entire thirty-month period while on pretrial release.[11]

As discussed above, a recent psychosexual evaluation confirms that Mr. Johnson poses no danger to the community.  According to Dr. Felix, "Mr. Johnson presents a low risk of sexual recidivism.  He has no history of prior sexual offenses, maintains a stable and supportive relationship, and has shown compliance with treatment and legal expectations."  Report at 19. Dr. Felix determined that Mr. Johnson rightly falls in the "Below Average Risk" range of the Static-99R test, with his grand total of 0 on the test (and almost lower) and his "multiple protective factors that may decrease his risk level, including but not limited to an absence of pre-existing mental health diagnoses, his willingness to engage in treatment, his history of consistent employment/income, his charitable contributions and volunteer services, and the presence of social supports, as evidenced by his support letters."  *Id.* at 16.

Dr. Felix's conclusion is backed by extensive recent research about the low rates of recidivism among sexual offenders in general.  The United States Sentencing Commission's research demonstrates that a history of stable employment, a college education, lack of criminal history, and family ties and responsibilities all predict reduced recidivism across offenses, *see Measuring Recidivism*, United States Sentencing Commission (May 2004) at 12-13.[12]

"[T]he research consistently demonstrates that recidivism rates for people who have been convicted of a sex offense are substantially lower than most people believe, and in fact, are among the lowest of all people convicted of a crime."  Mary Helen McNeal & Patricia Warth,

---

[11] *See* ECF Nos. 11, 19, 24, 28, 33, 35, 40, 46, 49, 53, 56, 59, 62, 65, 66, 68, 71, 75, 105, 108, and 144.

[12] *Available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf.

*Barred Forever: Seniors, Housing and Sex Offense Registration*, 22 KAN. J.L. & PUB. POL. 317, 344-45 (Spring 2013).

Those rates are even lower for individuals like Mr. Johnson, who have no record of contact behavior and no relevant prior offenses.  *See* Written Statement of Michael C. Seto, Ph.D., C. Psych. before the U.S. Sentencing Commission at 3 (Feb. 15, 2012),[13] (citing research that shows that online (mostly child pornography) offenders had recidivism rates that were "relatively low compared to the average recidivism rates found for contact offenders" and "[i]n particular*, first-time child pornography possession only offenders appear to be very low risk of sexual recidivism*, in contrast to those with any prior or concurrent criminal convictions or those who engage in other sexual offending (e.g., attempted or actual contacts with a child, production of child pornography).") (emphasis added); *see also* Written Statement of Richard Wollert, Ph.D. before the U.S. Sentencing Commission, at 20 (Feb. 15, 2012) (drawing on his decade of supervising child pornography offenders and concluding that the typical child pornography offender "is mortified by his criminal internet behavior once he is confronted with its reality in the wake of being arrested.  This reaction is helpful for motivating him against relapse, which is rarely encountered.").[14]  Dr. Wollert explicitly recommends increasing "efforts to support the reintegration of CPOs into the community sooner rather than later.  *The more an ex-CPO is tied to the community, and the greater his stake in it, the less likely he will be to reoffend.*"  *Id*. at 22 (emphasis added).

---

[13] *Available at* https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20120215/Testimony_15_Seto.pdf.
[14] *Available at* https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-courts-and-meetings/20120215-16/Testimony_15_Wollert_2.pdf.

In addition to Mr. Johnson's overall conduct, his background, his "low-risk" classification, and the vast amount of research showing that individuals like Mr. Johnson are unlikely to recidivate, the period of supervised release that Mr. Johnson must serve upon his release from custody will provide an addition layer of assurance that the public will be safe when Mr. Johnson returns to the community.  Mr. Johnson's conditions of supervised release will surely be very restrictive, likely including strict travel conditions, restrictions on contact with children, and internet monitoring and restrictions.  Mr. Johnson will also be required to report regularly to his probation officer, be subject to unannounced visits, and adhere to searches by his probation officer that are not based on probable cause.

For these reasons, a sentence exceeding the five-year mandatory minimum will *not* provide any greater protection for the community and is greater than necessary here.

### 4.    Educational or Vocational Training, Medical Care, or Other Treatment

Incarcerating Mr. Johnson for more than five years will not assist him with any needed educational or vocational training, medical care, or other correctional treatment.  Considering that Mr. Johnson has a bachelor's degree, he is not in need of any educational or vocational training that can be offered at a penal institution.  And, given Mr. Johnson's good physical health, he will not receive any beneficial medical care at a federal prison.  Any mental health treatment, therapy, or other correctional treatment from which Mr. Johnson can benefit can be fully accomplished within the five-year period that Mr. Johnson must serve due to the mandatory minimum penalty.

Given Mr. Johnson's results as "Below Average Risk" for sexual recidivism, Dr. Felix specifically held that "sexual offender treatment is not warranted."  Report at 19.  Individual counseling and mental health treatment is recommended, in order to address "any underlying

issues related to sexual behaviors" as well as Mr. Johnson's depression and anxiety, but not the SOTP. *Id.* at 19-20. Dr. Felix notes that Mr. Johnson's "overall compliance and support network further suggest a reduced likelihood of reoffending." *Id.* at 19. This support network, comprised of his family, friends and extended community, is the network that Mr. Johnson seeks to return to soon.

## C.   Kinds of Sentences Available and the Guidelines Range, § 3553(a)(3), (4)

### 1.   Kinds of Sentences

18 U.S.C. § 3553(a)(3) requires courts to consider "the kinds of sentences available" when imposing a sentence. When considering the kinds of sentences available, "§ 3553(a) directs the judge to consider sentences other than imprisonment." *Gall v. United States*, 552 U.S. 38, 59 (2007). This directive is consistent with Congress' directive to the United States Sentencing Commission concerning the importance of "insur[ing] that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." 28 U.S.C. § 994(j). Since Mr. Johnson has never been convicted of a crime of violence or any other serious offense, Congress encourages imposing sentencing alternatives to imprisonment for individuals like Mr. Johnson.

Since Mr. Johnson's offense of conviction requires that he serve a minimum of five years in custody, Congress' goal of sentences other than imprisonment for individuals like Mr. Johnson can best be met here by imposing a sentence at the mandatory minimum and offering Mr. Johnson through supervised release the opportunity to realize his significant potential in life. Sentencing Mr. Johnson to a five-year period of incarceration that is followed by a lengthy period of supervised release is clearly not letting him off easily. Especially for a person who has never been incarcerated before and has little experience with the criminal justice system, five

26

years in prison will be very debilitating for Mr. Johnson.  Adding to this imprisonment a period of supervised release, sex offender registration, and the lifelong problems and indignities he will experience because of his felony sex conviction, Mr. Johnson will endure significant hassles and limitations for the remainder of his life.[15]  The United States Supreme Court recognized the severity of federal post-offense supervision alone when observing that "[o]ffenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty."  *Gall*, 552 U.S. at 48.  Regarding some of the substantial restrictions supervision places on one's liberty, the Supreme Court observed that:

> Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. Most probationers are also subject to individual "special conditions" imposed by the court.

*Id*.

---

[15] Courts and commentators are increasingly recognizing how severe the collateral consequences of a felony conviction are.  A federal district court noted that "federal law imposes nearly 1,200 collateral consequences" on people who have been convicted of a felony. *United States v. Nesbeth*, 188 F. Supp. 3d 179, 185 (E.D.N.Y. 2016), *appeal withdrawn* (Sept. 9, 2016) (sentencing a drug defendant to no jail time even though her sentencing guidelines range had been 33-41 months, because of the serious collateral consequences she would suffer by virtue of her status as a convicted felon).  And state laws impose even more consequences; all told "there are nationwide nearly 50,000 federal and state statutes and regulations that impose penalties, disabilities, or disadvantages on convicted felons." *Id.* at 184.  Consequences for the conviction of a sex offense are even more severe.  The *New York Times* has reported on the particularly harsh consequences that accompany sex offense convictions, suggesting that "our entire approach to dealing with sex offenders has gone tragically off the rails."  Lisa Jackson and David Feige, *Sex Offender Village*, N.Y. Times, May 21, 2013.  *Available at* http://www.nytimes.com/2013/05/22/opinion/sex-offender-village.html. "In the past 25 years, the laws governing sex offenses have gone from punitive to draconian to senseless."  *Id.*  The *Federal Probation Journal*, a publication of the United States Courts, issued a report with similar findings, including that "[c]ollateral harms include harassment or victimization, social isolation, difficulty finding employment, and difficulty finding housing."  Sarah W. Craun and David M. Biere, *Are the Collateral Consequences of Bring a Registered Sex Offender as Bad as We Think? A Methodological Research Note*, 78 Fed. Probation J. 28 (2014).  *Available at* https://www.uscourts.gov/sites/default/files/june2014_final_proof_6_11_2014.pdf.

### 2.    Sentencing Guidelines

As 18 U.S.C. § 3553(a) makes clear, the guideline range established by the United States Sentencing Guidelines ("Sentencing Guidelines," "Guidelines," or "U.S.S.G.") is merely one of many factors the court must consider when determining an appropriate sentence.  *See also Gall v. United States*, 552 U.S. 38, 59 (2007) ("the Guidelines are only one of the factors to consider when imposing sentence").  Moreover, because "the Guidelines are not mandatory," the applicable sentencing guideline range is not binding on courts.  *Gall v. United States*, 552 U.S. at 59.  Rather, the Guidelines range is advisory and sentencing courts are free to impose sentences below the advisory Guidelines range.  *Id.; see also Rita v. United States*, 551 U.S. 338, 351 (2007) (courts are free to impose sentences outside of the advisory Guidelines range for various reasons, including that, for example, "the case at hand falls outside the 'heartland' to which the Commission intends individual Guidelines to apply," the advisory Guidelines range "fails properly to reflect § 3553(a) considerations," or because "the case warrants a different sentence regardless").

In Mr. Johnson's case, there is disagreement concerning the proper application of the Sentencing Guidelines.  Much of the disagreement centers on properly characterizing the offense conduct and ensuring that Mr. Johnson's guidelines range is not influenced by acquitted conduct, per the most recent Amendment to the Sentencing Guidelines.  Regarding the nature of Mr. Johnson's offense conduct, the government alleges that Mr. Johnson acquired files containing child pornography from the internet, stored all or some of those files to his computer's hard drive, and then on September 21, 2020, and October 1, 2020, transferred those files to his personal secured private Google Drive account.  There are no allegations that Mr. Johnson ever distributed the files to another person or knowingly made the files available to anyone else.  Thus, the conduct in this case involves Mr. Johnson receiving child pornography and then

28

transporting that material via the internet to his personal and exclusive cloud-based storage Google Drive account for no purpose other than his own personal use.  Mr. Johnson's conduct does not involve the trafficking or distribution of child pornography.  *See United States v. Chiaradio*, 684 F.3d 265 (1st Cir. 2012) (distribution of child pornography has occurred "[w]hen an individual consciously makes files available for others to take and those files are in fact taken").

In accordance with the 2024 United States Sentencing Guidelines (effective on November 1, 2024), acquitted conduct shall not be considered when calculating a defendant's sentencing guidelines range.  A new amendment to the 2024 Sentencing Guidelines adds an "acquitted conduct" provision to the "Relevant Conduct" guideline at U.S.S.G. § 1B1.3.  The new provision makes clear that "[r]elevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court, unless such conduct also establishes, in whole or in part, the instant offense of conviction."  U.S.S.G. § 1B1.3(c).  Therefore, acquitted conduct "is not relevant conduct for purposes of determining the guideline range."  U.S.S.G. § 6A1.3 commentary.

Mr. Johnson was acquitted on ten counts and found guilty of six counts.[16]  Five of the six counts of conviction relate to transportation of child pornography and each of these five counts involved only a single video file.  Since the video depicted in counts Five and Eight is the same video, the five transportation offenses involve four unique and distinct files.  *See* Motion to Dismiss Counts Five and Eight of Second Superseding Indictment, ECF 115 ("the contents of the

---

[16] Mr. Johnson was acquitted of Counts Three, Four, Six, Nine, Ten, Eleven, Twelve, Thirteen, Fourteen, and Fifteen.  He was convicted of Counts One, Two, Five, Seven, Eight, and Sixteen.

visual depiction charged in Counts Five and Eight, which is a video, are identical").[17]  The sixth count of conviction involved a possession of child pornography offense that, unlike the transportation counts, does not specifically identify the material encompassing that count.  The jury was permitted to convict Mr. Johnson of the possession offense based only on a single file, if it determined that the one file constituted child pornography.  Indeed, regarding the possession count, the jury was instructed by the Court to decide only whether "*at least one* of the images possessed by the defendant involved a prepubescent minor or a minor who had not obtained 12 years of age."  ECF 169 at 2 (emphasis added).  And, during closing argument, the government took advantage of the fact that the jury could convict Mr. Johnson of the possession count based on a single file when telling the jury that "[a]ll that we have to prove to you, beyond a reasonable doubt, is that he possessed one file. One file is enough. If you all agree on one file, that's sufficient for Count 16. Counts 1 through 15 focus on specific file names. Count 16, one file is enough."  4/12 Tr. 1225.

    In determining the offense conduct, it is clear that the jury's guilty verdicts were based on the five images—and that the jury acquitted him of everything else.  This interpretation of the jury's verdict on the transportation allegations is supported by its note to the Court regarding available metadata, *see* ECF 156, as well as this Court's observations in its Order regarding Mr. Johnson's Motion for a New Trial ("Order").  *See* ECF 210.  In the Order, the Court noted that the five files the government showed "had been saved and played on Johnson's computer prior to being uploaded to his Google Drive . . . were the only five files that the jury convicted Johnson

---

[17] Significantly, in the government's opposition, the government does not deny that the video depicted in Counts Five and Eight is the same.  *See* Government's Consolidated Memorandum in Opposition to Defendant's Motions to Dismiss Certain Counts of Second Superseding Indictment, ECF 123 at 5 (". . . the video files charged in Counts Five and Eight are the same length and appear visually identical. . . .").

of transporting." *Id.* at 4, note 3.[18]  The Court further noted that the jury was "discerning" by "acquitting [Mr. Johnson] on the ten counts supported by less evidence." *Id*.  It stands to reason that the jury took a similar approach with the possession of child pornography offense, convicting Mr. Johnson of only the five files for which the government's evidence was the strongest and acquitting him of everything else.  Thus, the most reasonable interpretation of the jury's verdicts is that it acquitted Mr. Johnson of all conduct except for the five files specifically charged in Counts One, Two, Five, Seven, and Eight.

In calculating Mr. Johnson's sentencing guidelines, the government has the burden of proving any sentence enhancement.  *See United States v. Vega*, 826 F.3d 514, 538 (D.C. Cir. 2016) ("[t]he Government must demonstrate that a sentencing enhancement is warranted by a fair preponderance of the evidence"); *see also United States v. Hines*, 449 F.3d 808, 815 (7th Cir. 2006) ("[t]his court's case law clearly places upon the Government a burden to prove by a preponderance of the evidence that a particular sentencing enhancement is warranted") (cleaned up).  In satisfying this burden, the government "may not simply rely on assertions in a presentence report if those assertions are contested by the defendant." *United States v. Price*, 409 F.3d 436, 444 (D.C. Cir. 2005).  Rather, "the Government must demonstrate that the description in the report is based on a sufficiently reliable source to establish the accuracy of that description." *Id*.  When sentencing guideline enhancement disputes arise, "the defendant need not produce any evidence" because "the Government carries the burden to prove the truth of the disputed assertion." *Id*.

---

[18] The parties disputed during trial whether the government's evidence showed that certain files were clicked on or whether the evidence showed that these files were actually played.

>  a.   *Mr. Johnson is entitled to a two-level decrease in his offense level because the conduct for which he was convicted was limited to the receipt of child pornography.*

When the applicable base offense level under U.S.S.G. § 2G2.2 is 22,[19] the defendant is entitled to a two-level decrease if "the defendant's conduct was limited to the receipt or solicitation of material involving the sexual exploitation of a minor" and "the defendant did not intend to traffic in, or distribute, such material." U.S.S.G. § 2G2.2(b)(1). As explained above, considering that the government's evidence shows nothing more than Mr. Johnson receiving child pornography from the internet and then receiving it again when he transported it solely to himself, Mr. Johnson's conduct in this case was limited to the receipt of child pornography. By not sending child pornography to another person or making it available to anyone else, Mr. Johnson did not intend to traffic in or distribute child pornography.

In *United States v. Chiccini*, 2022 WL 1024261 (3d Cir. 2022), where the defendant—like Mr. Johnson—possessed child pornography on his computer and transferred those files via the internet to his personal cloud storage account, it was held that it was plain error to deny the defendant a 2-level decrease under U.S.S.G. § 2G2.2(b)(1). The court in *Chiccini* determined that "the act of downloading images into a personal cloud account, without more, does not demonstrate an intent to distribute, and in fact, defines the act of receiving or possessing the images." *Id.* at 2. In holding that the 2-level decrease applied in cases involving only a transfer of child pornographic material into the defendant's personal cloud account, the *Chiccini* court found significant that "[defendant's] conduct was 'limited' to receiving the material, which he did by storing it in a private, password protected account." *Id.* at 3.

---

[19] There is no dispute that Mr. Johnson's base offense level is 22. *See* PSR at ¶ 67; *see also* U.S.S.G. § 2G2.2(a)(2).

Cases in which courts have denied application of the 2-level decrease are easily distinguishable from *Chiccini*.  Those cases, unlike *Chiccini* and Mr. Johnson's case, either involve conduct where the defendant transferred child pornography to at least one other person or engaged in offense conduct greater than the receipt or even solicitation of child pornography. Cases concerning the transfer of material to someone else involve defendants who affirmatively provide child pornography to another person or store it in a location that makes the material available for others to access.  *See, e.g., United States v. Bleau*, 930 F.3d 35 (2d Cir. 2019) (two-level decrease for conduct limited to receipt or solicitation of child pornography unwarranted where defendant's computer was equipped with peer-to-peer software that enabled other people to access defendant's child pornography); *United States v. Miltier*, 993 F.3d 267 (4th Cir. 2021) (decrease under § 2G2.2(b)(1) inapplicable when law enforcement used a peer-to-peer file sharing network to download child pornography from an IP addresses associated with defendant); *Haney v. United States*, 962 F.3d 370 (8th Cir. 2020) (decrease under § 2G2.2(b)(1) did not apply where defendant distributed child pornography by making it available to others through a file sharing program).  Other cases denying application of § 2G2.2(b)(1)'s two-level decrease involve offense related criminal conduct that is greater than mere receipt or solicitation. *See, e.g., United States v. Hodge*, 805 F.3d 675 (6th Cir. 2015) (section 2G2.2(b)(1) decrease did not apply to defendant whose offense conduct also involved the attempted production of child pornography); *United States v. Meek*, 32 F.4th 576 (6th Cir. 2022) (no error in denying two-level § 2G2.2(b)(1) decrease for conduct more extensive than mere receipt or solicitation where defendant made child pornography available to others by downloading the material on a peer-to-peer file sharing network and admitted that "he may have inadvertently shared or traded child pornography").

Because each of the following are true, Mr. Johnson is entitled to a two-level reduction under § 2G2.2(b)(1): (1) Mr. Johnson's base offense level under U.S.S.G. § 2G2.2 is 22; (2) Mr. Johnson's offense conduct is limited to the receipt of child pornography; and (3) Mr. Johnson did not intend to traffic in, or distribute, child pornography.

> b.    *The two-level increase in Mr. Johnson's offense level for "distribution" is inapplicable.*

U.S.S.G. § 2G2.2(b)(3) provides for an offense level increase ranging from two to seven levels for various types of child pornography distribution. Because Mr. Johnson was clearly not involved in distributing child pornography for pecuniary gain or to a child, neither the government nor the probation office is seeking the more serious distribution enhancements. They do, however, argue that the least serious distribution enhancement, which provides for a two-level increase when "the defendant knowingly engages in distribution" that was not covered by the more serious distribution enhancements, applies in Mr. Johnson's case. *See* U.S.S.G. § 2G2.2(b)(3)(F). The position adopted by the Probation Office and government is incorrect.

Mr. Johnson's position that the distribution enhancement does not apply is supported by case law, while the position taken by Probation and the government has no such support. In a case identical to Mr. Johnson's, the distribution enhancement was found not to apply. In *United States v. Hyatt*, 28 F.4th 776 (7th Cir. 2022), it was held that application of § 2G2.2(b)(3)(F)'s distribution enhancement where defendant uploaded files containing child pornography to his cloud-based storage account was plain error. In denying application of the distribution enhancement where a person transports child pornography to his own cloud-based storage account, the Court held that "[d]istribution is not present unless and until there is something related to a transfer of material from the defendant *to another person*." *Id*. at 783 (emphasis added). By noting that "[a] person can 'transport' an item without distributing it to anyone," the

Court held that inapplicability of the distribution enhancement can exist in cases where a defendant has "transported" child pornography.  *Id*. at 783-84.[20]  In order to apply the distribution enhancement in a transportation of child pornography offense, "[w]e must find transportation *related to* a transfer from [the defendant] to some other person."  *Id*. at 785 (emphasis in the original).

Various other courts have sensibly found the existence of "distribution" in child pornography cases only when there is a transfer of material to some other person.  *See In re United States v. Manzano*, 945 F.3d 616 (2d Cir. 2019) (defendant's uploading of a video containing child pornography to his personal Google Photos folder by using internet servers located outside of defendant's state was not distribution); *United States v. Budziak*, 697 F.3d 1105, 1109 (9th Cir. 2012) ("we hold that the evidence is sufficient to support a conviction for distribution under 18 U.S.C. § 2252(a)(2) when it shows that the defendant maintained child pornography in a shared folder, knew that doing so would allow others to download it, and another person actually downloaded it"); *United States v. Pirosko*, 787 F.3d 358 (6th Cir. 2015) (same); *United States v. Husmann*, 765 F.3d 169, 174 (3rd Cir. 2014) ("[t]he statutory context confirms that 'distribute' in § 2252(a)(2) means to apportion, give out, or deliver and that distribution necessarily involves the transfer of materials to another person"); *United States v. Fall*, 955 F.3d 363, 374 (4th Cir. 2020) (transportation of child pornography, unlike distribution, "does not require conveyance to another person"); *United States v. Clarke*, 979 F.3d 82, 95 (2nd Cir. 2020) ("'[d]istribution' and 'transportation' are different. . . as distribution can be accomplished by mere transfer of ownership without movement from one place to another").

---

[20] The defendant in *Hyatt* was charged with transportation, receipt, and possession of child pornography.

Accordingly, since Mr. Johnson did not distribute child pornography to another person, a two-level enhancement under §2G2.2(b)(3)(F) plainly does not apply.

> c.   *Because the material for which Mr. Johnson was convicted did not involve sadistic or masochistic conduct, or depictions of violence, nor did the material involve sexual abuse or exploitation of an infant or toddler, a four-level enhancement does not apply.*

Pursuant to U.S.S.G. § 2G2.2(b)(4), a four-level enhancement applies "[i]f the offense involved material that portrays (A) sadistic or masochistic conduct or other depictions of violence; or (B) sexual abuse or exploitation of an infant or toddler."  While some files amongst the approximate 220 files that the government alleges Mr. Johnson unlawfully possessed and transported *may* contain material that justifies an enhancement under §2G2.2(b)(4),[21] the conduct for which Mr. Johnson was convicted does not.  The five files constituting all conduct associated with the transportation counts of conviction (i.e. Counts One, Two, Five, Seven, and Eight) do not portray sadistic, masochistic, or other depictions of violence; and these five files also do not portray sexual abuse or exploitation of any infant or toddler.  And, as discussed above, the conduct for which Mr. Johnson was convicted in the possession count includes only the same files implicated in the five transportation counts of conviction.  Mr. Johnson was acquitted of everything else.  There is accordingly no basis for finding that the possession conviction includes any files in addition to those associated with the transportation convictions.

Because the new Sentencing Guideline precludes the use of acquitted conduct in calculating a defendant's sentencing guidelines range, any determination about whether an enhancement under § 2G2.2(b)(4) applies must be based only on the five files charged in Counts

---

[21] Unless the government can direct Mr. Johnson's counsel to a file that portrays sadism, masochism, depictions of violence, sexual abuse or exploitation of an infant or toddler, Mr. Johnson does not concede that this enhancement even applies to the broader approximate 220 files.

One, Two, Five, Seven, and Eight.  *See* U.S.S.G. § 1B1.3(c) ("[r]elevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court, unless such conduct also establishes, in whole or in part, the instant offense of conviction").  Since these five files do not portray the type of conduct that justifies an enhancement, Mr. Johnson's offense level may not be increased under § 2G2.2(b)(4).

> d.   *The applicable offense level increase for number of images is limited to four levels.*

The Sentencing Guidelines includes an incremental increase in a child pornography offender's offense level based on the number of images involved in the offense.  *See* U.S.S.G. § 2G2.2(b)(7).[22]  In Mr. Johnson's case, the PSR writer determined that Mr. Johnson's offense involved more than 600 images and, therefore, applied a five-level increase in Mr. Johnson's offense level.[23]  *See* PSR at ¶ 72.  This calculation is incorrect.

As explained above, the most reasonable interpretation of the jury's verdicts is as based on five discrete files.  And, because the videos depicted in Counts Five and Eight are the same, the number of video files involved for which Mr. Johnson was convicted is limited to four distinct videos.  When counting each of the four distinct video files on which Mr. Johnson's conviction was based as 75 images, Mr. Johnson is accountable for a total of 300 images under U.S.S.G. § 2G2.2(b)(7).  In accordance with § 2G2.2(b)(7)(C), a four-level offense level increase applies when there are "at least 300 images, but fewer than 600."  Therefore, since the correct number of images involved in Mr. Johnson's case for purposes of calculating his sentencing

---

[22] In determining the number of images involved, "[e]ach photograph, picture, computer or computer-generated image, or any similar visual depiction shall be considered to be one image" and "[e]ach video, video-clip, movie, or similar visual depiction shall be considered to have 75 images."  U.S.S.G. § 2G2.2, Application Note 6(i) & (ii).

[23] This five-level increase is the maximum increase permitted by the Sentencing Guidelines based on the number of images.  *See* U.S.S.G. § 2G2.2(b)(7)(D).

guidelines is 300, his offense level is increased by four levels—not five levels—based on the number of images.

*     *     *

Based on the above, and given a Criminal History Category of I, the correct Guidelines range in this case is 78-97 months.

### D.      Pertinent Policy Statements and the Flawed Sentencing Guidelines in Child Pornography Cases, § 3553(a)(5)

It is widely accepted that the sentencing guidelines in child pornography cases produce absurdly high guideline ranges, primarily due to various enhancements that are not based on the United States Sentencing Commission exercising its institutional role and basing those guidelines on empirical data and national experience.  And even under the correct Guidelines range of 78-97 months, that is plainly the case here.  The Sentencing Commission has publicly expressed criticism about the child pornography guidelines for over a decade.  A large number of federal courts share the concerns of the Sentencing Commission, and the Department of Justice has agreed with much of the criticism, as well.

#### 1.      The United States Sentencing Commission's Position

In its 2012 report, the Sentencing Commission found that the current sentencing scheme in U.S.S.G. § 2G2.2 does not accurately measure the severity of non-production child pornography offenses.  U.S. SENT'G COMM'N, FEDERAL CHILD PORNOGRAPHY OFFENSES at 207, 321 ("2012 Report").[24]  According to the Commission at that time, this is due in part to the fact that "the sentencing scheme … has not been updated for nearly a decade"

---

[24]*Available at* https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf.

and fails to "account for significant changes in offense conduct, particularly in technology, that have occurred in recent years." *Id*. at 207. Conduct that is now typical of almost every child pornography offense "triggers multiple guideline enhancements and exposes the vast majority of defendants today to substantial penalty ranges." *Id*.

More specifically, the Commission found that before advances in computers, the internet, and digital cameras, "child pornography was difficult to find, risky to produce, expensive to duplicate, and required a secure and private storage area," as offenders typically received and distributed it in printed form using the U.S. mail. *Id*. at 42, 312. Now, most offenders rely on internet or internet-enabled technology to access and distribute child pornography. *Id*. at 42. These changes in technology have made it significantly easier to access child pornography. "All of these technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography, including many graphic sexual images involving very young victims, a genre of child pornography that previously was not widely circulated." *Id*. at 6. An "entry-level offender," like Mr. Johnson, can now easily access large amounts of child pornography for little or no financial cost and often in an anonymous, indiscriminate manner. *Id*. at 312.

Yet, as the Sentencing Commission stated in its 2012 Report, "the sentencing scheme for non-production offenses has not been updated for nearly a decade. It thus does not account for significant changes in offense conduct, particularly in technology, that have occurred in recent years—such as the widespread use of peer-to-peer ("P2P") file sharing, which typical offenders now use to receive and distribute large quantities of graphically violent child pornography." *Id*. at 207. The sentencing scheme has not been updated since the 2012 Report. Thus, a relatively less serious offender can now be saddled with an excessive guidelines range.

The Commission identified five § 2G2.2(b) enhancements that are at odds with the above-described changes in technology: (1) images involving a pre-pubescent minor; (2) offenses involving distribution; (3) sado-masochistic images; (4) use of a computer; and (5) enhancements based on the quantity of images possessed.  2012 Report at 313 (citing U.S.S.G. § 2G2.2(b)(2)-(4), (6)-(7)).  According to the Commission, these enhancements were established "in an earlier technological era" when child pornography was typically received and distributed in printed form.  *Id.*  But now, enhancements that were intended to apply to the very worst offenders "are now being applied routinely to most offenders."  *Id.*  For example, in 2010, the "typical non-production offender" was subject to the enhancements for images of pre-pubescent minors, use of a computer, and quantity of images in more than 96 percent of cases, [25] and the enhancement for sado-masochistic images in nearly 80 percent of cases.  *Id.* at 316; *see also* U.S.S.G. § 2G2.2(b)(2), (4), (6)-(7); U.S. Sent'g Comm'n, *Use of Guidelines and Specific Offense Characteristics* (2004-2011).  Together, these five "typical" enhancements, which apply to "the vast majority of offenders," account for 15 offense levels.  2012 Report at 316.

Because the above enhancements are now so common in child pornography offenses, the Commission determined that they often overstate the seriousness of individual offenses.  Federal Id. at 321 ("The current sentencing scheme . . . places a disproportionate emphasis on outmoded measures of culpability regarding offenders' collections[.]") (citing § 2G2.2(b)(3)(B), the five-level enhancement for possession of 600 or more images, as an example of an "outmoded measure[] of culpability").

---

[25] Further, of the offenders who received an enhancement based on the number of images, almost 70 percent received the maximum five-level enhancement based on possession of 600 or more images.  *See* 2012 Report at 141.

In 2021, the Sentencing Commission issued another report reaffirming similar criticisms about the child pornography guidelines that the Sentencing Commission expressed a decade earlier.  United States Sentencing Commission, *Federal Sentencing of Child Pornography: Non-Production Offenses* ("2021 Report").[26]  For example, the 2021 Report noted that Guideline offense level enhancements for age of victim, distribution, type of images,[27] and use of computer "continued to apply in the vast majority of non-production child pornography cases."  2021 Report at 19.[28]  Additionally, the five-level enhancement for more than 600 images, an enhancement that the probation office claims applies in Mr. Johnson's case, applied in 77.2% of non-production cases in fiscal year 2019.  *Id*.  The frequency with which these enhancements apply to all types of non-production child pornography offenses shows that §2G2.2 of the Sentencing Guidelines "fails to distinguish adequately between more and less severe offenders."  *Id.*

According to the 2021 Report, offense conduct involving files depicting prepubescent minors is also not a distinguishing factor in non-production child pornography cases because—with significant advances in technology—nearly all non-production cases involve prepubescent minors.  In fiscal year 2019, 99.4% of all non-production offenders "had images or videos depicting victims who were prepubescent or under the age of 13."  2021 Report at 31.

---

[26] This report updates and expands upon the Sentencing Commission's 2012 Report to Congress by evaluating "data from the Commission's fiscal years 2005-2019 Offender Datafiles."  2021 Report at 8.  The 2021 Report is based on a particularly detailed evaluation of fiscal year 2019 data as the Commission "undertook an extensive special coding project to collect and analyze data on non-production child pornography offenses and offender characteristics beyond the information regularly collected."  *Id.* at 9.

[27] The "type of images" enhancement includes the four-level increase the probation office applies to Mr. Johnson's case for material portraying sadistic or masochistic conduct.

[28] Three enhancements – use of computer, number of images, and age of victims – applied in more than 95% of non-production cases.

Additionally, the report reveals, most non-production offenders "had images or videos of infants or toddlers." *Id.*

The 2021 Report, like the Sentencing Commission's 2012 Report to Congress, identifies offenders who participate in child pornography communities as a factor that deserves considerable attention when making sentencing determinations. In 2012, the "Commission found that online communities provided a forum to discuss sexual interest in children without fear of condemnation and helped offenders to develop positive feelings about their online deviant sexual identities." 2012 Report at 37. The 2012 Report warns that child pornography communities contribute to the child pornography market and some members of these communities "produced new child pornography to gain access to other images." *Id.* at 36. In 2021, the Sentencing Commission reports that nearly half (43.7%) of all "non-production child pornography offenders sentenced in fiscal year 2019 belonged to a child pornography community." 2021 Report at 38. The 2021 Report further noted that "even 36.4 percent of possession offenders, the least serious type of non-production offender under §2G2.2, participated in a child pornography community." *Id.*

The 2021 Report also identified the manner in which offenders stored child pornography and whether there were any sophisticated methods of concealing the offense as relevant sentencing factors. The Sentencing Commission observed that "some offenders possess child pornography collections numbering in the hundreds of thousands or even millions of images and videos." 2021 Report at 34. "The typical non-production offender," the Sentencing Commission reports, "stored child pornography in more than one place, with 57.6 percent of offenders storing their collections on two or more devices." *Id.* With regard to the use of sophisticated means to conceal child pornography collections, "16.0 percent of non-production child pornography

offenders engaged in sophisticated concealment efforts" in fiscal year 2019. *Id.* at 35. A slightly higher rate (18.8 %) of possession offenders employed sophisticated means of concealment. *Id.* Tactics used by those engaging in sophisticated concealment include "using the Dark Web, software that wipes files, encryption, or using cryptocurrency to facilitate the transfer of child pornography." *Id.*

### 2.    The Department of Justice's Position

After the Commission released its 2012 Report, the Department of Justice expressed agreement with the Commission's position in several respects. *See* Ltr. from Anne Gannon, Nat'l Coordinator for Child Exploitation Prevention and Interdiction, Office of the Deputy Attorney Gen., U.S. Dep't of Justice, to Patti B. Saris, Judge, U.S. Sentencing Comm'n (Mar. 5, 2013).[29]

Significantly, the Department of Justice agreed "with the Commission's conclusion that advancements in technology and the evolution of the child pornography 'market' have led to a significantly changed landscape – one that is no longer adequately represented by the existing sentencing guidelines." *Id.* at 1. For these reasons, the Department, like the Sentencing Commission, recommended targeted revisions to § 2G2.2 "to account for new technology and the dramatic evolution in how offenders obtain, store, organize, trade, and protect child pornography collections." *Id.* at 2.

Specifically, the Department of Justice proposed the elimination of the increase for the use of a computer. *Id.* at 4; U.S.S.G. § 2G2.2(b)(6) (providing for a two-level increase "[i]f the offense involved the use of a computer or an interactive computer service"). The Department of

---

[29]*Available at* http://sentencing.typepad.com/files/dojletter-to-ussc-on-cp-report.pdf.

Justice also suggests a revision to the specific offender characteristic governing the quantity of images. *Id.* at 4. Although the Department supports the continued tying of the guideline range to the quantity of images collected, it argues that "the numeric thresholds should be substantially increased for each offense level," which will "better distinguish between occasional and habitual collectors." *Id.* The Department bases this recommendation on its assessment that the "technology-facilitated ease of obtaining larger child pornography collections" warrants such a substantial revision. *Id.*

### 3. Federal Court Sentences

For very similar reasons to those articulated by the Sentencing Commission and the Department of Justice, federal courts have been rejecting the child pornography sentencing guidelines for years.

The majority of federal circuits have voiced criticism about the child pornography guidelines in U.S.S.G. § 2G2.2—or at least recognized its *sui generis* nature as a creature not of Commission action but primarily Congressional manipulation. *See, e.g.*, *United States v. Stone*, 575 F.3d 83, 97 (1st Cir. 2009) ("we wish to express our view that the sentencing guidelines at [U.S.S.G. § 2G2.2] are in our judgment harsher than necessary"); *United States v. Dorvee*, 616 F.3d 174, 188 (2d Cir. 2010) (observing that U.S.S.G. § 2G2.2 is "an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results"); *United States v. Grober*, 624 F.3d 592, 609-10 (3d Cir. 2010) (affirming downward variance from a 235-293-month advisory guideline range to the mandatory minimum of 60 months based on criticism of § 2G2.2); *United States v. McNerney*, 636 F.3d 772, 777 (6th Cir. 2011) (recognizing that "some courts and commentators have questioned the wisdom of the congressionally-directed Child Pornography Sentencing Guideline because they were the product of Congressional mandate rather than the Commission's preferred systematic, empirical

approach") (cleaned up); *United States v. Halliday*, 672 F.3d 462, 473 (7th Cir. 2012) (acknowledging that not giving a downward variance in a child pornography case actually "may be in tension" with section 3553(a)(6)'s requirement for sentencing courts to avoid unwarranted disparity); *United States v. Henderson*, 649 F.3d 955, 965 (9th Cir. 2011) ("an unduly deferential application of § 2G2.2 will lead to the vast majority of offenders being sentenced to near the maximum statutory term"); *United States v. Regan*, 627 F.3d 1348, 1354 (10th Cir. 2011) (noting that arguments that U.S.S.G. § 2G2.2 should be accorded less deference because it lacks empirical support are "quite forceful"). Furthermore, some of these circuits have approved a district court's categorical refusal to sentence under the guidelines based on a policy disagreement. *See, e.g.*, *Henderson*, 649 F.3d at 960; *Grober*, 624 F.3d at 609; *Dorvee*, 616 F.3d at 188.

Sentencing courts throughout the country are increasingly recognizing the failures of the child pornography guidelines and are routinely imposing below guidelines sentences in non-production child pornography cases. In 67.9% of all non-production cases in fiscal year 2019, defendants received a below guidelines sentence. 2021 Report at 24.[30] While the vast majority of non-production child pornography sentences are below the guidelines range, there is significant variation with regard to the extent to which courts are sentencing below the guideline range. Sentences in child pornography cases for fiscal year 2019 ranged from probation to 228 months. *Id.* at 55.

---

[30] This includes both downward departures and downward variances.

Courts are relying on factors such as participation in a child pornography community[31] and aggravating conduct[32] in determining the appropriate length of sentence.  According to the 2021 Report, in fiscal year 2019, "[o]ffenders who did not participate in a child pornography community or engage in aggravating conduct received the lowest average and median sentences."  2021 Report at 45.  This pattern is consistent with the recommendations made by the Sentencing Commission in 2012.  In 2012, the Sentencing Commission "identified participation in online child pornography communities and aggravated sexual conduct as factors that should be accounted for in the guidelines and in the sentences imposed on non-production child pornography offenders."  2012 Report at 44.

### 4.    Policy Based Variance is Warranted in Mr. Johnson's Case

Like with the crack cocaine Guidelines the Supreme Court addressed in *United States v. Kimbrough*, Congressional action heavily influenced the sentencing outcomes suggested by the Guidelines in Mr. Johnson's case.  For example, the two-level use of a computer enhancement was added to the Guidelines in 1996 after Congress explicitly directed the Commission to increase child-pornography punishments whenever "a computer was used" to facilitate the

---

[31] The Sentencing Commission "identified an offender as part of a child pornography community if he or she engaged in any of the following: (1) participating in an online group whose members interact with each other primarily via the internet through posts, discussions, and one-on-one chatting in a forum devoted to child pornography; (2) having conversations with at least one other individual about child pornography or the sexual abuse of a minor; (3) distributing or receiving child pornography via personal means (*e.g.*, text, email, or instant message); or (4) working with another individual to produce child pornography."  2021 Report at 38.

[32] "Aggravating conduct" is defined by the Sentencing Commission as "(1) contact sex offenses (any illegal sexually abusive conduct involving actual or attempted physical contact with a victim, before or concurrent with the non-production child pornography offense); (2) non-contact sex offenses (any illegal sexually abusive conduct not involving actual or attempted physical contact with a victim, such as soliciting a minor online, before or concurrently with the non-production child pornography offense); or (3) prior non-production child pornography offenses."  2021 Report at 39.

offense.[33]  In the years leading up to this directive, the Commission considered a series of specific offense characteristics designed to differentiate between more and less culpable offenders, but none involved an offense-level increase based on the use of a computer.[34]  Also, soon after Congress issued the mandate, the Commission noted that the suggested enhancement failed to adequately differentiate between different types of computer uses, not all of which corresponded to the congressional concerns underlying the directive, namely the potential for widespread dissemination of child pornography over the internet.[35]  Moreover, the enhancement's ability to meaningfully differentiate between more and less culpable defendants has waned as computer use has become increasingly ubiquitous.  The enhancement initially applied to roughly a quarter of child-pornography defendants,[36] but by 2010, it applied in over ninety-five percent of possession-of-child-pornography cases.[37]  Any worth this enhancement once had as a basis for differentiating between more and less culpable defendants is largely gone, and the Commission recognized as much in a recent report to Congress.[38]

The four-level (or five-level according to probation and the government) number-of-images enhancement provides another example.  This enhancement was added to the Guidelines

---

[33] *See* U.S.S.G. App. C, amend. 537, at 470, 472 (Supp. 2003) (citing the Sex Crimes Against Children Prevention Act of 1995, Pub. L. 104-71, § 3 (1995)).

[34] United States Sentencing Commission, History of the Child Pornography Guidelines, 14-15, 18 (2009).

[35] United States Sentencing Commission, Sex Offense Against Children: Findings and Recommendations Regarding Federal Penalties, 27, 30 (1996) (citing H.R. REP. NO. 104-90 at 3-4 (1995)).

[36] *Id*. at 30.

[37] FEDERAL CHILD PORNOGRAPHY OFFENSES at 209.

[38] *See id*. at xi ("[S]entencing enhancements that originally were intended to provide additional proportional punishment for aggravating conduct now routinely apply to the vast majority of offenders.").

in 2003 following an explicit congressional directive,[39] but aside from a general fear that child-pornography defendants were receiving exceedingly lenient sentences,[40] the available legislative history does little to explain Congress' motivation or the process by which it matched the various numbers of images to the prescribed offense-level increases.  Also, the ability of this enhancement to meaningfully differentiate between defendants on the basis of culpability is suspect, as roughly seventy percent of child-pornography offenders sentenced in 2010 received the maximum five-level enhancement.[41]

Given that the child pornography guidelines, like the crack cocaine guidelines, are not based on the Sentencing Commission's unique role of relying on evidence and study to develop sound sentencing practices, this Court should reject the guideline range applicable in Mr. Johnson's case.  Because the advisory range recommends a sentence that is far greater than necessary to serve the statutory purposes of federal sentencing, a substantial downward variance is warranted in Mr. Johnson's case.

### E.       Need to Avoid Unwarranted Sentencing Disparities, § 3553(a)(6)

Because the sentencing guidelines are uniquely problematic with regard to fashioning an appropriate sentence in child pornography cases, comparisons with other similar cases can be particularly useful.  When making such comparisons between Mr. Johnson's case and other cases in this District and elsewhere in the country, a sentence at the five-year mandatory minimum is warranted.

---

[39] *See* U.S.S.G. App. C, amend. 649, at 299, 303 (Supp. 2003) (citing the Prosecutorial Remedies and Tools Against theExploitation of Children Today Act of 2003, Pub. L. 108-21, § 401(i) (2003)).

[40] *See* H.R. Conf. Rep. No. 108-66, at 58-59 (2003); *see also* 149 Cong. Rec. H.3069-709 (statement of Rep. Sensenbrenner) (noting with disappointment that a defendant who possessed 1,300 images of child pornographyreceived a downward departure).

[41] FEDERAL CHILD PORNOGRAPHY OFFENSES at 141.

1.      **District of Columbia Cases That are Most Similar to Mr. Johnson's Case**

Comparing Mr. Johnson's case with other cases in the United States District Court for the District of Columbia is difficult because the prosecution of cases in this District where the conduct only involves possession of child pornography or transportation to oneself is rare.  Cases in this District that are most similar to Mr. Johnson's case are as follows:

   • *United States v. Brian Kampel*, **1:20-cr-0084 (DLF) (D.D.C. August 5, 2021)**

The defendant in this case was sentenced to thirty-three months imprisonment after being convicted of access with intent to view child pornography, based on his downloading of child pornography from a web site which required credit card payment to access.  Mr. Kampel downloaded and viewed child pornography over the course of *ten years*.  He possessed over a thousand files depicting child pornography, including files showing prepubescent girls engaging in oral sex with adult men, being vaginally penetrated by adult men, and at least one file of an adult male penetrating a child's anus with his penis.  Mr. Kampel's sentencing guideline range included enhancements for material involving a prepubescent minor, material portraying sadistic or masochistic conduct, use of a computer, and a five-level enhancement based on the number of images.

   • *United States v. Jason Wright*, **1:09-cr-00311 (ESH) (D.D.C. Apr. 15, 2010)**

In this case, the Court sentenced Mr. Wright to no prison time and to 5 years of probation.  Mr. Wright was charged with possession of child pornography and he had nearly 300 images on his computer.  After complying with all conditions of his probation for three and a half years, the Court agreed to the early termination of his probation.

• *United States v. David Malakoff*, **1:09-cr-00051 (ESH) (D.D.C. July 17, 2009)**

In *Malakoff*, the Court sentenced Mr. Malakoff to no prison time and to 5 years of probation.  Mr. Malakoff was charged with possession of child pornography and he received sentencing guidelines enhancements for sado-masochistic content, prepubescent content, use of a computer, and for having more than 600 images.

### 2.   District of Columbia Cases Involving More Serious Conduct Than Mr. Johnson's Case

Probationary, or near probationary, sentences have been imposed in some cases in this District where the conduct was more serious than the conduct with which Mr. Johnson was involved.  Examples are:

• *United States v. Pasha Pakdel*, **1:17-cr-00165 (RJL) (D.D.C. June 11, 2019)**

Judge Leon imposed a sentence of one day imprisonment, credit for time served, to be followed by 120 months of supervised release.  Though the charge was possession of child pornography, over a two-year period, the defendant made multiple child pornography files available for download on a peer-to-peer network—and many of those files were downloaded by other users.  The defendant had approximately 215 videos and 212 images of child pornography on his computer, including videos and images depicting prepubescent children being vaginally penetrated by adult penises.

• *United States v. John Moreira*, **1:10-cr-00002 (ESH) (D.D.C. May 21, 2010)**

In this case, where the defendant shared and distributed files from his computer, including providing files to an undercover officer on three different occasions, the Court imposed a sentence of probation for 5 years.  After complying with all the conditions of his probation, the Court agreed to the early termination of his probation after three years.

3.      **District of Columbia Cases Involving Substantially More Serious Conduct Than Mr. Johnson's Case**

In many other cases in this district where the conduct was considerably more serious than Mr. Johnson's conduct, defendants received significant downward variances, including variances to the applicable mandatory minimum and to one year and a day or less.  Some examples are as follows:

• *United States v. Ryan Cooper*, 19-cr-382 (KBJ) (D.D.C. April 30, 2021)

Defendant who distributed dozens of files of child pornography on Tumblr sentenced at the five-year mandatory minimum.  In this case, Mr. Cooper distributed nineteen images of child pornography using one of his Tumblr accounts and, after that Tumblr account was shut down for the distribution of child pornography, he distributed an additional twenty-six files depicting pre-pubescent children on another one of his Tumblr accounts.  Three of the images he distributed depicted children sucking on erect penises.  Searches of Mr. Cooper's electronic devices and Tumblr account uncovered hundreds of videos and images of child pornography, triggering the five-level Guidelines enhancement for more than 600 images.  Mr. Cooper's guideline range was also enhanced for depictions of prepubescent children and sadomasochistic images.  His collection contained videos of prepubescent children having oral sex with adult men and a prepubescent boy being penetrated anally and orally by another child's penis.

• *United States v. Patterson*, 19-cr-355 (PLF) (D.D.C. January 28, 2020)

Defendant sentenced at the five-year mandatory minimum for distributing child pornography within a messenger group that was established for trading child pornography.  Defendant played a leadership role in the messenger group when he was assigned as the "owner" of the messenger group.  As the owner, defendant encouraged others to distribute child

pornography to the group by removing anyone from the group who failed to quickly share child pornography with the group.

    • *United States v. Solorzano*, 19-cr-282 (TJK) (D.D.C. December 3, 2019)

    Judge Kelly sentenced defendant at the five-year mandatory minimum for distributing child pornography.  In addition to sending an undercover officer child pornography via a mobile messaging application, Mr. Solorzano sent the officer images of a minor stepdaughter with whom Mr. Solorzano claimed to have engaged in sexual activity.  While chatting with the undercover officer through the mobile messaging application, Mr. Soloranzo discussed traveling to Washington, D.C., to have sex with the undercover's purported 8-year-old child.

    • *United States v. Anthony Gardea*, 19-cr-00022 (EGS) (D.D.C. Aug. 5, 2019)

    In this case, a sentence of time served (7 months and 10 days) was imposed, followed by 120 months of supervised release.  The defendant was found by an undercover agent in an interactive online meeting room where he publicly masturbated through his Webcam while viewing child pornography.

    • *United States v. Ryan Young*, 16-cr-00082 (CRC) (D.D.C. Aug. 17, 2016)

    Judge Cooper imposed a sentence of one year and one day imprisonment, to be followed by 60 months of supervised release.  Though the defendant was charged with possession, the defendant sent multiple images of child pornography to an undercover agent, solicited images of the agent's purported 9-year-old daughter, and discussed engaging in sex acts with the purported daughter.  The guidelines range in that case was 108 to 135 months.

• *United States v. Mark Misiano*, 16-cr-00048 (RDM) (D.D.C. July 26, 2016)

A sentence of nine months' imprisonment was imposed, to be followed by 120 months of supervised release.  Though the defendant was charged with possession, the defendant distributed multiple pornographic images of prepubescent children to an undercover agent.

• *United States v. Marc Singleton*, 14-cr-206 (RMC) (D.D.C. April 8, 2015)

Judge Collyer imposed a sentence of one year and a day where Mr. Singleton traveled from Maryland to Washington, D.C., with the intent to engage in illicit sexual conduct with a child who Mr. Singleton believed was eight years old.  After a 3-level reduction for acceptance of responsibility, Mr. Singleton's guideline range was 108-135 months.

• *United States v. Thomas DeGrange*, 13-cr-297 (BAH) (D.D.C. February 25, 2014)

Judge Howell sentenced Mr. DeGrange to 57 months in relation to his convictions for traveling with intent to have sex with a minor and possessing child pornography.  In this case, Mr. DeGrange traveled to Washington, D.C., to have sex with a purported 12-year-old girl. Condoms, lubricant, and prolonging gel were recovered from Mr. DeGrange's vehicle.  When his residence was searched, child pornography depicting prepubescent children and other depictions of violence were found.

• *United States v. Wesley Hawkins*, 13-cr-00244 (KBJ) (D.D.C. Nov. 22, 2013)

Mr. Hawkins was charged with possession, but also communicated with and sent child pornography to an undercover officer.  Mr. Hawkins sent the officer a video of child pornography, uploaded to a website controlled by YouTube videos depicting child pornography, and uploaded images depicting child pornography to Microsoft's file share site, Skydrive.  Mr. Hawkins's guidelines range was 97 to 121 months.  Judge Jackson sentenced Mr. Hawkins to 3 months' incarceration, and 73 months of supervised release.

• *United States v. Peter Zagorski*, 11-cr-351 (BAH) (D.D.C. October 9, 2012)

Defendant sentenced to 99 months in distribution of child pornography and attempted coercion and enticement of a minor case where Guidelines range, after adjusting downward for acceptance of responsibility, was 262-327 months.  Defendant's relevant conduct included distribution for a thing of value, prepubescent minors/minors under 12, sadistic, masochistic and/or violent material, and more than 600 images.  In this case, defendant distributed multiple videos of child pornography to an undercover police officer.   Several of the video files depicted nude prepubescent children being vaginally or anally penetrated by an adult male penis or finger, including at least one of these files showing the child bound in restraints.  After an undercover officer claimed that he was sexually active with his girlfriend's purported 12-year-old daughter, Mr. Zagorski asked if he could speak with the purported 12-year-old by telephone and suggested having a web camera session to see the girl nude.  Mr. Zagorski also expressed an interest in traveling from Pennsylvania to Washington, D.C., to engage in sex acts with the purported 12-year-old child.

### 4.   Cases in Other Districts in Which the Conduct is Similar to, or More Serious Than, Mr. Johnson's Conduct

• *United States v. Sprecher,* 19-cr-749 (JPO) (S.D.N.Y. March 18, 2021)

In this possession of child pornography case, the Court imposed a sentence of probation despite the government's request for a sentence within the applicable guideline range.

• *United States v. Liddy*, 19-cr-1685 (CAB) (S.D.C.A. September 2, 2020)

Mr. Liddy was convicted of possession of child pornography after a bench trial and he was sentenced to a five-year probationary sentence.

- ***United States v. Benton**, 16-cr-287 (RAL) (M.D. Fla. December 8, 2017)*

In this case, where the defendant admitted to visiting websites dedicated to child pornography for more than fifteen years, the Court imposed a sentence of probation.

- ***United States v. Maliza**, 13-cr-628 (FB) (E.D.N.Y June 19, 2015)*

In this case, Mr. Maliza was sentenced to a term of probation for three years where the conduct included possession and distribution of child pornography.

- ***United States v. Teves**, 11-cr-10351 (JLT) (D. Mass. July 26, 2012)*

Mr. Teves pled guilty to possession of child pornography, but his conduct included distribution.  Mr. Teves was sentenced to probation.

- ***United States v. Campbell**, 09-cr-3023 (RGK) (D. Neb. September 14, 2010)*

In this possession of child pornography case, the applicable guideline range was 51-63 months.  Mr. Campbell was sentenced to a period of probation.

- ***United States v. Pustis**, 10-cr-60038 (HO) (D.OR August 24, 2010)*

Although Mr. Pustis pled guilty to possession of child pornography, his conduct included distribution of child pornography.  He also had a prior misdemeanor conviction.  The government sought a sentence of 87 months, but the Court sentenced Mr. Pustis to probation.

- ***United States v. Flores**, 09-cr-60100 (AA) (D.OR July 22, 2010)*

Mr. Flores was sentenced to five years of probation in a case involving both the distribution and possession of child pornography.

- ***United States v. Applequist**, 09-cr-120 (JWS) (D. Alaska June 11, 2010)*

Mr. Applequist pled guilty to possession of child pornography.  His conduct involved multiple purchases relating to child pornographic material, including five purchases totaling

$484.00 within a two-month period.  Mr. Applequist was sentenced to a period of probation for five years.

• *United States v. Victor*, 08-cr-5821 (RJB) (W.D. Wash. January 29, 2010)

In this case, the court imposed a one-day time-served sentence in a possession of child pornography case where the guideline range was 121-151 months.  The government agreed to a downward variance of 14 levels, 8 levels of which were due to the following factors: 1) Mr. Victor's participation in a psychosexual evaluation; 2) the evaluator's assessment that there is a "low risk" that Mr. Victor will reoffend; and 3) Mr. Victor's weekly participation in treatment prior to sentencing.

• *United States v. Gonzalez*, 07-cr-328 (JCC) (W.D. Wash. March 27, 2009)

The Court imposed a one-day time-served sentence where defendant possessed thousands of images and was involved in trading images.

• *United States v. Connelly*, 17-cr-830 (JHR) (D.N.J. December 17, 2008)

Mr. Connelly pled guilty to possession of child pornography and he stipulated to various sentencing enhancements, including images of minors under the age of 12, sado-masochistic images, use of computer, and more than 600 images.  The court imposed a sentence of probation.

### F.  Need to Provide Restitution, § 3553(a)(7)

The PSR states that restitution in this case is mandatory.  *See* PSR at ¶ 157.  Mr. Johnson disagrees.  The statutes cited in the PSR as authority for the position that restitution is mandatory—*i.e.*, 18 U.S.C. §§ 2259(b)(2) and 3663A—do not support the PSR writer's position in Mr. Johnson's case.  18 U.S.C. § 2259 requires defendants "convicted of trafficking in child pornography" to pay restitution "in an amount to be determined by the court."  18 U.S.C. §

2259(b)(2).  Because, as discussed in detail above, Mr. Johnson was not convicted of "trafficking" child pornography, this statute does not apply to his case.  The PSR further cites to 18 U.S.C. § 2259(c)(3), which states that "'trafficking in child pornography' means conduct proscribed by section . . . 2252" as well as other specifically referenced sections in Chapter 110 of Title 18 of the United States Code.  Because § 2252 criminalizes a wide range of child pornography-related conduct, including merely the possession and receipt of child pornography, "trafficking child pornography" cannot possibly include all offenses proscribed by section 2252.  *See* 18 U.S.C. § 2252.  While some conduct covered by section 2252, such as distribution and selling child pornography, is the type of "trafficking child pornography" conduct for which mandatory restitution applies, other section 2252 conduct, such as possession, receipt, and the type of transportation that Mr. Johnson was convicted for, does not mandate restitution.  *Id*.

Mr. Johnson is also not required to pay restitution under 18 U.S.C. § 3663A.  Restitution is mandatory under § 3663A only for convictions for "a crime of violence," "an offense against property," offenses "relating to tampering with consumer products," and offenses "relating to theft of medical products."  18 U.S.C. § 3663A(c).  Because Mr. Johnson was not convicted of any of the type of offenses described in § 3663A(c), section 3663A's mandatory restitution provision does not apply in Mr. Johnson's case.

Although Mr. Johnson is not required to pay restitution, this Court has discretionary authority to order restitution in this case based upon the offenses of conviction.  *See* 18 U.S.C. § 3663(a)(1)(A) ("[t]he court, when sentencing a defendant convicted of an offense under [Title 18 and other specifically identified sections of other titles in the United States Code] *may* order . . . that the defendant make restitution to any victim of such offense") (emphasis added).

If the Court enters an order of restitution, that order must be based on the four images Mr. Johnson was convicted of transporting and possessing.  *See generally United States v. Pole*, 741 F.3d 120, 127-129 (D.C. Cir. 2013) (holding that the restitution order "suffers from a more fundamental defect" because "nothing in the record supports the government's assertion that the jury [through its verdict] or district judge actually found a scheme of such duration."); *see also United States v. Udo*, 795 F.3d 24, 33-34 (D.C. Cir. 2015) (citing *Hughey v. United States*, 495 U.S. 411, 413 (1990) (holding that Congress "authorize[d] an award of restitution only for the loss caused by the specific conduct that is the basis of the offense of conviction")).  And, in determining the proper amount of any restitution Mr. Johnson should pay, restitution "shall be based on the amount of public harm caused by the offense."  18 U.S.C. § 3663(c)(2)(A).[42]

Whether evaluating the amount of public harm caused by the instant offense or Mr. Johnson's relative role in the causal process that underlies any identifiable victim's losses, a relatively low amount of restitution is warranted.  The burden of demonstrating any amount of loss sustained by a victim, to be met by a preponderance of the evidence, is on the government. *See* 18 U.S.C. § 3664(e); *see also United States v. Bryson*, 485 F.3d 1205, 1208 (D.C. Cir. 2007) ("The Government must prove at sentencing that its proposed restitution figure is supported by a preponderance of the evidence.").  Mr. Johnson's relative role in the causal process was also minimal, even according to the government.  Mr. Johnson's offense conduct is limited to possessing child pornography on his computer and uploading it to his own Google Drive folder. He did not produce any child pornography; he did not advertise any child pornography; he did not distribute child pornography; and he did make his Google Drive folder available to anyone

---

[42] If restitution is ordered under section 2259's mandatory restitution provision, "the court shall order restitution in an amount that reflects the defendant's relative role in the causal process that underlies the victim's losses, but which is no less than $3,000." 18 U.S.C. § 2259(b)(2)(B).

else.  Under the government's allegations he was a passive consumer of five files containing

illicit material, two of which depicted the same video.  *See* ECF 115, 116, 138, and 166.

For these reasons, any restitution order should not exceed $3,000 per identifiable victim.

Because there are at most four separate identifiable victims in this case, the final order should not

exceed $12,000.

## IV.   FINANCIAL ABILITY TO PAY A FINE

Mr. Johnson's financial condition has changed drastically since he self-surrendered in

April of 2024.  The profitable business that he ran since 2018 was forced to abruptly shut down

due to his incarceration.  PSR at ¶¶ 110, 111.  Thus, as noted by the Probation Office, his

"business presently has no value."  *Id*. at ¶ 122.  His only other sources of income are interest on

his bank accounts, dividends from his stock holdings, and rent from a rental property.  *Id.* at ¶

123.

Without his business income, Mr. Johnson's expenses now vastly outpace his income,

and he will also likely pay restitution here.  The PSR writer noted that Mr. Johnson's most recent

tax return shows that expenses associated with his rental property were more than $30,000 higher

than the income he earned from his rental properties.  *Id.*  Those expenses, including utilities,

occasional repairs and other payments have only increased since.  He also incurs regular legal

fees, has two mortgages with a total balance of nearly two million dollars, as well as an auto loan

with a balance of $46,254.  *Id.* at ¶¶ 124, 125.  His credit card debt has also increased.  *Id.*  As

explained to the Probation Office in his Objections to the Draft Presentencing Report, Mr.

Johnson's negative cash flow every month is more than five thousand dollars and, at this rate, he

will eventually run out of his savings.  Put simply, he is unable to pay a fine.

## V.      CONCLUSION

For the above-mentioned reasons, and any others the Court finds just and proper, the

Court should impose a sentence of sixty months, to be followed by five years of supervised

release.

Dated: October 24, 2024                          Respectfully Submitted,

*/s/ Jonathan Jeffress*
Jonathan Jeffress (D.D.C. No. 479074)
Courtney R. Forrest (D.D.C. No. 996740)
Tony Miles (D.D.C. No. 484450)
Washington, D.C. 20005
Phone: (202) 640-2850
Fax: (202) 280-1034
jjeffress@kaiserlaw.com
cforrest@kaiserlaw.com
tmiles@kaiserlaw.com

*Counsel for Stephen Johnson*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 24th day of October 2024, the foregoing was served

electronically on the counsel of record through the U.S. District Court for the District of

Columbia Document Filing System (ECF) and the document is available on the ECF system.

*<u>/s/ Jonathan Jeffress</u>*
Jonathan Jeffress
